UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

L3HARRIS MARITIME SERVICES, INC.
f/k/a L-3 UNIDYNE, INC.,

                Plaintiff,

v.                                         Action No. 2:23cv259

BAE SYSTEMS NORFOLK SHIP REPAIR
INC.,

                Defendant.

**OPINION AND ORDER**

This matter comes before the Court on defendant's, BAE Systems Norfolk Ship Repair Inc. ("BAE"), partial motion to dismiss filed July 13, 2023. ECF No. 7. On September 22, 2023, this case was referred to the undersigned United States Magistrate Judge pursuant to both parties' consent in accordance with 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. ECF No. 29. For the reasons stated herein, BAE's motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**.

I.       **PROCEDURAL AND FACTUAL BACKGROUND**

Accepting the facts in the complaint as true for the purposes of this motion, plaintiff, L3Harris Maritime Services, Inc. ("L3Harris"), entered into a firm, fixed-price ("FFP") subcontract (the "subcontract") with BAE to provide ship repair services to the U.S.S. Vicksburg in exchange for $1,896,652.00. Compl. ¶¶ 1, 15, ECF No. 1. The subcontract between the parties was in support of BAE's prime contract with the U.S. Navy. *Id.* ¶ 1.

The subcontract incorporates three terms and conditions documents: (1) USGOVFFP 2017 ("General Terms and Conditions"); (2) USGOVA 2017 ("Subcontractor Flow-Downs");

and (3) SRAddendum 2017 ("Ship Repair Addendum"). *Id.* ¶ 16. Under the General Terms and Conditions, L3Harris was required to notify BAE in writing when L3Harris became aware of any difficulty in performing the subcontract's scope of work. *Id.* ¶ 17. Further, under the General Terms and Conditions, the parties agreed that any provision of the subcontract that is either "incorporated in full text or by reference from the Federal Acquisition Regulations ("FAR")," "incorporated in full or by reference from any agency regulation that implements or supplements the FAR," and/or "is substantially based on any such agency regulation or FAR provision," shall be construed and interpreted according to the U.S. federal common law of government contracts. *Id.* ¶ 19.

Through the Subcontractor Flow-Downs, the subcontract incorporates 48 C.F.R. § 52.243-1, the changes clause. *Id.* ¶ 18; *see* 48 C.F.R. § 52.243-1. However, the subcontract replaces paragraph (a) of the changes clause to state the following:

> BAE SYSTEMS Procurement Representative may at any time, by written order, and without notice to sureties, if any, direct changes within the general scope of this Contract in any one or more of the following: (i) technical requirements and descriptions, specifications, statement of work ("SOW"), drawings or designs; (ii) shipment or packing methods; (iii) place of delivery, inspection, or acceptance; (iv) reasonable adjustments in quantities or delivery schedules or both; (v) amount of BAE SYSTEMS furnished property; and (vi) if this Contract includes services: (x) description of services to be performed; (y) time of performance (e.g., hours of the day, days of the week, etc.); and (z) place of performance. SELLER shall comply immediately with such direction.

ECF No. 8-3, at 7. Additionally, paragraph (b) of the changes clause states that, "[i]f any such change causes an increase or decrease in the cost of, or the time required for, performance of any part of the work under this contract, . . . [BAE] shall make an equitable adjustment in the contract price, the delivery schedule, or both, and shall modify the contract." 48 C.F.R. § 52.243-1.

The subcontract also incorporates 48 C.F.R. § 52.249-14, excusable delays, which provides that a contractor shall not be in default because of a failure to perform if the failure arises from causes beyond the control and without the fault or negligence of the contractor. Compl. ¶ 25; 48 C.F.R. § 52.249-14. Examples of causes beyond the control of the contractor include acts of God and epidemics, among other causes. 48 C.F.R. § 52.249-14.

The subcontract required a Period of Performance ("PoP") of April 2018 until September 2018. Compl. ¶ 21. The PoP was formally extended several times throughout the course of performance through December 2019. *Id.* ¶ 22. Beginning in March 2020, L3Harris' performance of the subcontract was impacted by the COVID-19 pandemic. *Id.* ¶ 24. BAE directed L3Harris to continue performing the subcontract during the pandemic, however, causing L3Harris to incur additional costs resulting from COVID-19 testing, increased sick leave, protective measures, increase cleaning processes, and inefficiencies caused by social distancing. *Id.* ¶¶ 27–28. In total, L3Harris' costs increased by $863,315.45 for the period between March 12, 2020, and July 30, 2021, due to its continued performance during the COVID-19 pandemic. *Id.* ¶ 29.

Between December 2019 and August 2022, BAE engaged in acts and omissions that delayed or otherwise interfered with L3Harris' performance of the subcontract. *Id.* ¶ 30. In accordance with the General Terms and Conditions, L3Harris consistently documented these delays and interferences through the Conditions Found Report ("CFR") process, a shipyard industry standard method to document and seek compensation for events occurring beyond a contractor's control. *Id.* ¶ 31. For the acts and omissions by BAE at issue, L3Harris has submitted 228 CFR's, which can be divided into seven categories: (1) L3Harris' provision of out-of-scope structural support services to facilitate BAE's welding, grinding, and drilling; (2)

3

BAE-caused delays and disruptions resulting from BAE's failure to complete required structural support services; (3) rework caused by BAE or its third-party subcontractors; (4) other delays caused by BAE or its third-party subcontractors; (5) delays in receipt of materials BAE was required to provide, production delays, and delays in closing out work; (6) additional personnel costs resulting from the delays; and (7) management and administrative costs resulting from extended performance. *Id.* ¶ 35. On May 25, 2023, L3Harris submitted an additional CFR documenting costs associated with efforts to close out contract work items from November 2022 to April 2023. *Id.* ¶¶ 91–92. At the time the complaint was filed in June 2023, L3Harris was still performing the subcontract due to constructive changes by BAE that increased and delayed L3Harris' work. *Id.* ¶ 23.

On June 12, 2023, L3Harris filed a complaint seeking judgment against BAE, "[f]or all sums due for compensation of increased work beyond the scope of the Vicksburg Subcontract in an amount to be proven at trial, together with pre-judgment interest from the date of breach to the date of judgment, and post-judgment interest at the judgment rate until paid." *Id.* at 18. Specifically, L3Harris seeks $863,315.45 in COVID-19 pandemic related expenses, $4,607,111.40 in costs incurred as a result of BAE's constructive changes to L3Harris' performance, and $194,005.13 in costs for additional close out work. *Id.* ¶¶ 29, 39, 53, 63, 67, 72, 76, 83, 93. In total, L3Harris seeks $5,664,431.98 in compensation and interest, as well as attorneys' fees and costs. *Id.* at 17–18.

On July 13, 2023, BAE filed a partial motion to dismiss, along with an accompanying memorandum, arguing that L3Harris' claims for pandemic and delay-related expenses are not compensable under the subcontract because it was an FFP contract, meaning L3Harris bore the

4

risk that performance costs may be more than anticipated.  ECF Nos. 7–8.  L3Harris responded

on July 27, 2023, ECF No. 16, and BAE replied on August 2, 2023.  ECF No. 19.

## II.  <u>STANDARD OF REVIEW</u>

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss complaints, or claims

within complaints, upon which no relief can be granted. Fed. R. Civ. P. 12(b)(6); *Sonnier v.*

*Diamond Healthcare Corp.*, 114 F. Supp. 3d 349, 354 (E.D. Va. 2015).  In order to survive a

motion to dismiss, the complaint must contain "a short and plain statement of the claim showing

that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  This pleading standard requires that

the complaint state a claim for relief that is "plausible on its face." *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 570 (2007).  In essence, "[a] claim has facial plausibility when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Ascertaining whether

a complaint states a plausible claim for relief is a "context-specific task" that requires a court to

"draw on its judicial experience and common sense." *Id.* at 679.

A motion to dismiss pursuant to Rule 12(b)(6) challenges "the sufficiency of a complaint;

it does not resolve disputes over factual issues, the merits of a claim, or the applicability of a

defense." *SunTrust Mortg., Inc. v. Simmons First Nat'l Bank*, 861 F. Supp. 2d 733, 735 (E.D.

Va. 2012) (citing *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)).

Therefore, "[i]n ruling on a 12(b)(6) motion, a court 'must accept as true all of the factual

allegations contained in the complaint' and 'draw all reasonable inferences in favor of the

plaintiff.'" *Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cty., Md.*, 684 F.3d 462, 467

(4th Cir. 2012) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440

(4th Cir. 2011)).  The factual allegations, however, "cannot be mere speculation, and must

amount to more than 'a sheer possibility that a defendant has acted unlawfully.'" *Brach v. Conflict Kinetics Corp.*, 221 F. Supp. 3d 743, 747 (E.D. Va. 2016) (quoting *Iqbal*, 556 U.S. at 678). In addition, "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement fail to constitute well-pled facts for Rule 12(b)(6) purposes." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009) (citing *Iqbal*, 556 U.S. at 678).

On a motion to dismiss, a court may consider "documents sufficiently referred to in the complaint so long as the authenticity of these documents is not disputed." *Witthohn v. Federal Ins. Co.*, 164 F. App'x 395, 396–97 (4th Cir. 2006) (citing *Alternative Energy, Inc. v. St. Paul Fire and Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001)).

## III.   ANALYSIS

BAE argues that L3Harris' clams for pandemic-related and delay-related expenses should be dismissed because the changes clause, FAR 52.243-1(b), which L3Harris bases its entitlement to relief for all categories of damages on, only entitles L3Harris to reimbursement where BAE ordered changes to L3Harris' scope of work. Mem. in Supp. of Def.'s Part. Mot. to Dismiss ("Def.'s Mem.") ECF No. 8, at 3. This is due, BAE maintains, to the subcontract being an FFP contract, which places the burden of increased costs of performance on the subcontractor, rather than the prime contractor. *Id.* at 8. Therefore, because these categories of damages "relate to alleged delays, not to scope changes," BAE contends they are not compensable under the subcontract's changes clause. *Id.* at 4.

"The essence of a firm fixed-price contract is that the contractor, not the government, assumes the risk of unexpected costs." *Lakeshore Eng'g Servs., Inc. v. United States*, 748 F.3d 1341, 1347 (Fed. Cir. 2014) (citing *United States v. Spearin*, 248 U.S. 132, 136 (1918)); 48

6

C.F.R. § 16.202-1. As fixed-price contracts do not contain provisions for varying the price of the contract in light of unanticipated circumstances, "they assign the risk to the contractor that the actual cost of performance will be higher than the price of the contract." *Dalton v. Cessna Aircraft Co.*, 98 F.3d 1298, 1305 (Fed. Cir. 1996). The awarded contractor, by willingly bidding on and signing a FFP contract, therefore assumes any associated risk of performance. *PCL Const. Servs., Inc. v. United States*, 47 Fed. Cl. 745, 808 (2000). Accordingly, FPP contracts place maximum incentive on the contractor, or sub-contractor, to efficiently complete the required work while keeping costs to a minimum. *Dalton*, 98 F.3d at 1304 (citing 48 C.F.R. § 16.202-1).

L3Harris acknowledges that the subcontract is a FFP contract. Compl. ¶ 15. In spite of this, L3Harris asserts: (1) that the COVID-19 pandemic constituted an excusable delay of performance under the subcontract, thus entitling L3Harris to compensation under a constructive acceleration change theory for increased costs incurred at BAE's direction to continue performing; and (2) that the BAE-caused delays amounted to constructive changes of the subcontracts' terms, entitling L3Harris to additional compensation for the increased costs associated with the delay. Pl.'s Mem. in Opp. ("Pl.'s Opp."), ECF No. 16, at 5, 7. Although both claims rely on the changes clause of the subcontract, FAR § 52.243-1, because the pandemic-related expenses and delay-related expenses rest on different theories of recovery, the Court will address each in turn.[1]

---

[1] "Legal scholars have recognized five distinct types of constructive changes: (I) disputes over contract interpretation during the course of performance; (II) government interference or failure to cooperate; (III) defective specifications; (IV) misrepresentation and nondisclosure of superior knowledge; and (V) acceleration." *Miller Elevator Co., Inc. v. United States*, 30 Fed. Cl. 662, 678 (1994). L3Harris' COVID-19 pandemic-related claim is an acceleration change, while its delay-related claims evidence a government interference-type change.

## A.     L3Harris' Claim for COVID-19 Pandemic-Related Expenses.

BAE seeks dismissal of L3Harris' claim for COVID-19 related expenses on the grounds

that these costs were incurred in the course of performing L3Harris' existing contractual

obligations, and therefore did not constitute changes to the scope of the subcontract. Def.'s

Mem. at 8–9; Def.'s Reply Mem. ("Def.'s Reply"), ECF No. 19, at 2. In response, L3Harris

contends that the complaint sufficiently pleads the elements of a constructive acceleration

change, which it asserts is compensable under the changes clause of the subcontract. Pl.'s Opp.

at 5.

Constructive acceleration is a recognized form of constructive change that occurs when

the government orders work to continue in an attempt to complete performance earlier than

expected. *Ace Constructors, Inc. v. United States*, 70 Fed. Cl. 253, 280 (2006), *aff'd*, 499 F.3d

1357 (Fed. Cir. 2007) (citing John Cibinic and Ralph Nash, *Administration of Government*

*Contracts* 450 (3d ed. 1995). Stated differently, constructive acceleration occurs when the

government requires compliance with an original deadline, despite excusable delay being

present. *Nova Grp./Tutor-Saliba v. United States*, 159 Fed. Cl. 1, 51 (2022) (citing *Zafer*

*Taahhut Insaat ve Ticaret A.S. v. United States*, 833 F.3d 1356, 1362 (Fed. Cir. 2016)). The

Federal Circuit has held that in order to set forth a claim of constructive acceleration, the

following elements must generally be pled:

> (1) that the contractor encountered a delay that is excusable under the contract; (2)
> that the contractor made a timely and sufficient request for an extension of the
> contract schedule; (3) that the government denied the contractor's request for an
> extension or failed to act on it within a reasonable time; (4) that the government
> insisted on completion of the contract within a period shorter than the period to
> which the contractor would be entitled by taking into account the period of
> excusable delay, after which the contractor notified the government that it
> regarded the alleged order to accelerate as a constructive change in the contract;
> and (5) that the contractor was required to expend extra resources to compensate
> for the lost time and remain on schedule.

*Fraser Constr. Co. v. United States*, 384 F.3d 1354, 1361 (Fed. Cir. 2004).

Importantly, the Federal Circuit has approved "different formulations" of the constructive acceleration elements, so long as the "essential elements," excusable delay, an acceleration order, and acceleration with associated costs, are present. *Id.* (citing *Norair Eng'g Corp. v. United States*, 666 F.2d 546, 548 (Ct. Cl. 1981)). Therefore, it is well settled that an order to accelerate need not be specific, and "even an expression of concern about lagging progress, may have the same effect as an order." *Norair Eng'g Corp.*, 666 F.2d at 549.

In its complaint, L3Harris alleges that: (1) its performance of the subcontract was impacted by the COVID-19 pandemic beginning in March 2020, Compl. ¶ 24; (2) under the excusable delays clause, 48 C.F.R. § 52.249-14, which the parties incorporated into the subcontract, the COVID-19 pandemic qualified as an excusable delay, *id.* ¶¶ 25–26; (3) BAE directed L3Harris, "to continue performing the Vicksburg subcontract during the COVID-19 pandemic," *id.* ¶ 27; and (4) L3Harris incurred $863,315.45 in increased costs due to "BAE's direction for L3Harris to continue performance during the COVID-19 pandemic." *Id.* ¶¶ 28–29.

L3Harris has alleged sufficient facts to survive BAE's motion to dismiss. The complaint adequately alleges that the COVID-19 pandemic constituted an excusable delay under 48 C.F.R. § 52.249-14, that BAE's direction that L3Harris continue performing the subcontract during the pandemic amounted to a constructive acceleration order under the changes clause, and that L3Harris' continued performance resulted in increased expenses. *Id.* ¶¶ 24–29. Accordingly, the complaint sufficiently pleads facts to state a constructive acceleration claim. *See Norair Eng'g Corp.*, 666 F.2d at 548 (holding that excusable delay, an acceleration order, and acceleration with associated costs are the key elements that must be present to assert a claim for constructive acceleration).

9

BAE argues that the complaint fails to allege that BAE required L3Harris to meet its original schedule, and therefore L3Harris has failed to meet the pleading requirements for a constructive acceleration claim. Def.'s Reply at 3. To support this argument, BAE contends that a constructive acceleration claim "requires a showing that the government required the contractor (or the prime contractor required the subcontractor) to meet the original delivery schedule in spite of excusable delays." *Id.* at 3 (citing *Nova Grp.*, 159 Fed. Cl. at 51). Further, BAE contends that L3Harris "seeks to distort the pleadings requirements for constructive acceleration," arguing that L3Harris must prove that BAE "required" it to meet the original work schedule, rather than merely alleging an order or implied order to perform in the face of an excusable delay. Def.'s Reply at 3. Due to this discrepancy, BAE contends, the constructive acceleration claim cannot stand. *Id.*

The Federal Circuit has made apparent, however, that any pressure by the government to continue performance through excusable delay, "even if it were merely implicit," is sufficient to constitute an acceleration order. *See Ace Constructors, Inc.*, 70 Fed. Cl. at 281 (quoting *Norair Eng'g Corp.*, 666 F.2d at 549) (holding that, after the government and the contractor had discussed the possibility of a time extension, the government's subsequent "refusal to grant an extension while keeping the original deadlines in place effectively constituted an order for constructive acceleration"). In *Ace Constructors, Inc. v. United States*, 70 Fed. Cl. 253 (2006), the Federal Circuit affirmed a lower court decision holding that any "statement or act by the government that can be construed as an acceleration order," is sufficient to sustain a constructive acceleration claim. *Id.* at 280, *aff'd*, 499 F.3d 1357 (holding the other elements to be excusable delay, government knowledge of the delay, notice by the contractor to the government that the order is a constructive change, and incurrence of costs as a result). Moreover, *Nova*

*Group/Tutor-Saliba v. United States*, 159 Fed. Cl. 1 (2022), which BAE cites to support its contention that L3Harris must "allege that BAE Systems required L3Harris to meet its original schedule," recognizes that "different formulations" are acceptable in setting forth the constructive acceleration elements. *Id.* at 51 (citing *Fraser*, 384 F.3d at 1361); Def.'s Reply at 3. L3Harris sufficiently alleges and the complaint permits the reasonable inference that BAE directed L3Harris to perform within the existing contract schedule, despite excusable delay, and L3Harris incurred increased costs as a result.[2] *See id.*; Compl. ¶ 27.  BAE's motion to dismiss is therefore denied as to L3Harris' claim for COVID-19 pandemic-related expenses.

**B.      L3Harris' Claims for Delay-Related Expenses.**

BAE also seeks dismissal of five of the seven categories of claims that L3Harris alleges constituted constructive changes to the scope of L3Harris' work under the subcontract.  Def.'s Mem. at 3, 7–10.  Specifically, BAE seeks to dismiss L3Harris' claims for:  (1) delays caused by BAE's failure to perform structural support services; (2) delays caused by BAE and BAE's third-party subcontractors; (3) delays in delivery of materials BAE was required to provide to L3Harris and other production delays; (4) additional personnel costs resulting from BAE delays; and (5) management and administrative extension costs. *Id.* at 3; (referencing Compl. ¶¶ 44–54, 64–83, 85, 89–90).

The purpose of an equitable adjustment is "to keep a contractor whole when the Government modifies a contract." *Bruce Const. Corp. v. United States*, 163 Ct. Cl. 97, 100

_____

[2] BAE also points out that the subcontract incorporates paragraph 216 of the Ship Repair Addendum, which states that L3Harris is, "[s]olely responsible for the safe conduct of its employees and subcontractors while performing the Work required under this Order."  Def.'s Mem. at 5 (citing ECF No. 8-2, at 3).  BAE argues that because the subcontract required L3Harris to cover the health and safety costs of its personnel, the COVID-19 expenses do not qualify as changes in the scope of the subcontract. Def.'s Reply at 4.  Inasmuch as L3Harris has presently alleged sufficient facts to support its constructive acceleration claim, the impact, if any, of BAE's argument on L3Harris' pandemic-related claim must await development of the facts.

(1963). When a contractor performs work beyond the contract requirements at the government's direction, without a formal or informal order by the government under the changes clause to do so, the situation is treated as a constructive change to the contract, and the contractor is entitled to an equitable adjustment. *The Redland Co., v. United States*, 97 Fed. Cl. 736, 755 (2011) (citing *Int'l Data Prods. Corp. v. United States*, 492 F.3d 1317, 1325 (Fed. Cir. 2007). "'Thus, if the Government either expressly or impliedly ordered work outside the scope of the contract, or if the government otherwise caused the contractor to incur additional work, a constructive change arises for that work performed outside of the scope of the contract.'" *E. Coast Repair & Fabrication, LLC v. United States*, 199 F. Supp. 3d 1006, 1028 (E.D. Va. 2016) (quoting *Miller Elevator*, 30 Fed. Cl. at 678).

However, while changes to the scope of work to be performed under a contract are compensable under the changes clause, damages for delay are remediable only under the suspension of work clause. *Triax-Pacific v. Stone*, 958 F.2d 351, 354 (Fed. Cir. 1992) (holding that "the Suspension clause contemplates equitable adjustments for unreasonable delays in the performance of the contract").

The subcontract incorporates a changes clause, 48 C.F.R. § 52.243-1; ECF No. 8-3, at 7, but does not include a suspension of work clause. *See* ECF No. 8-3. Therefore, L3Harris' delay-related claims are contingent on whether the complaint adequately alleges that BAE's conduct amounted to a constructive change in the work L3Harris contracted to perform under the subcontract.

The five "constructive contract change" claims that BAE moves to dismiss do not actually involve changes to L3Harris' scope of work under the subcontract, but instead allege damages as a result of delays caused by BAE. Compl. ¶¶ 44–54, 64–83. Under constructive

contract change 2, L3Harris alleges that "a significant portion of L3Harris' work . . . could only be performed after BAE completed these structural support services." *Id.* ¶ 46. As a result, L3Harris states that it had to delay its own performance, ultimately resulting in costs due to the delays and inefficiencies in performance. *Id.* ¶¶ 47–48. Similarly, in constructive contract change 4, L3Harris alleges that BAE, and/or its third party contractors, committed six significant acts or omissions that caused L3Harris to encounter delays and incur associated costs.[3] *Id.* ¶ 65. In constructive contract change 5, L3Harris alleges that BAE's delay in delivering materials, failure to timely complete area closeouts, and production delays resulted in corresponding delays to L3Harris that caused it to incur additional costs. *Id.* ¶¶ 68–70. Lastly, in constructive contract changes 6–7, L3Harris alleges that these BAE-caused delays resulted in L3Harris incurring additional personnel costs and requiring additional management and administrative effort to complete performance. *Id.* ¶¶ 73–83.

Although each of these claims alleges facts sufficient to demonstrate that BAE's conduct delayed L3Harris' performance, none adequately alleges that L3Harris' scope of work under the subcontract was ever changed. *See id.* ¶¶ 44–54, 64–83. Although L3Harris asserts that the alleged delays extended the period of performance from seven months to over five years, L3Harris does not allege that BAE's delays required it to perform work beyond the scope of the subcontract, nor that BAE ever explicitly or implicitly directed L3Harris to do the same. *See id.* As direction by the prime contractor and performance of work outside the scope of the subcontract are each required to sustain a constructive change claim, L3Harris' claims for delay-

---

[3] These acts or omissions included undocking a vessel, losing power on the job site, temporarily evacuating on-site personnel due to toxic fumes, failing to complete "DAU 8A" staging, and failing to make the job-site available both when the Machine Control System – Integrated Bridge System ("MCS-IBS") room was locked, as well as when L3Harris personnel were required to evacuate due to a fire on board the vessel. Compl. ¶ 65.

related expenses are not compensable under the changes clause. *Miller Elevator*, 30 Fed. Cl. at 679.

Notwithstanding Federal Circuit precedent, L3Harris argues that prime contractor-caused delays constitute compensable changes under the changes clause. Pl.'s Opp. at 7. In support of this theory, L3Harris first cites *East Coast Repair & Fabrication, LLC, v. United States*, 199 F. Supp. 3d 1006 (E.D. Va. 2016), arguing that this Court found "that the government constructively changed the contract by causing unreasonable delays to performance." Pl.'s Opp. at 7 (citing *E. Coast Repair*, 199 F. Supp. 3d at 1021). L3Harris misinterprets the analysis, however, which found not that a delay to performance constituted a constructive change, but that the government had constructively changed the agreement by dictating a new method of performance after the contract had already been negotiated and finalized. *E. Coast Repair*, 199 F. Supp. 3d at 1035–36. Therefore, the contractor was entitled to an equitable adjustment "based on the Government's expansion of the scope of work and subsequent refusal to provide [the contractor] with 'fair and reasonable' compensation for such additional work," rather than purely based on delay. *Id.* at 1043.

L3Harris further contends that BAE's argument that delays cannot constitute constructive changes has been rejected and that "government-caused delay 'fits squarely within a governmental-interference type of constructive change.'" Pl.'s Opp. at 8 (quoting *Metric. Const. Co., v. United States*, 81 Fed. Cl. 804, 819 (2008)). This contention misses the mark. In *Metric Construction v. United States*, 81 Fed. Cl. 804 (2008), the court found that the government's requiring the contractor to land its barge on a pontoon, rather than the beach, constituted a constructive change to the relevant contract that hindered the contractor's performance. *Id.* at 819. This finding of a change in scope of work is distinguishable from L3Harris' claim that

14

BAE's delays amounted to a constructive change to the subcontract. Pl.'s Opp. at 7–8. The *Metric Construction* court emphasized the discrepancy between the two scenarios, stating that "[a]lthough witnesses at trial and plaintiff's briefs used the word 'delay' when discussing the pontoon claim and the results of the pontoon installation, . . . these references do not make Metric's pontoon claim a delay claim." 81 Fed. Cl. at 819 (citing *Ets-Hokin Corp., v. United States*, 190 Ct. Cl. 668, 673–74 (1970)). Accordingly, L3Harris' attempt to transform a delay claim into a constructive change claim fails.

Citing another Court of Federal Claims case, L3Harris further argues "that the government's inaction in responding to the contractor's requests for information caused unreasonable delays, thereby constructively changing the contract." Pl.'s Opp. at 7 (citing *Fireman's Fund Ins. Co. v. United States*, 92 Fed. Cl. 598, 678 (2010)). This argument fails, as well, as *Fireman's Fund Insurance Co. v. United States,* 92 Fed. Cl. 598 (2010), held that the government's "unreasonably delayed response to RFI 787 constituted a breach of its implied duty of good faith and fair dealing," rather than holding that the government's delay constructively changed the contract. *Id.* at 679 (citing *Malone v. United States*, 849 F.2d 1441, 1445 (Fed. Cir. 1988) (noting that government-caused delay that hindered contractor performance violated the implied duty of good faith and fair dealing)). Similarly, L3Harris' cite to *Hoffman v. United States*, 166 Ct. Cl. 39 (1964), does not aid its claim, as there the court held that acts of a subcontractor amounted to a violation of the changed conditions clause of the contract, which in turn led to the modification of plaintiff's contract. *Id.* at 49.

Finally, the Board of Contract Appeals cases that L3Harris cites are also unpersuasive, as they do not support the contention that delay-related claims are compensable under the changes clause as a constructive change. *See Oliver's Landscape*, ASBCA No. 23488, 80-1 BCA ¶

14,320 (concluding that the government required the contractor to submit daily work verification forms that were not contract requirements); *see also Gramercy Contractors, Inc.*, GSBCA No. 6495, 83-2 BCA ¶ 16,825 (making no mention of the changes clause, nor whether delays were compensable under it as constructive changes); *see also In re R. W. Jones Const., Inc.*, 99-1 BCA ¶ 30268 (holding that the government's arbitrary contract administration violated the implied duty to cooperate, which amounted to a constructive change under the changes clause, as opposed to a delay in itself amounting to a constructive change).

L3Harris' complaint fails to allege that constructive change claims 2, 4, 5, 6, and 7 are based on changes to the scope of work it was required to perform under the subcontract, as opposed to being merely based on alleged delays. Compl. ¶¶ 44–54, 64–83. As delay-related claims are not compensable under the changes clause of the subcontract, these claims are dismissed.

### IV.    CONCLUSION

For the foregoing reasons, BAE's motion to dismiss, ECF No. 7, is **GRANTED IN PART** and **DENIED IN PART**.

_____
Robert J. Krask
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
October 26, 2023

16