# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

L3HARRIS MARITIME SERVICES, INC.
f/k/a L-3 UNIDYNE, INC.,

**REDACTED COPY**

Plaintiff,

v.

Action No. 2:23cv259

BAE SYSTEMS NORFOLK SHIP REPAIR
INC.,

Defendant.

## OPINION AND ORDER

This matter is before the Court to resolve claims arising from the alleged breach of a subcontract. Following a four-day bench trial, the parties submitted proposed findings of fact and conclusions of law, and the matter is now ripe for adjudication. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court's findings of fact and conclusions of law are set forth below. The Court finds for plaintiff and awards damages on count I. As for counts II, IV, and V, the Court concludes plaintiff has failed to establish entitlement to an equitable adjustment or a breach of contract, and/or failed to prove its damages.

## I.    BACKGROUND FINDINGS OF FACT

This action involves contract disputes arising out of a firm, fixed-price subcontract (the "subcontract") between plaintiff, L3Harris Maritime Services, Inc. ("L3Harris"), and defendant, BAE Systems Norfolk Ship Repair Inc. ("BAE"), to provide ship repair services to the U.S.S. Vicksburg ("Vicksburg") in exchange for $1,896,652.00. Am. Compl. ("Am. Compl."), ECF No.

51, ¶¶ 1, 15–16. The subcontract was in support of BAE's prime contract with the U.S. Navy.[1] *Id.* ¶ 1. L3Harris seeks to recover damages for breach of contract in four counts: (1) count I – constructive acceleration during an excusable delay; (2) count II – constructive change for the performance of out-of-scope work; (3) count IV – breach of performance obligations; and (4) count V – breach of implied contractual duties. Am. Compl. 16–22.

## A.     General Background[2]

L3Harris is a Delaware corporation that has its principal place of business in Florida. Ct.'s Ex. 1, ¶ 1. BAE is a Virginia corporation with its principal place of business in Norfolk, Virginia. *Id.* ¶ 2. BAE operates a full-service ship repair facility in which it primarily services contracts with the U.S. Navy. *Id.*

On November 20, 2017, BAE issued a Request for Quotation, "USS Vicksburg (CG 69) Solicitation No. N50054-18-R-6004" ("RFQ"), soliciting quotations from subcontractors for certain ship repair services for primarily electrical work to be performed on the Vicksburg. *Id.* ¶ 3. The RFQ required subcontractors to list their exceptions for each work item in their quotation. *Id.* ¶ 4. On December 13, 2017, L3Harris submitted its Quotation for Services ("Quote") in response to the RFQ. *Id.* ¶ 6. L3Harris took exception to performing welding, grinding, and burning, among other services, meaning that L3Harris would not be responsible for accomplishing that work. *Id.* ¶¶ 7–12. On March 27, 2018, BAE issued Purchase Order 51P65821 (the "Purchase Order") identifying L3Harris as the vendor. *Id.* ¶¶ 14–15.

---

[1] The contracting authority responsible for administering the prime contract is the Mid-Atlantic Regional Maintenance Center ("MARMC"). Trial Tr. Day 4, ECF No. 174, at 224:17–225:4. As BAE's prime contract was to remobilize the Vicksburg, a U.S. naval vessel, the Court will refer to the prime contract customer as the U.S. Navy.

[2] The facts below are gathered primarily from the parties' joint stipulation. Court's Exhibit 1 ("Ct.'s Ex. 1"), ECF No. 165.

**B.     Selected Subcontract Terms**

The Purchase Order expressly incorporates:  (a) USGOVFFP 2017 ("General Terms and Conditions"); (b) USGOVA 2017 ("Subcontractor Flow-Downs"); and (c) SRAddendum 2017 ("Ship Repair Addendum"). *Id.* ¶ 15.  The subcontract is a binding agreement between L3Harris and BAE, signed by representatives of both parties. *Id.* ¶¶ 16–17.

The subcontract reflected the exceptions L3Harris took in its Quote. *Id.* ¶ 18.  L3Harris' statement of work was delineated through line items of the Purchase Order that identify the specification items ("spec items"), and reference paragraphs within those spec items that the parties agreed L3Harris would perform. *Id.* ¶¶ 24–25.  These spec items were identical to those in BAE's prime contract with the U.S. Navy, and they identified tasks required to be performed by L3Harris as part of the modernization of the Vicksburg. *Id.* ¶ 20.

Under the subcontract's choice of law provision, "all matters arising from or related to [the subcontract] shall be governed by and construed in accordance with the law of the State from which this Contract was issued, excluding its choice of law rules, except that any provision in this Contract that is (i) incorporated in full text or by reference from the Federal Acquisition Regulations ("FAR"); and/or (ii) incorporated in full text or by reference from any agency regulation that implements or supplements the FAR; and/or (iii) that is substantially based on any such agency regulation or FAR provision, shall be construed and interpreted according to the U.S. federal common law of government contracts as enunciated and applied by U.S. federal judicial bodies, boards of contract appeals, and quasi-judicial agencies of the U.S. federal Government." *Id.* ¶ 31; Plaintiff's Exhibit ("Pl.'s Ex.") 1, § 17(a).

The subcontract was issued in the Commonwealth of Virginia.  Ct.'s Ex. 1, ¶ 32; Pl.'s Ex. 4.  It contains an order of precedence provision providing that "[a]ny inconsistencies in this

Contract shall be resolved in accordance with the following descending order of precedence: (1) face of the Purchase Order; . . . (4) any supplemental terms and conditions incorporated by reference under provision 14; [and] (5) these terms and conditions." Ct.'s Ex. 1, ¶ 33; Pl.'s Ex. 1, § 3.

Through the Subcontractor Flow-Downs, the subcontract incorporated FAR § 52.243-1, the changes clause. Ct.'s Ex. 1, ¶ 35; 48 C.F.R. § 52.243-1.[3] The subcontract further incorporates the default clause (fixed-price supply and service) at FAR § 52.249-8. Ct.'s Ex. 1, ¶ 43.

Section 4(a) of the subcontract's General Terms and Conditions also contains a changes clause, stating "[o]nly the BAE Systems Procurement Representative has authority to make changes in, to amend, or to modify this [subcontract] on behalf of BAE []. [L3Harris] shall not implement any changes or modifications to this [subcontract] (including contract specifications and quality control provisions) without first having received written authorization to do so from BAE['s] Procurement Representative." Pl.'s Ex. 1, § 4(a).

Section 4(f) of the General Terms and Conditions further states that "[o]nly BAE ['s] Procurement Representative shall have the authority to direct or authorize changes or modifications to this contract," and section 4(g) states that "BAE [] shall not be liable for any of [L3Harris'] increased costs of performance that result from [L3Harris'] implementation of changes or modifications that BAE['s] procurement representative did not first approve in writing." *Id.* § 4(f), (g).

Section 222 of the subcontract's Ship Repair Addendum states "[i]f any change shall have resulted or derived in any way from an act or omission or formal or constructive order by [the

---

[3] The FAR consists of provisions that are required to be incorporated into government contracts based on the type of contract at issue. *See* Pl.'s Ex. 3, at 1. The citations for the FAR clauses referenced in this opinion can be found in the Code of Federal Regulations ("CFR").

4

government], [L3Harris'] right to equitable adjustment shall be contingent on, and the amount thereof shall be determined in accordance with the following:  (a) [L3Harris] shall have provided to [BAE] written notice of the facts giving rise to such change and shall have done so in time and in form sufficient to enable [BAE] to provide [the U.S. Navy] notice sufficient to protect [BAE]'s right to equitable adjustment under [BAE]'s prime contract; (b) [BAE] shall be liable to [L3Harris] only to the extent that [the U.S. Navy] accepts liability or is determined to be liable therefore; (c) The amount of [L3Harris'] equitable adjustment, if any, shall not exceed that allowed or awarded to [BAE] from [the U.S. Navy], less any profit or costs, or both, to which [BAE] is entitled." Pl.'s Ex. 2, § 222.

Section 216 of the subcontract's Ship Repair Addendum states "[L3Harris] shall be solely responsible for the safe conduct of its employees and subcontractors while performing the Work required under this Order.  [L3Harris] shall comply with all applicable federal, state, and local health, safety and fire protection laws and regulations.  [L3Harris] shall also comply with BAE['s] safety policies and procedures." *Id.* § 216.

Section 16(a) of the General Terms and Conditions provides that, "[L3Harris] assumes full responsibility for the actions and supervision of [] personnel while engaged in Work under this Contract.  BAE [] assumes no liability for [L3Harris] personnel." Pl.'s Ex. 1, § 16(a).  The subcontract requires L3Harris to submit conditions found reports ("CFRs") when L3Harris encountered a condition, delay, or interference that affected its ability to perform. Ct.'s Ex. 1, ¶ 46.

Section 24 of the subcontract's General Terms and Conditions states "(a) [L3Harris'] timely performance is a critical element of this Contract[;] . . . (c) If [L3Harris] becomes aware of

difficulty in performing the Work, [L3Harris] shall timely notify BAE [], in writing, giving pertinent details. This notification shall not change any delivery schedule." Pl.'s Ex. 1, § 24.

The subcontract specified an initial period of performance through September 28, 2018. Ct.'s Ex. 1, ¶ 50. The subcontract's period of performance was formally extended through December 4, 2019. *Id.* ¶ 51. Work continued on the Vicksburg until August 23, 2023, and this work included L3Harris' performance of the subcontract. *Id.* ¶ 52. L3Harris did not incur any penalty, sanction, or other formal consequences for the completion of work after the contractually-specified expiration of the period of performance of December 4, 2019. *Id.* ¶ 54.

The Purchase Order states that the "availability or period of performance listed on this order are approximate and subject to change based on key events, milestones and ongoing movement of production schedule. [L3Harris] must contact the BAE [] ship superintendent for the daily plan of the day. It is the [L3Harris'] responsibility to remain compliant with schedule, any updated schedule, NAVSEA[4] [standard items], and milestones based on daily production meetings. Equitable adjustment of schedule and/or cost will only be considered with actual scope changes." Pl.'s Ex. 4, at 1.

Section 210 of the subcontract's Ship Repair Addendum states "[i]t is agreed that time is of the essence in performance of any Order incorporating these terms and conditions. Commencement and completion of Work or delivery of the goods ordered shall be strictly in accordance with the times set forth on the face of the Order, or, if no time is there set forth, in accordance with the requirements of BAE['s] prime contract. If requested by BAE [], [L3Harris] shall submit to BAE [], in the form acceptable to BAE [], a detailed schedule for performance of the Order which schedule will comply with all schedule requirements of BAE[s'] prime contract.

---

[4] "NAVSEA" refers to the Naval Sea Systems Command.

6

If the Order requires shipboard Work, [L3Harris] shall, at no additional cost to BAE [], coordinate its Work with that being performed by BAE [], other subcontractors of BAE [], and by [the U.S. Navy]." Pl.'s Ex. 2, § 210.

Section 33(a) of the subcontract's General Terms and Conditions, states, in part, that "BAE [] may provide to [L3Harris] property owned by either BAE [] or its Customer (Furnished Property), or require [L3Harris] to acquire property to be used specifically for Work under this Contract (Acquired Property)." Pl.'s Ex. 1, § 33(a).

The subcontract incorporates the government property clause at FAR § 52.245-1 and provides that "Government" means "BAE Systems" for paragraph (d)(1) of that clause. Ct.'s Ex. 1, ¶ 84. Section 33(e) of the subcontract's General Terms and Conditions states "[t]he Government Property clause (52.245-1) . . . shall apply in lieu of subparagraphs (a) (b) and (d) above with respect to Government-furnished property, or property to which the Government may take title under this Contract." Pl.'s Ex. 1, ¶ 33(e).

The Purchase Order states that "BAE-NSR takes exception to all materials" in all but two of the line items, which do not require any materials to be provided. Pl.'s Ex. 4; Ct.'s Ex. 1, ¶ 85.

## C.    Change Order 36

From the start of the availability until August 2019, L3Harris submitted a series of CFRs to BAE, as well as a request for equitable adjustment ("REA") for costs incurred in relation to several CFRs. Ct.'s Ex. 1, ¶¶ 57–58. On August 23, 2019, the parties executed change order 36 to add line 69 to the Purchase Order, which settled all L3Harris claims against BAE through August 30, 2019. Defendant's Exhibit ("Def.'s Ex.") 1, at 1; Ct.'s Ex. 1, ¶ 67. The Court granted, in part, BAE's motion in limine #4, precluding L3Harris from introducing certain evidence relating to change order 36 at trial, pursuant to Rule 408 of the Federal Rules of Evidence. ECF No. 163.

**D.    Additional Facts Relevant to L3Harris' Claims**

On or around June 13, 2021, BAE undocked the Vicksburg. Ct.'s Ex. 1, ¶ 74. During the undocking, and for several days before the undocking, no hot work, such as welding, grinding, and burning, could be performed on the vessel. *Id.* ¶ 75. On July 1, 2021, BAE [] lost power on the job site, which L3Harris documented in CFR 334C. *Id.* ¶ 77. On June 23, 2021, a toxic fume alarm aboard the Vicksburg required temporary evacuation of the ship, which L3Harris documented in CFR 335C. *Id.* ¶ 78. On August 26, 2021, a fire on the Vicksburg required temporary evacuation of certain portions of the ship, which L3Harris documented in CFR 362C. *Id.* ¶ 79. On July 21, 2021, L3Harris submitted CFR 340C, which documented a condition relating to data acquisition unit ("DAU") 8A staging. *Id.* ¶ 80. In the summer of 2021, L3Harris submitted CFR 358C, which documented a certain cabinet being locked on board the Vicksburg. *Id.* ¶ 81.

BAE received and distributed government-furnished material ("GFM") required for the performance of the subcontract from a BAE-owned warehouse. *Id.* ¶ 86. L3Harris submitted numerous CFRs to BAE relating to alleged out-of-scope structural support work, BAE-caused delays, missing or damaged GFM, equipment interferences, production delays, administrative and management costs, COVID-19 costs, and close-out costs. *Id.* ¶¶ 71, 73, 87, 90, 95, 97, 106.

Despite emergency precautions by state and national authorities due to the COVID-19 pandemic, work continued on the Vicksburg as the government deemed such work to be an "essential service." *Id.* ¶¶ 92–93. Starting around April 2020, both BAE and L3Harris implemented health and safety measures to reduce the spread of COVID-19, as required by the U.S. Navy and/or federal, state, or local laws and protocols. *Id.* ¶ 94. The U.S. Navy denied both L3Harris and BAE's requests for compensation for costs incurred as a result of complying with COVID-19 health and safety protocols. *Id.* ¶¶ 100–01, 104–05.

8

## II.   LEGAL STANDARDS APPLICABLE TO BURDEN OF PROOF AND DAMAGES

Although L3Harris seeks damages in each count under a breach of contract theory, it does so in counts I and II pursuant to the subcontract's changes clause, while counts IV and V are pursuant to traditional common law breach of contract.[5]  *See* Am. Compl.  Compensation pursuant to the changes clause comes in the form of an equitable adjustment, which L3Harris bears the burden of proving, by a preponderance of the evidence, that it is entitled to pursuant to the subcontract. *E. Coast Repair  & Fabrication, LLC v. United States*, 199 F. Supp. 3d 1006, 1027 (E.D. Va. 2016).  L3Harris "must make a showing as to each element, liability, causation, and injury, by a preponderance of the evidence." *Delhur Indus., Inc. v. United States*, 95 Fed. Cl. 446, 454 (2010); *accord Servidone Constr. Corp. v. United States*, 931 F.2d 860, 861 (Fed. Cir. 1991).  Moreover, for equitable adjustment claims pursuant to the changes clause, the contractor is entitled to "increased costs which were the direct and necessary result of the change or changed conditions, where the condition or the change directly leads to disruption, extra work, or new procedures." *Sauer Inc. v. Danzig*, 224 F.3d 1340, 1349 (Fed. Cir. 2000) (internal quotations omitted).

"A contractor must prove its costs using the best evidence available under the circumstances.  The preferred method is through the submission of actual cost data." *Delco Elec. Corp. v. United States*, 17 Cl. Ct. 302, 321 (1989), *aff'd*, 909 F.2d 1495 (Fed. Cir. 1990).  When

---

[5] In counts IV and V, L3Harris claims that BAE breached various performance obligations, both express and implied, which delayed L3Harris in its own performance and caused it to incur excess costs.  Am. Compl. 19–22.  Normally in the government contracts context, breach of contract claims are remediable not as traditional breaches, but under the contingencies contemplated by the contract clause that the claim falls under.  *See Triax-Pacific v. Stone*, 958 F.2d 351, 354 (Fed. Cir. 1992) (holding that "claims for breach of contract are claims for equitable adjustment," and that because "the Suspension clause contemplates equitable adjustments for unreasonable delays in [] performance . . . additional costs must be recovered under the Suspension clause").  However, the suspension clause was not incorporated into the subcontract.  ECF No. 32, at 12.  Accordingly, L3Harris resorts to traditional breach of contract theories of recovery.

dealing with equitable adjustments pursuant to the changes clause, "the actual costs incurred by the contractor will provide the measure of the equitable adjustment to the contract price, if those incurred costs are reasonable." *George Sollitt Constr. Co. v. United States*, 64 Fed. Cl. 229, 245 (2005).

In cases where the contractor is unable to determine its actual damages attributable to a contract change, the "jury verdict" method of damages calculation is "designed to produce an approximation of damages based on the entire record." *Raytheon Co. v. White*, 305 F.3d 1354, 1367 (Fed. Cir. 2002); *see Needles, Inc. v. United States*, 101 Ct. Cl. 535, 618 (1944) (the jury verdict method is an approximation of damages that, "in the judgment of fair [jurors], directly and naturally resulted from the breach of the contract for which the suit is brought."). Use of the "jury verdict" method is appropriate in situations where it is not possible to prove damages with exact precision, but it "is not favored and may be used only when other, more exact, methods cannot be applied." *CEMS, Inc. v. United States*, 59 Fed. Cl. 168, 227 (2003). Therefore, "[b]efore resorting to the jury verdict method, a court . . . must determine (1) that clear proof of injury exists; (2) that there is no more reliable method for calculating damages; and (3) that the evidence is sufficient to make a fair and reasonable approximation of the damages." *Raytheon Co.*, 305 F.3d at 1367.

Finally, the "total cost" method can be employed to compare the contractor's actual costs to its original bid to quantify the damages associated with its increase in work. *CEMS, Inc.*, 59 Fed. Cl. at 227. However, this theory is highly disfavored and should be used only when four conditions are met: "(1) the nature of the particular losses make it impossible or highly impracticable to determine them with a reasonable degree of accuracy; (2) the plaintiff's bid or estimate was realistic; (3) its actual costs were reasonable; and (4) it was not responsible for the added expenses." *WRB Corp. v. United States*, 183 Ct. Cl. 409, 426 (1968). Accordingly, use of

the total cost method is permissible only in "extraordinary circumstances where no other way to compute damages [is] feasible and where the trial court employ[s] proper safeguards." *Servidone Constr.*, 931 F.2d at 862; *see CEMS, Inc.*, 59 Fed. Cl. at 227 (noting that the total costs method "provides less assurance that the plaintiff is being precisely compensated for the exact amount of damages suffered").

For its common law breach of contract claims in counts IV and V, L3Harris must show that BAE breached its contractual obligations. "The elements of a breach of contract under Virginia law are '(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation.'" *Shore Bank v. Harvard*, 934 F. Supp. 2d 827, 839 (E.D. Va. 2013) (quoting *Sunrise Continuing Care, LLC v. Wright*, 671 S.E.2d 132, 135 (Va. 2009)). "To recover for [a] breach of . . . contract[], plaintiff[] must prove, by a preponderance of evidence . . . that the breaches are the cause of actual damages sustained by plaintiff[]." *Carley Capital Grp. v. Newport News*, 709 F. Supp 1387, 1396 (E.D. Va. 1989).

For common law breach of contract claims, L3Harris "bears the burden to establish the element of damages with reasonable certainty." *Sunrise Continuing Care*, 671 S.E.2d at 135; *see Blue Stone Land Co. v. Neff*, 526 S.E.2d 517, 518–19 (Va. 2000) (discussing the two types of contract damages recognized by Virginia – direct and consequential damages); *see also Roanoke Hosp. Ass'n v. Doyle & Russell, Inc.*, 214 S.E.2d 155, 160 (Va. 1975).

## III.   ANALYSIS

The Court now turns to a count-by-count analysis of L3Harris' claims, and makes additional factual and legal findings, as necessary, to address each claim.

**A.      Count I – Constructive acceleration as a result of the COVID-19 pandemic**

L3Harris contends that BAE breached the subcontract by constructively accelerating L3Harris' performance by instructing it to continue performing during the COVID-19 pandemic, an excusable delay under the subcontract.   Pl. L3Harris Maritime Serv.'s Inc.'s Post-Trial Proposed Findings of Fact and Conclusions of Law ("Pl.'s Mem."), ECF No. 178, at 16–20.   Due to this alleged breach, L3Harris seeks damages of $863,315.45 for increased costs incurred between March 12, 2020, and July 30, 2021, resulting from BAE's alleged constructive acceleration of the subcontract's period of performance. *Id.* at 86–89; *see* Am. Compl. ¶ 96.

**1.      Constructive Acceleration Generally**

"A constructive change occurs where a contractor performs work beyond the contract requirements without a formal order, either by an informal order or due to the fault of the Government." *Int'l Data Prod. Corp. v. United States*, 492 F.3d 1317, 1325 (Fed. Cir. 2007). Constructive acceleration is a recognized form of constructive change that occurs when the government "orders the work to proceed faster in an attempt to complete performance earlier than otherwise expected." *Ace Constructors, Inc. v. United States*, 70 Fed. Cl. 253, 280 (2006), (citing John Cibinic, Jr., and Ralph Nash, Jr., *Administration of Government Contracts* 450 (3d ed. 1995)). Constructive acceleration occurs when the government requires compliance with an original deadline, despite excusable delay being present. *Nova Grp./Tutor-Saliba v. United States*, 159 Fed. Cl. 1, 51 (2022) (citing *Zafer Taahhut Insaat ve Ticaret A.S. v. United States*, 833 F.3d 1356, 1362 (Fed. Cir. 2016)).

A constructive acceleration claim generally requires proof of the following elements:

(1) that the contractor encountered a delay that is excusable under the contract; (2) that the contractor made a timely and sufficient request for an extension of the contract schedule; (3) that the government denied the contractor's request for an extension or failed to act on it within a reasonable time; (4) that the government

insisted on completion of the contract within a period shorter than the period to which the contractor would be entitled by taking into account the period of excusable delay, after which the contractor notified the government that it regarded the alleged order to accelerate as a constructive change in the contract; and (5) that the contractor was required to expend extra resources to compensate for the lost time and remain on schedule.

*Fraser Constr. Co. v. United States*, 384 F.3d 1354, 1361 (Fed. Cir. 2004). However, the Federal Circuit has approved "different formulations" of the constructive acceleration elements, so long as the "essential elements," excusable delay, an acceleration order, and acceleration with associated costs, are present. *Id.* (citing *Norair Eng'g Corp. v. United States*, 666 F.2d 546, 548 (Ct. Cl. 1981)). Therefore, it is well settled that an order to accelerate need not be specific, and "even an expression of concern about lagging progress, may have the same effect as an order." *Norair Eng'g Corp.*, 666 F.2d at 549.

### 2. The subcontract's "Contract Direction/Changes" clause does not bar L3Harris from recovering costs attributable to BAE's constructive acceleration of L3Harris' performance.

Before determining whether L3Harris has satisfied the elements required to prove its constructive acceleration claim, the Court addresses BAE's arguments that two provisions of the subcontract bar L3Harris from recovery on count I.

BAE first argues that the subcontract's "Contract Direction/Changes" clause in the Ship Repair Addendum prohibits L3Harris from being compensated for changes that resulted from an order by the U.S. Navy. Def.'s Proposed Findings of Fact and Conclusions of Law ("Def.'s Mem."), ECF No. 177, at 64–66. The clause states:

If any change shall have resulted or derived in any way from an act or omission or formal or constructive order by [the U.S. Navy], [L3Harris]' right to equitable adjustment shall be contingent on, and the amount thereof shall be determined in accordance with the following:

(a)     [L3Harris] shall have provided to [BAE] written notice of the facts giving rise to such change and shall have done so in time and in form sufficient to

13

enable [BAE] to provide to [the U.S. Navy] notice sufficient to protect [BAE]'s right to equitable adjustment under [BAE]'s prime contract;

(b)    [BAE] shall be liable to [L3Harris] only to the extent that [the U.S. Navy] accepts liability or is determined to be liable therefore;

(c)    The amount of [L3Harris]' equitable adjustment, if any, shall not exceed that allowed or awarded to [BAE] from [the U.S. Navy], less any profit or costs, or both, to which [BAE] is entitled.

Pl.'s Ex. 2, § 222. BAE asserts that because the measures implemented by L3Harris in response to COVID-19 were required by the U.S. Navy, L3Harris' recovery for the costs of implementing such measures is contingent on the Navy either "accept[ing] liability or [being] determined to be liable therefore." *Id.* § 222(b). BAE contends that because the U.S. Navy has not accepted liability for COVID-19 related expenses, L3Harris is prohibited from recouping such costs from BAE. Def.'s Mem. 64. Moreover, BAE argues that "L3Harris has not demonstrated that a constructive acceleration caused by BAE [] caused any of the costs allegedly incurred in relation to [c]ount I." *Id.* ¶ 253.

Although BAE accurately asserts that L3Harris cannot receive an adjustment for changes that resulted from an order from the U.S. Navy, L3Harris' constructive acceleration claim is premised on acceleration not by the government, but by BAE. Pl.'s Mem. ¶¶ 70–72. Accordingly, to the extent L3Harris has proven that its increased costs are attributable to accelerating its pace of performance on account of a direction by BAE to do so, such a claim is not barred by the subcontract.

### 3.    The subcontract's "Safety" clause bars L3Harris from recovering health and safety costs that are not attributable to accelerated performance.

BAE next argues that L3Harris is prohibited by the subcontract's "Safety" clause from recovering health and safety costs that it was responsible for under the subcontract. Def.'s Mem. 66; *see* Pl.'s Ex. 2, § 216. The clause reads, in relevant part:

14

> [L3Harris] shall be solely responsible for the safe conduct of its employees and
> subcontractors while performing the Work required under this Order.  [L3Harris]
> shall comply with all applicable federal, state, and local health, safety and fire
> protection laws and regulations.  [L3Harris] shall also comply with [BAE's] safety
> policies and procedures.

Pl.'s Ex. 2, § 216.

The exhibits supplying the basis of the constructive acceleration claim notify BAE that L3Harris had been experiencing additional costs due to the COVID-19 pandemic.  Pl.'s Ex. 590. On April 8, 2020, L3Harris submitted a CFR notifying BAE that it was experiencing an unprecedented absenteeism rate due to the quarantine of several key personnel, which was "causing inefficiencies in the planning and execution of the project."  *Id.* at 1.  On May 29, 2020, L3Harris submitted four additional CFRs again reporting to BAE that L3Harris was experiencing excessive costs due to the COVID-19 pandemic, for reasons such as school closures creating a lack of childcare, quarantining of key personnel creating excessive absences, and reassigning work locations and departments on a daily basis due to missing personnel which was causing inefficiencies in the planning and execution of the project on a daily basis.  *Id.* at 2–5.  L3Harris also informed BAE of efforts that were being implemented to reduce the spread of COVID-19, including daily self-assessments and temperature checks, daily sanitization of work areas as well as employee tools and equipment, providing additional hand sanitizer and handwashing breaks, and reducing the persons working in an area to maintain social distancing.  *Id.*  Moreover, on July 22, 2022, L3Harris submitted an REA due to "COVID Impact," which further notified BAE that "[d]ue to the lack of qualified personnel, L3Harris also had to expend overtime to accelerate and aid in maintaining schedule."  Pl.'s Ex. 59, at 4.

The Court's analysis is informed by the subcontract being a firm-fixed-price contract, in which the contractor bears the full risk of all costs associated with performance.  *See Agility*

*Defense & Gov't Serv., Inc. v. United States*, 115 Fed. Cl. 247, 250 (2014); 48 C.F.R. § 16.202-1

("A firm-fixed-price contract provides for a price that is not subject to any adjustment on the basis

of the contractor's cost experience in performing the contract.  This contract type places upon the

contractor maximum risk and full responsibility for all costs and resulting profit or loss.").

L3Harris had an obligation to "comply with all applicable federal, state, and local health, safety,

and fire protection laws and regulations." Pl.'s Ex. 2, § 216.  That the COVID-19 pandemic caused

L3Harris to "experience[] unprecedented excessive costs" does not change the fact that L3Harris

was legally obliged to comply with all government health and safety protocols. *See* Pl.'s Ex. 59,

at 4; *see also Murdock & Sons Constr. v. Goheen General Constr.*, 461 F.3d 837, 843 (7th Cir.

2006) ("Unexpected difficulties in the performance of a construction contract do not relieve a

contractor from its obligations or serve as justification for more time or money to perform.").

Accordingly, the subcontract's "Safety" clause bars L3Harris from recovering costs attributable

solely to implementing health and safety measures.

    Further, this conclusion is consistent with § 222 of the General Terms and Conditions.

Work on the subcontract was designated an essential service by the U.S. Navy, and pursuant to

U.S. Navy direction and/or federal, state, or local law, both BAE and L3Harris implemented health

and safety measures to reduce the spread of COVID-19.  Ct.'s Ex. 1, ¶¶ 92–94.  The U.S. Navy

subsequently denied both BAE and L3Harris' requests for compensation pursuant to costs incurred

as a result of implementing these health and safety measures.  *Id.* ¶¶ 100–01, 104–05.  The

subcontract states that "[i]f any change shall have resulted . . . from an act or omission or formal

or constructive order by [the U.S. Navy] . . . [L3Harris'] right to equitable adjustment shall be

contingent on . . . the extent that [the U.S. Navy] accepts liability or is determined to be liable

therefore." Pl.'s Ex. 2, § 222.  Because the U.S. Navy caused L3Harris to incur COVID-19 health

and safety costs, L3Harris cannot recover these expenses from BAE.  Accordingly, L3Harris'
recovery, if any, is limited to expenses that directly flow from BAE's direction to accelerate.

If L3Harris proves each of the elements required to establish constructive acceleration, its
damages will be limited to costs such as overtime expenses and other damages attributable to actual
acceleration.  Such damages may not include costs for the implementation of health and safety
protocols that are not linked to an increased pace.  This conclusion is buttressed by caselaw holding
that constructive acceleration claims are intended to compensate the contractor for additional costs
incurred as a result of performing in less time than otherwise permitted under the contract, rather
than compensating it for unanticipated costs arising during the course of performance.  *See Ace
Constructors*, 70 Fed. Cl. at 280 ("Compensable acceleration occurs when the government orders
the work to proceed faster in an attempt to complete performance earlier than otherwise
expected."); *see also Fraser*, 384 F.3d at 1360–61 (holding that the basis for a constructive
acceleration claim is that the government has shortened the time for performance implicitly
through its conduct, and that the contractor is due additional costs incurred as a result of the shorter
period of performance); *see also Norair*, 666 F.2d at 550 ("the trial judge must determine whether
plaintiff actually accelerated and whether it incurred extra costs in doing so").  Thus, L3Harris
cannot recover count I damages related to additional paid time off wages for sick time or additional
hours spent implementing COVID-19 protocols, because such costs were L3Harris' responsibility
under the subcontract's "safety" clause.  *See* Pl.'s Ex. 2, § 216 (stating that L3Harris had a duty to
"comply with all applicable federal, state, and local health, safety, and fire protection laws and
regulations").

In the amended complaint, L3Harris alleges in count I that it is entitled to $863,315.45 for
increased costs between March 12, 2020 and July 30, 2021, as a result of BAE's constructive

acceleration. Am. Compl. ¶ 96. L3Harris' COVID-19 REA, for which Andrew Goude ("Goude"), a senior specialist of production planning at L3Harris, testified to collecting all of the underlying data, breaks down the damages alleged in count I into three categories: (a) overtime inefficiencies; (b) additional paid time off for sick time; and (c) additional hours spent implementing COVID-19 precautions. Pl.'s Ex. 59, at 5; Trial Tr. Day 2, ECF No. 175, at 428:10–15; Trial Tr. Day 3, ECF No. 172, at 25:16–26:2. Because the latter two categories relate only to government-directed COVID-19 costs, which are not attributable to any acceleration order from BAE, these costs are not compensable under L3Harris' constructive acceleration claim.[6]

Accordingly, L3Harris' recovery, if any, under count I is limited to "overtime inefficiencies," as detailed in L3Harris' COVID-19 REA and COVID-19 damages spreadsheet, a maximum recovery of $32,845.68.[7] Pl.'s Ex. 59, at 5; Pl.'s Ex. 469.

---

[6] Even if some portion of the costs attributable to increased sick time and implementation of health and safety protocols was uniquely attributable to BAE's acceleration order, L3Harris has supplied no basis to the Court to differentiate these costs from those attributable to the U.S. Navy's order to keep working. *See* Pl.'s Ex. 59 (COVID-19 REA stating that L3Harris "has experienced unprecedented excessive costs due to the COVID[-]19 pandemic"); Trial Tr. Day 2, at 275:3–14 (Stanley Tomlinson testifying that the relief L3Harris sought was caused by the COVID-19 pandemic, as opposed to any acceleration order from BAE).

[7] In its post-trial proposed findings of fact and conclusions of law, L3Harris asserts, for the first time, that it also incurred costs for working increased hours by bringing on new employees and for purchasing additional protective gear. Pl.'s Mem. ¶ 348. These additional alleged damages were not included in the Amended Complaint, and they are not included in the $863,315.45 that L3Harris seeks in count I. *See* Am. Compl. ¶ 96; *see also* Pl.'s Mem. ¶ 350 ("These damages are not included in the $863,315.45."). As these categories of count I damages were neither pled, nor included in the total damages that L3Harris seeks, the Court declines to consider them.

**4.    L3Harris has proven its constructive acceleration claim for the overtime hours worked during the pandemic.**

Having ruled out damages attributable solely to L3Harris' implementation of health and safety protocols, the Court turns to the L3Harris' claim for increased costs resulting from BAE's alleged constructive acceleration of the subcontract's period of performance.

**a.    The COVID-19 pandemic constituted an excusable delay.**

L3Harris must first prove that it encountered a delay that is excusable under the subcontract. *Fraser*, 384 F.3d at 1361. L3Harris contends that the COVID-19 pandemic constituted an excusable delay under FAR § 52.249-8, the default clause in fixed-price contracts. *See* 48 C.F.R. § 52.249-8(c) (stating that default is excused when "failure to perform the [sub]contract arises from causes" outside of L3Harris' control, including "acts of God," "acts of the Government in either its sovereign or contractual capacity," "epidemics," and "quarantine restrictions."). "The fact that a delay arises from one of the causes specifically referred to in the Default clause is, by itself, insufficient to justify the granting of an excusable delay." Cibinic & Nash, *Administration of Government Contracts* 546. "To establish excusable delay, [plaintiff] must demonstrate that [its] untimely performance was attributable to unforeseeable causes beyond [its] control and without [its] fault or negligence." *Servant Health, LLC v. United States*, 161 Fed. Cl. 210, 235 (2022). "A contractor's mere reference to a listed event under [a] FAR [excusable delays clause] (e.g., delays of common carriers, pandemic, quarantine restrictions) does not automatically excuse noncompliance." *Id.* at 236.

Stanley Tomlinson ("Tomlinson"), a project supervisor with L3Harris assigned to the Vicksburg, testified that L3Harris' performance coincided with the COVID-19 pandemic and that the pandemic impacted its performance. Trial Tr. Day 1, ECF No. 176, at 200:23–201:4, 258:15–261:20. Tomlinson stated that the impacts of the COVID-19 pandemic on L3Harris' performance

consisted primarily of health and safety-related expenses, for which the Court has already concluded L3Harris was responsible. *Id.* at 258:15–261:20 Tomlinson testified that these impacts included:    increased absences due to people not showing up to work because they, or their dependents, were sick; each L3Harris employee spending 25 minutes or so per day cleaning their personal equipment and work area before proceeding with their work; having to take daily temperature checks and employees being denied entry onto the worksite if they had a slight fever; wearing masks and gloves; and maintaining six-foot social distancing.  *Id.*  Tomlinson testified that initially L3Harris tried to work around these impacts, but that L3Harris was delayed by not having the requisite personnel.  *Id.* at 260:5–261:9.  To work around delays, Tomlinson testified that he would re-prioritize tasks and move people around, or in some cases do the job himself.  *Id.* This testimony is corroborated by the CFRs submitted to BAE, notifying that L3Harris' performance had been impacted by the COVID-19 pandemic and was "caus[ing] inefficiencies in the planning and execution of the project." Pl.'s Ex. 590, at 2.

This evidence shows not only that the COVID-19 pandemic constituted an excusable delay under the FAR default clause, but also that L3Harris experienced delay as a result of the pandemic, and that this delay was beyond L3Harris' control. *See Appeal of Crawford Dev. and Mfg. Co.*, A.S.B.C.A. No. 17565, 74-2 BCA ¶ 10660, 1974 WL 1972 (Armed Serv. B.C.A. 1974) (holding that the appellant needed to prove "that the flu epidemic contributed materially to the appellant's performance delay" and that "[i]t was incumbent upon the appellant to establish not only the existence of this excusable cause of delay but also that it actually contributed materially to the performance delay"). Although the Court finds that some of L3Harris' expenses, such as paying its employees additional sick time and implementing health and safety precautions, were its own contractual responsibility, it is apparent that these pandemic-related difficulties had an impact on

L3Harris' pace of performance.  Trial Tr. Day 2 at 275:10–14 (Tomlinson testifying that the pandemic affected L3Harris' ability to make its "current milestones"); *see Murdock & Sons*, 461 F.3d at 840–41 (holding that the contractor must show that there was an excusable delay that impacted timely performance in order to meet the first element of constructive acceleration).  Thus, L3Harris has satisfied the first element of its constructive acceleration claim.

### b.  **L3Harris made a timely request for a schedule extension.**

The second element of constructive acceleration is that the contractor must make a "timely and sufficient request for an extension of the contract schedule." *Fraser*, 384 F.3d at 1361. L3Harris asserts that it submitted five CFRs on April 8 and May 29, 2020, that notified BAE of the impacts of the COVID-19 pandemic on L3Harris' performance and requested a schedule extension.  Pl.'s Ex. 590.  However, L3Harris also contends that because a request for additional time would have been futile, it did not have an obligation to submit such a request to BAE.  Pl.'s Mem. ¶ 51 (citing *Nova Grp.*, 159 Fed. Cl. at 52).  BAE argues that L3Harris has failed to prove that it requested a schedule extension, asserting that the testimony and CFRs submitted to BAE were too vague, untimely, and insufficient.  Def.'s Mem. ¶¶ 269–70.

The Court agrees with L3Harris.  CFR 211C, submitted to BAE on April 8, 2020, as well as the subsequent four CFRs submitted to BAE on May 29, 2020, constituted a sufficient request for an extension.  CFR 211C, in addition to placing BAE on notice of the pandemic-related issues that L3Harris was encountering, requests that a contract change be issued "to adjust schedules and milestone dates."  Pl.'s Ex. 590.  The remaining CFRs in exhibit 590 similarly notified BAE that

L3Harris was experiencing inefficiencies in the planning and execution of the project due to COVID-19, and requested a contract change for additional time.[8] *Id.*

### c. L3Harris has proven that BAE directed it to accelerate.

The next element L3Harris must prove to make out its claim is that BAE directed L3Harris to accelerate its work. *Fraser*, 384 F.3d at 1361. L3Harris contends that "BAE issued numerous written and verbal instruction to L3Harris to continue working during the COVID-19 pandemic and held L3Harris to the milestones as originally contemplated." Pl.'s Mem. ¶ 70. Among these instructions, L3Harris asserts that written communications from BAE in June and October 2020 that "BAE's number 1 priority is to finish this avail on time," and "time is of the essence . . . L3Harris is obligated to provide the necessary personnel and supply such equipment, materials, overtime workers and other devices and facilities as necessary to meet and/or recover schedule," constituted acceleration orders. *Id.* ¶¶ 71–72. BAE argues that: (1) the initial period of performance had come and gone before the COVID-19 pandemic began, so logically BAE could not order L3Harris to meet a deadline that had already passed; (2) BAE did not impose any schedule on L3Harris during the pandemic, instead modifying its own project schedule multiple times at L3Harris' request; and (3) that the October 2020 letter stating that "time is of the essence" does not override the evidence demonstrating that L3Harris performed at its own pace. Def.'s Mem. ¶¶ 275–77.

There is a low threshold to find an order to accelerate. "An order to accelerate, to be effective, need not be couched in terms of a specific command. A request to accelerate, or even

---

[8] Precedent exists for relaxing the requirement that a contractor submit a request for an extension of time when such a request would be futile. *See Nova Grp.*, 159 Fed. Cl. at 52; *see also Appeal of Greulich, Inc.*, E.N.G.B.C.A. No. 3832, 78-2 BCA ¶ 13417, 1978 WL 2237 (Eng. B.C.A. 1978). However, because L3Harris requested an extension, there is no need to address this argument.

an expression of concern about lagging progress, may have the same effect as an order." *Norair*, 666 F.2d at 549; *see also Ace Constr.*, 70 Fed. Cl. at 281 (holding that a "refusal to grant an extension while keeping the original deadlines in place effectively constituted an order for constructive acceleration").

Before considering the BAE communications that L3Harris contends constituted acceleration orders, it is necessary to consider the contract schedules deadlines applicable to L3Harris and BAE. Prior to the start of the pandemic, the last schedule extension granted to L3Harris permitted performance through December 4, 2019. Trial Tr. Day 2, at 526:15–18. The U.S. Navy, however, extended BAE's performance under the prime contract through October 2020. Trial Tr. Day 4, ECF No. 174, at 229:19–231:5.[9] Notably, BAE never passed on and incorporated this extension into L3Harris' subcontract. *See* Trial Tr. Day 2, at 526:15–18. This backdrop bears upon the Court's assessment of BAE's communications to L3Harris about the schedule.

The first communication that L3Harris contends constituted an acceleration order is a June 25, 2020 email from Jeff Brooks ("Brooks"), a Director of Programs at BAE, to numerous L3Harris employees. Pl.'s Ex. 185. In his email, written in response to a communication from L3Harris stating that its revised schedule is contingent on BAE supplying a certain number of structural workers, Brooks states that "BAE's number 1 priority is to finish this avail on time." *Id.* When asked about the email at trial, Scott Huss ("Huss"), BAE's project manager for the subcontract, testified that "[t]he object or the priority is always finishing the availability and

---

[9] Paul Liples, a contract manager at BAE, testified that he was uncertain of the exact final date that BAE's period of performance was formally extended through, but recalled a formal extension being issued through October 30, 2020. Trial Tr. Day 4, at 203:18–20, 229:19–231:5. He further testified that BAE's prime contract with the U.S. Navy would state the exact date. However, BAE's prime contract with the Navy has not been made a part of the record. *See id.*

return[ing] the ship to the government."   Trial Tr. Day 4, at 123:14–16.   The second

communication that BAE asserts constituted an order to accelerate is an October 13, 2020, letter

from Adrienne London ("London"), BAE's Procurement Representative for the subcontract,

which stated that "time is of the essence in L3Harris' performance," and that L3Harris was

"obligated to provide the necessary personnel and . . . overtime workers . . . as necessary to meet

and/or recover schedule."   Pl.'s Ex. 5, at 2.

Taken in context, both of these communications suffice as orders to accelerate.   *Norair*,

666 F.2d at 549; *see Appeal of Elec. & Missile Facilities, Inc.*, A.S.B.C.A. No. 9031, 1964 BCA

¶ 4338, 1964 WL 524 (Armed Serv. B.C.A. 1964) ("[W]hen a contractor who has been excusably

delayed is directed [by] the Government to maintain the original progress schedule and completion

dates despite the excusable delay, this constitutes an order to accelerate for which the contractor is

entitled to an equitable adjustment in price under the Changes clause.").

Moreover, BAE's argument that the initial period of performance had already passed

before the pandemic does not affect the Court's analysis, as the relevant inquiry is whether BAE

directed L3Harris to perform its work in a period of time that was less than what it was entitled to,

given the excusable delay.   *See Norair*, 666 F.2d at 548 ("[I]t may be that the excusable causes for

delay . . . in fact justified a 700-day extension.   In that case, lateness of 500 days would necessarily

have involved acceleration.").   Similarly, BAE's arguments that it did not impose a schedule on

L3Harris during the pandemic and that L3Harris performed at its own pace do not alter the Court's

analysis.   Although L3Harris may have set its own daily or weekly schedule, that does not change

the fact that BAE effectively directed L3Harris to work faster and it does not bear on whether BAE

"insisted on completion of the contract within a period shorter than the period to which the

contractor would be entitled by taking into account the period of excusable delay."   *Fraser*, 384

24

F.3d at 1361; Pl.'s Ex. 5, at 2. And, BAE's assertion that "there is no evidence that BAE [] ever refused to extend the schedule when requested to do so by L3Harris," is unsupported by the record, as Scott Huss testified that L3Harris' April 8, 2020, request "to adjust schedules and milestone dates" was not granted. Trial Tr. Day 4, at 124:13–125:3. Accordingly, the Court finds that the June 2020 email from Brooks and the October 2020 letter from London constituted orders to accelerate.

### d.   L3Harris actually accelerated its performance.

Next, L3Harris must establish that it actually accelerated its performance as a result of the direction from BAE. L3Harris argues that it has proven through the testimony of Goude, a senior production specialist, and Tomlinson, a project supervisor, that it "worked additional hours to ensure it could meet the milestones that BAE continued to hold [L3Harris] to." Pl.'s Mem. ¶ 96. BAE contends that L3Harris has failed to establish actual acceleration, and put on no evidence at trial regarding what the proper rate of performance was during COVID-19 aside from Goude approximating that performance might have been extended by eight months. Def.'s Mem. ¶¶ 278–83.

To prove constructive acceleration, the contractor must actually perform at a faster rate than it is entitled to after adding in time for excusable delay. *Fraser*, 384 F.3d at 1361. "To find whether there was acceleration . . . the trial judge must determine what the proper rate of progress was . . . [h]e must also decide whether plaintiff actually did speed up its work over this rate and whether it incurred extra cost in doing so." *Norair*, 666 F.2d at 550.

Turning to the relevant evidence, the Court begins with the testimony of Tomlinson. In his role as project supervisor, Tomlinson was engaged with the day-to-day operations of the Vicksburg subcontract, executing electrical work on the vessel for the four and a half years that he was

assigned to the project. Trial Tr. Day 1, 201:5–14. Tomlinson's role was to oversee enhancements to the navigation, engineering, and operations systems aboard the Vicksburg by installing equipment and cabling. *Id.* at 203:12–25. The testimony of Goude, who did not have reason to be on board the ship, corroborates Tomlinson's testimony through the data tracked in L3Harris' damages spreadsheets. Trial Tr. Day 2, at 434:20–435:19, 465:16–25.

Relative to whether L3Harris worked at a faster pace during the pandemic than it was entitled to under the subcontract, the Court deems significant Tomlinson's testimony on the following points: (1) the COVID-19 pandemic was going on during the course of L3Harris' performance of the subcontract, Trial Tr. Day 1, at 258:15–19; (2) L3Harris had an increased absenteeism rate during the pandemic, due to people being turned away at the gate because they had a fever, because employees were actually sick and stayed home, or because schools were closed or dependents were sick so L3Harris employees had to stay home to take care of them, *id.* at 259:20–260:4, 261:7–9; (3) at any time, L3Harris had three to four employees out during the pandemic, which comprised roughly one-third to one-half of L3Harris' work force, Trial Tr. Day 2, at 274:1–11; (4) limited staffing delayed L3Harris' work and affected its ability to perform at the normal rate, Trial Tr. Day 1, at 260:5–7, 261:18–20; (5) to maintain performance, Tomlinson rearranged and re-prioritized work assignments, which would sometimes involve "doubl[ing] up" and working "a couple extra hours to get it done" when he did not have enough personnel, *id.* at 261:10–17; (6) in order to meet milestones, L3Harris would do "whatever we could get done and pick up the pace in what was lacking," meaning that it would try to expedite certain areas of the subcontract that L3Harris knew would pose difficulties, Trial Tr. Day 2, at 275:25–276:8; and (7)

L3Harris worked overtime in some areas and cut back in other areas that were not essential at the time, and in some cases paid overtime to its employees, *id.* at 276:9–12, 278:5–7.[10]

Additionally, Goude's testimony that L3Harris did not work any overtime hours from December 2019 until the beginning of the pandemic, aside from supervisors who did not bill direct labor hours, supports the conclusion that L3Harris worked overtime during the pandemic to maintain pace. Trial Tr. Day 3, at 190:18–191:17. Goude testified that he determined how much overtime was due to acceleration during the pandemic by pulling data from L3Harris' labor timekeeping system, and that he was able to differentiate between regular overtime and pandemic-related overtime because all of the overtime between March 2020 and January 2021[11] was "related to maintaining the staffing on board due to acceleration regarding COVID." *Id.* at 31:21–32:2, 32:6–9. Thus, although there is little evidence about what the proper rate of progress should have been, the Court finds that the proper rate of progress was normal work hours before L3Harris began working overtime for the purpose of keeping up with milestones and performance deadlines during the pandemic. *See Ace Constr.*, 70 Fed. Cl. at 281 (holding that evidence of the contractor's increased overtime hours after discovery of the differing site condition, an excusable delay, entitled the contractor to compensation for the actual overtime paid).

Based on this review, the Court concludes that L3Harris has proved by a preponderance of the evidence that the pandemic slowed its performance, BAE directed L3Harris to accelerate

---

[10] Although Tomlinson also testified that L3Harris did not take steps to work faster, Trial Tr. Day 2, at 277:6–9, the Court attaches less weight to this testimony because of other evidence documenting the overtime hours actually worked.

[11] Although Goude testified that all of the overtime billed from March 2020 to January 2021 was "related to maintaining the staffing on board due to acceleration regarding COVID," L3Harris' alleged damages for count I run until July 2021. *See* Am. Compl. ¶ 96. Moreover, overtime charged to the COVID-19 charge node runs through December 2021. *See* Pl.'s Ex. 132 (showing that L3Harris' overtime hours billed to the COVID-19 charge node go beyond January 2021).

beyond the proper rate of progress considering the effects of the pandemic, and L3Harris started working overtime to try to keep up. Particularly noteworthy is Tomlinson's testimony, corroborated by Goude, that L3Harris occasionally worked extra hours to get a particular job done due to a lack of personnel, that L3Harris would pick up the pace and expedite certain areas of the subcontract in order to meet milestones, and that L3Harris personnel worked overtime in some areas based on what Tomlinson prioritized as most important. *See Ace Constr.*, 70 Fed. Cl. at 281 (holding that evidence of increased overtime payments was sufficient for the plaintiff to prove that it incurred additional costs as a result of a constructive acceleration); *see also Fraser*, 384 F.3d at 1361 (holding that a constructive acceleration claim "ordinarily arises when the government requires the contractor to adhere to the original performance deadline set forth in the contract even though . . . excusable delay [] entitle[s] the contractor to a longer performance period").

Accordingly, L3Harris has shown that its pace of performance was faster than the proper rate of progress, given the presence of COVID-19. *See Norair*, 666 F.2d at 548 (stating that if an excusable delay justified a 700-day extension, then performance 500 days late would constitute acceleration). Therefore, L3Harris is entitled to damages for overtime it paid employees in an effort to maintain progress in the face of BAE's communications about the schedule and refusal to extend the period of performance.

### 5. L3Harris is entitled to damages for the overtime hours charged to the COVID-19 charge node.

The Court next addresses the damages that L3Harris is entitled to for overtime hours worked as a result of BAE's constructive acceleration during the pandemic. L3Harris' recovery will be limited to the overtime hours worked from March 12, 2020, when L3Harris asserts it began experiencing increased costs due to the pandemic, until July 30, 2021. *See* Pl.'s Ex. 590.

L3Harris contends that it "required its existing employees to work overtime resulting in ▮ hours of overtime amounting to $32,845.68 of damages." Pl.'s Mem. ¶ 353. This allegedly results from multiplying the ▮ hours spent working overtime by the "burdened" delta overtime labor rate for the year 2021, ▮ *See* Pl.'s Ex. 59, at 5; *see* Pl.'s Ex. 469. BAE argues that "L3Harris has not introduced any evidence to explain how it arrived at its figure of ▮ hours of overtime," and that it is "therefore impossible to determine from the evidence provided what, if any, OT hours were incurred as a result of acceleration due to COVID-19." Def.'s Mem. ¶ 219.

To prove its damages, L3Harris relies on the testimony of Goude. Looking to L3Harris' COVID REA that it submitted to BAE on July 22, 2022, Goude testified that he "collected all of the data underlying" the numbers in the chart, summarizing L3Harris' alleged costs related to COVID-19. Trial Tr. Day 3, at 25:16–26:2; *see* Pl.'s Ex. 59, at 5. Goude explained that the first category of damages, "Virginia COVID-19 PTO," reflects "the additional time that [L3Harris] [was] required to provide paid time off for employees for quarantine during that time period." Trial Tr. Day 3, at 26:5–7. Goude further testified that the second category of damages, "COVID-19 precautions," was comprised of actual hours spent implementing and conducting additional health precautions, and that this was tracked by a "separate charge node[12] that people would utilize to charge [] time for the additional work that was not originally included in [L3Harris'] statement of work." *Id.* at 26:10–17. Goude elaborated that "any amount of time specifically doing additional tasks related to COVID would be charged to that node with their other tasks being charged to the work that they were assigned for that day." *Id.* at 28:9–12.

---

[12] Goude testified that a charge node "is a way of having a particular task separated out from the main project so that we can have a more granular idea of the charges going to a particular function." Trial Tr. Day 3, at 26:21–24.

Lastly, Goude testified that the third category of COVID-19 related damages, "[overtime] inefficiencies," referred to "instances where people had to work overtime due to others being out for one reason or another, . . . and it's only the differential between their straight time pay and their overtime." *Id.* at 31:6–20. As stated above, Goude explained that he determined how much overtime was expended on work during the COVID-19 pandemic by pulling the data from L3Harris' labor timekeeping system. *Id.* at 31:21–32:2. And when asked how he was able to differentiate between regular overtime and pandemic-related overtime, Goude testified that all of the overtime between March 2020 and January 2021 was "related to maintaining the staffing on board due to acceleration regarding COVID." *Id.* at 32:6–9. Moreover, this is consistent with his testimony that L3Harris did not work any overtime hours from December 2019 until the beginning of the pandemic, aside from supervisors who did not bill direct labor hours. *Id.* at 190:18–191:17. Goude further testified that he knew all overtime billed during this period was related to COVID-19 based on "[d]iscussions with the management team." *Id.* at 32:6–11.

To fully understand L3Harris's alleged costs related to BAE's acceleration order, however, the Court turns to L3Harris' timekeeping exhibit. *Id.* at 53:12–15; *see* Pl.'s Ex. 132. Goude testified that this exhibit is an extraction of all the costs associated with the subcontract, and that the "combined tab" of the spreadsheet is "a list of all of the charges for labor on the Vicksburg contract." Trial Tr. Day 3, at 53:18–54:4, 55:1–5. Goude explained that the columns show: the type of labor billed to a particular account, noting that there were different accounts for direct labor, overtime labor, and subcontractor labor; a description of the charge node, detailing what specific project the laborer was billing time to; as well as the year and month in which the charge accrued. *Id.* at 56:25–57:2, 57:20–58:7, 61:2–3, 61:9–12, 62:13–15; *see* Pl.'s Ex. 132 (showing that under column B, account name, there are different accounts for direct labor, overtime, and

30

subcontractor labor).  When asked if the data in the combined tab of L3Harris' exhibit 132 was

exported into the COVID-19 spreadsheet, L3Harris' exhibit 469, Goude testified that was correct,

and that the information in exhibit 469 was "just a summary of the hours charged to the COVID-

19 node on the combined [tab]."  Trial Tr. Day 3, at 100:17–101:2.

Based on the testimony and data contained in L3Harris' damages spreadsheets, the Court

finds that L3Harris has not introduced sufficient evidence to explain how it arrived at ▇ hours

of overtime worked as a result of BAE's constructive order to accelerate during the COVID-19

pandemic.  *See* Def.'s Mem. 54–56.  Goude testified that the combined tab of L3Harris' exhibit

132 can be filtered by direct or overtime labor, by charge node, by year, and by month.  Trial Tr.

Day 3, at 56:25–62:15.  Therefore, when applying the appropriate filters in the combined tab of

L3Harris' exhibit 132 for overtime labor charged to COVID-19, for the period of March 2020 to

July 2021, the total number of hours worked should equal ▇ *See* Pl.'s Ex. 469 (listing the

number of overtime hours worked due to COVID-19 on the Vicksburg to be ▇).  When the

above-mentioned filters are applied, however, the total number of hours listed is 139.  *See* Pl.'s

Ex. 132.  Moreover, there is no formula listed in the appropriate cell box on the COVID-19

spreadsheet to explain how L3Harris calculated the time attributable to COVID-19 overtime to be

▇ hours.  *See* Pl.'s Ex. 469.  Accordingly, although Goude testified that this number was pulled

from the labor timekeeping system, L3Harris has not provided a sufficient basis to validate this as

the proper number of hours worked due to acceleration during COVID-19.[13]

---

[13] At the Court's direction, L3Harris and BAE provided supplemental briefing to explain whether
the ▇ overtime hours listed as COVID-19 "overtime inefficiencies" in L3Harris' Exhibit 469,
can be derived from the combined tab of L3Harris' Exhibit 132, as indicated by Goude's
testimony.  ECF No. 184; Trial Tr. Day 3, at 100:17–101:2.  After considering L3Harris'
explanation for how the ▇ hours can be derived, the Court is unpersuaded for the following
reasons. L3Harris contends that the ▇ hours is derived from two components, the first of which
is ▇ overtime hours calculated "by taking all overtime incurred on the production work-items

Although L3Harris has failed to prove its COVID-19 overtime damages with absolute precision, however, this lack of proof does not preclude recovery. *See Delhur Indus.*, 95 Fed. Cl. at 454 (holding that a contractor need not prove his damages with absolute certainty). By applying the proper filters to the appropriate time period, based on Goude's testimony, to the combined tab of exhibit 132, the Court can compute with reasonable certainty the number of hours L3Harris worked that are attributable to overtime worked due to acceleration during the pandemic. *See Raytheon*, 305 F.3d at 1367 (ruling that the jury verdict method of calculating damages is designed to "produce an approximation of damages based on the entire record"). After filtering the "account I.D." column to only reflect overtime hours, the charge node to only reflect COVID-19, and the year and month categories to only show the time period from March 12, 2020 to July 30, 2021, the total number of hours worked equals ■■■ *See* Pl.'s Ex. 132 (reflecting ■ total hours in the cell corresponding to column U and row 7787 during the time period from March 2020 to December

_____

from June 2020 through the third week of February 2021." ECF No. 184, at 2. Not only is the time period suggested inconsistent with the trial testimony, whereby Goude testified that the correct time frame is March 2020 to January 2021, but applying hours besides those charged to the COVID-19 charge node is inconsistent with Goude's testimony that L3Harris' Exhibit 469 is "just a summary of the hours charged to the COVID-19 node on the combined spreadsheet." Trial Tr. Day 3, at 32:6–9, 100:17–101:2. Moreover, despite L3Harris' assertion without a citation in support, there is no record evidence to support the contention that "June 2020 through the third week of February 2021" was the proper time period to apply overtime premium hours for acceleration. ECF No. 184, at 3, n.3. Next, L3Harris contends that the second component of the ■■■ hours at issue is "■■ hours of overtime that were incurred for the COVID-19 work item for work between May 2020 and December 2021." *Id.* at 3. The Court is unable to understand why hours beyond July 30, 2021, the date L3Harris pled in its Amended Complaint as the conclusion of the time period for which it sought damages in count I, should be included now as part of the basis for the ■■■ hours at issue. *See* Am. Compl. ¶ 96. Moreover, even taking L3Harris' assertion as true, the total number of hours billed is 687.75, which L3Harris contends is explainable because "three individual employee timecard corrections [] were made before L3Harris submitted its COVID REA amounting to ■■ hours." ECF No. 184, at 3, n.4. As testimony regarding these timecard corrections is nowhere in the record, the Court is unable to consider it. For the reasons stated, L3Harris has not provided a sufficient basis for the Court to determine how the ■■ overtime inefficiency hours were derived.

2020, and ■ total hours from January 2021 to March 2021).[14]  Accordingly, L3Harris can recover ■ hours of overtime worked on account of COVID-19.

Having determined the appropriate number of hours, the Court must determine the proper rate to be applied for this work.  Referencing the summary tab of L3Harris' exhibit 469, Goude testified that "[t]he 2020 labor rate is the base rate out [of] all of our employees during 2020 during the pandemic period, average[d] to cost." Trial Tr. Day 3, at 44:14–20; *see* Pl.'s Ex. 469.  As to the burdened rates, Goude testified that the numbers are derived through a process of calculations, involving several different rates.  Trial Tr. Day 3, at 45:9–10, 45:20–46:3.  Goude also testified that the overtime delta rate is "the change in cost from straight time to overtime so that we were not charging or reporting costs that included the straight time rate for those additional hours of overtime.  So it's just the acceleration portion." *Id.* at 46:25–47:4.

Based on the testimony and L3Harris' exhibit 469, the Court accepts Goude's calculation process, and concludes that the 2020 delta overtime burdened rate, which only reflects the overtime acceleration portion of the hours worked, is the appropriate rate to apply.  Thus, the Court will apply a rate of ■ to L3Harris' ■ overtime hours worked between March 12 and December 31, 2020 on account of acceleration during the COVID-19 pandemic, and a rate of ■ to L3Harris' ■ overtime hours worked between January 1 and July 30, 2021.  *See* Pl.'s Ex. 469 (noting that the fully burdened delta overtime rate for 2020 is ■, as shown in column E and row 25, while the fully burdened delta overtime rate for 2021 is ■ as shown in column I and row 25).  These calculations yield a total of $5,757.06.  Accordingly, L3Harris is awarded $5,757.06 in damages for its constructive acceleration claim.

---

[14] There are no overtime hours billed for April, May, June, and July 2021. *See* Pl.'s Ex. 132.

**B.    Count II – Constructive change claim for out-of-scope structural support work**

In count II, L3Harris asserts that "BAE constructively changed the subcontract by requiring L3Harris to provide out-of-scope personnel to direct BAE to perform tasks to which L3Harris took exception."[15]  Pl.'s Mem. 20.  As a result, L3Harris asks the Court to award damages of $1,009,813.00.  *Id.* at 89–90; *see* Am Compl. ¶ 41.

**1.    Constructive Changes Generally**

When a contractor performs work beyond the contract requirements at the government's direction, without a formal or informal order under the changes clause, this constitutes a constructive change to the contract, and the contractor is entitled to an equitable adjustment. *Redland Co. v. United States*, 97 Fed. Cl. 736, 755 (2011); *Bruce Constr. Corp. v. United States*, 324 F.2d 516, 518 (Ct. Cl. 1963) (the purpose of an equitable adjustment is "to keep a contractor whole when the Government modifies a contract").  A constructive change claim is comprised of two components:  (1) the change component, which describes work outside the scope of the contract; and (2) the "order or fault" component, which describes the reason the contractor performed the work.  *Miller Elevator Co. v. United States*, 30 Fed. Cl. 662, 678 (1994).  "'Thus, if the Government either expressly or impliedly ordered work outside the scope of the contract, or if the government otherwise caused the contractor to incur additional work, a constructive change arises for that work performed outside of the scope of the contract.'"  *E. Coast Repair*, 199 F. Supp. 3d at 1028 (quoting *Miller Elevator*, 30 Fed. Cl. at 678).  There are five recognized types of constructive contract changes:  "(I) disputes over contract interpretation during performance; (II) Government interference or failure to cooperate; (III) defective specifications; (IV)

---

[15] L3Harris also asserted a claim in count II for out-of-scope rework, but the Court granted summary judgment to BAE on this claim.  ECF No. 149, at 38–42.

34

misrepresentation and nondisclosure of superior knowledge; and (V) acceleration." *Miller Elevator Co.*, 30 Fed. Cl. at 678. If a constructive change is proven, "the contractor's 'actual costs' of the changed work, provided that such costs are reasonable, will typically 'provide the measure of the equitable adjustment.'" *E. Coast Repair*, 199 F. Supp. 3d at 1029 (*quoting Delhur Indus.*, 95 Fed. Cl. at 454).

    **2.    L3Harris' constructive change claim is not barred by the subcontract.**

    Before evaluating the merits of L3Harris' constructive change claim, the Court must first address BAE's argument that constructive changes are barred by the subcontract. Def.'s Mem. 71–75. The contract direction/changes clause, within the General Terms and Conditions, states that L3Harris "shall not implement any changes or modifications to this contract . . . without first having received written authorization to do so from BAE['s] Procurement Representative." Pl.'s Ex. 1, § 4(a). The FAR changes clause, as modified by the parties, states that the BAE Procurement Representative "may at any time, by written order, and without notice to sureties, if any, direct changes within the general scope of this Contract." Pl.'s Ex. 3, at 6–7; *see* 48 C.F.R. § 52.243-1.

    BAE contends that: (1) both the FAR changes clause and the contract direction/changes clause are a part of the Purchase Order, and as such neither clause can be said to take precedence over the other pursuant to the precedence clause; (2) the clauses are consistent and should be read in harmony with each other, so the precedence clause is inapplicable and does not give the FAR changes clause priority over the contract direction/changes clause; (3) the contract direction/changes clause states that changes must be made by written order of the BAE Procurement Representative and disallows compensation for any changes, constructive or express,

without prior written authorization; and (4) constructive change claims are not permitted when they are expressly disallowed by other contractual language.[16] Def.'s Mem. 71–73.

The Court first addresses BAE's argument that because both the FAR changes clause and the contract direction/changes clause are a part of the Purchase Order, "neither can be said to take precedence over the other pursuant to the Precedence clause." *Id.* ¶ 291. As noted above, the subcontract is comprised of several documents; namely, a Purchase Order which expressly incorporates General Terms and Conditions, Subcontractor Flow-Downs, and a Ship Repair Addendum. Ct.'s Ex. 1, ¶ 15. The contract direction/changes clause at issue is contained within the General Terms and Conditions. Pl.'s Ex. 1, § 4. The FAR changes clause, applicable to fixed-price contracts, is contained within the Subcontractor Flow-Downs. Pl.'s Ex. 3, at 6–7. The Purchase Order provides that BAE's "standard terms & conditions (enclosed) . . . are to be considered a part of this order," and that "FAR [] flow down clauses applicable to this order are enclosed and are a part of this purchase order." Pl.'s Ex. 4, at 2–3.

The precedence clause, which itself is contained within the General Terms and Conditions, specifies:

> Any inconsistences in this Contract shall be resolved in accordance with the following descending order of precedence: (1) face of the Purchase Order, release document or schedule, (which shall include continuation sheets), as applicable, to include any special provisions; (2) any master-type agreement (such as corporate, operating group, or blanket agreements); (3) representations and certifications; (4) any supplemental terms and conditions incorporated by reference under provision 14; (5) these terms and conditions; (6) statement of work; and (7) specifications or drawings.

---

[16] BAE's argument that the clauses are not inconsistent and that the precedence clause does not give the FAR changes clause priority over the contract direction/changes clause was not asserted in its motion for summary judgment. *See* ECF No. 90, at 18–21.

Pl.'s Ex. 1, § 3. Provision 14 incorporates the Subcontractor Flow-Downs, which includes the FAR changes clause. Pl.'s Ex. 1, § 14. Although the General Terms and Conditions and Subcontractor Flow-Downs are considered to be "a part of" the Purchase Order, they are nonetheless not on "the face of the Purchase Order," as required by the precedence clause. Pl.'s Ex. 1, § 3. Moreover, concluding otherwise would render the precedence clause meaningless and interfere with prioritizing terms of the subcontract that are inconsistent. *See D.C. McClain v. Arlington Cnty.*, 452 S.E.2d 659, 662 (Va. 1995) (holding that "[n]o word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it, and there is a presumption that the parties have not used words needlessly"). For purposes of the dispute in count II, the precedence clause prioritizes the applicable subcontract provisions in the following descending order: the terms on the face of the Purchase Order; the FAR clauses; and the General Terms and Conditions. Pl.'s Ex. 1, § 3. Thus, in the event of inconsistency, the FAR changes clause supersedes the contract direction/changes clause.

BAE argues next that there is no inconsistency between the two clauses, and that the "provisions can and should be read harmoniously so as to give effect to both." Def.'s Mem. ¶ 295. Although the two clauses do not appear to be inconsistent on their face, the distinction between the two is that the FAR is interpreted according to the federal common law of government contracts, Pl.'s Ex. 1, § 17(a), which recognizes the doctrine of constructive changes in the absence of a formal change order.[17] *See Miller Elevator*, 30 Fed. Cl. at 678 (holding that a constructive

---

[17] Inasmuch as BAE argues that the clauses should be read harmoniously and that "no word or paragraph can be omitted in construing the contract if it can be retained and a sensible construction given to the contract as a whole," the Court agrees and finds that both clauses can be read harmoniously. *See* Def.'s Mem. ¶ 295 (citing *Kraft Foods N. Am. v. Banner Eng'g Sales*, 446 F. Supp. 2d 551, 577 (E.D. Va. 2006)). The contract direction/changes clause within the General Terms and Conditions can be sensibly construed as barring any compensation for express changes implemented without prior written authorization from BAE's Procurement Representative. Pl.'s

change occurs "where a contractor performs work beyond the contract requirements, without a formal order under the changes clause, either by an informal order of the Government or by fault of the Government"). Accordingly, inasmuch as the contract direction/changes clause disallows compensation for any out-of-scope work in the absence of a written order of BAE's Procurement Representative, Pl.'s Ex. 1, § 4(b), (d), (f), (g), it is inconsistent with the FAR changes clause as interpreted by courts and boards of contract appeals, which permits constructive change claims, in the absence of a written, formal change order. *See* John Cibinic, Jr., Ralph Nash, Jr., and James F. Nagle, *Administration of Government Contracts* 427 (4th ed. 2006) ("A constructive change occurs when the contract work is actually changed but the procedures of the Changes clause have not been followed.").

Next, BAE argues that constructive change claims are not permitted when they are expressly disallowed by other contractual language, and that, in any event, the FAR changes clause does not permit constructive change claims in all circumstances. Def.'s Mem. ¶ 297. In support of this contention, BAE cites *Len Co. & Assoc. v. United States*, 385 F.2d 438, 443 (Ct. Cl. 1967),

---

Ex. 1, § 4. However, the clause does not address the present situation, in which the parties dispute whether certain work was inside or outside the scope of the subcontract. It is the FAR changes clause, informed by the constructive change doctrine as understood under federal common law, that addresses the present situation where the parties dispute whether the work at issue was within L3Harris' scope. Pl.'s Ex. 3, at 6–7; *see Miller Elevator*, 30 Fed. Cl. at 678 (holding that "disputes over contract interpretation during performance" is the first type of constructive change). Thus, L3Harris' only recourse is to assert a constructive change claim contending that BAE ordered it to perform out-of-scope work. *See Miller Elevator*, 30 Fed. Cl. at 678 ("[I]f the Government either expressly or impliedly ordered work outside the scope of the contract . . . a constructive change arises for that work."). The present situation highlights the rationale behind the constructive change doctrine, where L3Harris would not receive an express, written change directive, despite believing it performed out-of-scope work, because BAE's position is that the work was within L3Harris' scope, and no change to the subcontract was warranted. *See id.* ("While the constructive change doctrine provides a mean for a contractor recovery, the rationale for constructive changes involves the objective of persuading a contractor to continue to work pending resolution of any dispute involving the work at issue.").

and *Info. Sys. & Networks, Corp. v. United States*, 81 Fed. Cl. 740, 747–48 (2008).[18]  *Id.*  In *Len Co.*, the court recognized that while the constructive change theory has received "widespread acceptance," it is not applicable "in every instance in which a contracting officer requires the contractor to perform work not called for by the contract, regardless of the nature and terms of the 'Changes' clause inserted by the contracting parties into their agreement."  *Len Co.*, 385 F.2d at 443.  However, the court also stated that it "has considered it to 'be idle for the contractor to demand a written order from the contracting officer for an extra when the contracting officer was insisting that the work required was not additional' . . . and, therefore, has often dispensed, on these occasions, with the formality of issuing a written change order under the standard clause." *Id.*

Further, in *Info. Sys. & Networks*, the court discussed whether the constructive change doctrine can "apply in the face of contract provisions that not only indicate that all changes are to be approved in writing by the contracting officer, but also repeatedly warn that the contractor should not perform additional work without such a written order."  81 Fed. Cl. at 747.  Although the court discussed whether application of the doctrine was appropriate under such contractual circumstances, it ultimately did not decide the case on that ground, holding that "the court need not approach this case in such absolute terms," because the defendant proved that the doctrine was inapplicable, regardless. *Id.* at 748.  Thus, although both cases suggest that the constructive change doctrine is not absolute, neither goes so far as to rule that the doctrine is inapplicable when the contract language requires written authorization prior to the contractor implementing a change.

---

[18] BAE also cites *Artistic Stone Crafters v. Safeco Ins. Co.*, 726 F. Supp. 2d 595, 602 (E.D. Va. 2010), for the proposition that, under Virginia law, contractual provisions containing written change order requirements are binding upon the parties to the contract.  Def.'s Mem. ¶ 297. Because the FAR is governed by the federal common law of government contracts, however, rather than Virginia law, this contention does not have a bearing on the Court's analysis.

Moreover, a contrary conclusion would contradict the rationale behind the constructive change doctrine in the first place. *See Miller Elevator*, 30 Fed. Cl. at 678 ("While the constructive change doctrine provides a means for a contractor recovery, the rationale for constructive changes involves the objective of persuading a contractor to continue to work pending resolution of any dispute involving the work at issue."). And finally, the dispute at issue here falls squarely within a type I constructive change, namely, a contract interpretation dispute. *See id.* For the reasons discussed below, in the face of L3Harris' assertions that the work in question was not required by the contract and requests for issuance of a change order, multiple BAE personnel directed L3Harris to continue performing the disputed work and BAE never modified the subcontract as requested.

Further, other language in the subcontract casts doubt upon whether the parties' demonstrated "clear intent to disallow constructive changes," as BAE contends. Def.'s Mem. ¶ 297. In addition to the "contract direction/changes" clause contained within the subcontract's General Terms and Conditions, Pl.'s Ex. 1, § 4, there is another "contract direction/changes" clause located within the subcontract's Ship Repair Addendum, Pl.'s Ex. 2, § 222. The latter clause reads that "[i]f any change shall have resulted or derived in any way from an act or omission or formal or *constructive order* by [BAE's] prime contract customer, [L3Harris'] right to equitable adjustment shall be contingent on, and the amount thereof shall be determined in accordance with" certain conditions. *Id.* (emphasis added). Although the language refers to constructive changes resulting from orders by the U.S. Navy, rather than from BAE, the clause nonetheless contemplates that constructive changes may arise during performance, and in such an event, L3Harris may be entitled to an equitable adjustment.

**3.    L3Harris has failed to establish that the work it performed was outside its scope of work under the subcontract.**

Having determined that L3Harris is not barred from asserting its constructive change claim, the Court turns to the substance of the dispute.  To recover, L3Harris must show that it performed work outside the scope of the subcontract, and that BAE expressly or impliedly ordered or caused it to perform that work.  *Miller Elevator*, 30 Fed. Cl. at 678.  L3Harris argues that "BAE constructively changed the subcontract by requiring L3Harris to provide out-of-scope personnel to direct BAE to perform tasks to which L3Harris took exception."  Pl.'s Mem. 20.  BAE contends that L3Harris has failed to prove that it performed "ship fitting" work, instead only proving that it performed directional work, which was within its scope of work under the subcontract.[19]  Def.'s Mem. 75–80.  Prior to addressing who bore the obligation to perform this work under the subcontract, the Court first sets out the relevant contract interpretation principles.

The subcontract is comprised of four documents:  (1) the Purchase Order; (2) the General Terms and Conditions; (3) the Subcontractor Flow-Downs; and (4) the Ship Repair Addendum.  Ct.'s Ex. 1 ¶ 15.  Under Section 1B, "Laws and Regulations," of the General Terms and Conditions, the subcontract states:

> Unless specifically identified otherwise on [the Purchase Order] or under a master-type agreement, which is part of this Contract, all matters arising from or related to it shall be governed by and construed in accordance with the law of the State from

---

[19] The Court notes that the nomenclature used to describe the alleged out-of-scope work has changed throughout the case.  At the summary judgment stage, the alleged out-of-scope work at issue was referred to as "ship fitting," which the parties agreed constituted "lay[ing] out items to be welded or modified and coordinat[ing] with 'hot' workers who perform structural work."  ECF No. 90, ¶ 33; ECF No. 99, at 24–25.  After hearing the trial testimony, however, it is apparent that the alleged out-of-scope work is better referred to as directional and locating work, whereby L3Harris provided personnel to accompany BAE's welders and structural workers to assist them in identifying where to perform structural work.  Accordingly, the Court does not need to resolve the question of what exactly constitutes ship fitting, or whether ship fitting was outside L3Harris' scope of work, as it is immaterial to the question of whether the directional and locating work L3Harris' personnel performed was within its scope of work.

which this Contract was issued, excluding its choice of law rules, except that any provision in this Contract that is (i) incorporated in full text or by reference from the Federal Acquisition Regulations (FAR); and/or (ii) incorporated in full text or by reference from any agency regulation that implements or supplements the FAR; and/or (iii) that is substantially based on any such agency regulation or FAR provision, shall be construed and interpreted according to the U.S. federal common law of government contracts as enunciated and applied by U.S. federal judicial bodies, boards of contract appeals, and quasi-judicial agencies of the U.S. federal Government.

Pl.'s Ex. 2, § 17(a). In the amended complaint, L3Harris stated that "[t]he Vicksburg Subcontract was issued in the Commonwealth of Virginia," and in its answer, BAE admitted that statement to be true. Am. Compl. ¶ 23; ECF No. 55, at 7–8. Moreover, the Purchase Order lists Norfolk, Virginia as the location of the point of contact for each party. Pl.'s Ex. 4, at 1. Accordingly, Virginia law governs all terms of the subcontract, with the exception of clauses that are incorporated in full text or by reference from the FAR, or that are substantially based on the same, which are interpreted according to the federal common law of government contracts.

Although L3Harris and BAE agree that a contract existed, they disagree about its terms and meaning. As Virginia law applies to the parties' dispute, with the exception of the FAR Flow-Down provisions, the Court looks to Virginia contract caselaw for guidance.

The requisites of a valid contract are offer, acceptance, and valuable consideration. *Montagna v. Holiday Inns, Inc.*, 269 S.E.2d 838, 844 (Va. 1980). A party seeking compensation in accordance with a breach of the contract bears the burden of establishing its terms. *See Knox Energy, LLC v. Gasco Drilling, Inc.*, 738 F. App'x 122, 124 (4th Cir. 2018) (citing *Valjar, Inc. v. Maritime Terminals, Inc.*, 265 S.E.2d 734, 736 (Va. 1980)). For a contract to be enforceable, there must be "mutual assent of the contracting parties to terms reasonably certain under the circumstances." *W.J. Schafer Assocs., Inc. v. Cordant, Inc.*, 493 S.E.2d 512, 515 (Va. 1997) (citation and quotation marks omitted).

"The question of whether [a valid] contract exists is a pure question of law." *Spectra-4,*

*LLP v. Uniwest Com. Realty, Inc.*, 772 S.E.2d 290, 293 (Va. 2015) (citation and quotation marks

omitted). Once it is determined a contract exists, its proper interpretation also presents a question

of law if its terms are clear and unambiguous. *Bentley Funding Grp., LLC v. SK & R Grp., LLC,*

609 S.E.2d 49, 53 (Va. 2005). Contract construction looks to the terms agreed upon by the parties,

without adding terms they did not include. *See Wilson v. Holyfield*, 313 S.E.2d 396, 398 (Va.

1984). "When contract terms are clear and unambiguous, a court must construe them according

to their plain meaning." *Bridgestone/Firestone, Inc. v. Prince William Square Assoc.*, 463 S.E.2d

661, 664 (Va. 1995). Thus, "[w]ords that the parties used are normally given their usual, ordinary,

and popular meaning. No word or clause in the contract will be treated as meaningless if a

reasonable meaning can be given to it, and there is a presumption that the parties have not used

words needlessly." *D.C. McClain*, 452 S.E.2d at 662.

Under Virginia law, a term of a contract is considered ambiguous "when it may be

understood in more than one way or when it refers to two or more things at the same time." *Granite*

*State Ins. Co. v. Bottoms*, 415 S.E.2d 131, 134 (Va. 1992). However, "contractual provisions are

not ambiguous merely because the parties disagree about their meaning." *Nextel Wip Lease Corp.*

*v. Saunders*, 666 S.E.2d 317, 321 (Va. 2008). Moreover, "[a]n exclusion is not considered

ambiguous merely because the parties disagree as to its meaning." *Dragas Mgmt. Corp. v.*

*Hanover Ins. Co.*, 798 F. Supp. 2d 766, 773 (E.D. Va. 2011) (citing *Plunkett v. Plunkett*, 624

S.E.2d 39, 42 (Va. 2006)). Rather, if an ambiguity exists, it "must appear on the face of the

instrument itself," and after the words are given "their usual, ordinary, and popular meaning."

*Nextel Wip Lease, Corp.*, 666 S.E.2d at 321.

With these principles in mind, the Court turns to the language of the subcontract and the arguments of the parties. The Purchase Order states that L3Harris undertook an obligation to "provide services to accomplish the requirements of" 17 line items within BAE's prime contract with the U.S. Navy. Pl.'s Ex. 4, at 4–7. The Purchase Order further states that L3Harris took exception to:

> (all on an as-needed basis unless otherwise noted): disposal (hazardous), hazardous material testing, in-yard forklift transportation, truck loading/unloading, crane services, hook-on, rigging, compressed service air provided at manifold, interference removal and reinstallation, temporary lighting (provided to the lighting distribution panel), access cuts, structural repairs and [non-destructive testing], critical coat painting, insulation staging, hazardous material testing and removal, welding (all welding for aluminum), grinding, burning, firewatch, PCMS tile removal and installation.

*Id.* at 1. The parties agree that taking exceptions to various work items meant that L3Harris would not be performing these tasks and that BAE was obliged to do so. Trial Tr. Day 1, at 31:4–11; Trial Tr. Day 3, at 231:7–25. Based on this language, BAE was responsible for, among other things, performing any welding, grinding, or burning services necessary for L3Harris to complete its work. *Id.* However, the parties dispute whether L3Harris, despite having taken exception to performing welding, grinding, and burning, was required to provide directional and locating information to BAE's welders and fitters about the specific location and orientation of welds and structural work. Pl.'s Mem. 21–22; Def.'s Mem. 79–80.

The subcontract does not expressly specify which party is responsible for this particular work. Nor can the parties' intent be determined by looking elsewhere in the subcontract. On the one hand, the subcontract could be construed to mean that, inasmuch as L3Harris failed to take exception to directional and locating work and was otherwise required to "provide services to accomplish" the specified line items, L3Harris was responsible for this disputed work. On the other hand, the subcontract could be read to require that, inasmuch as BAE was responsible for

44

access cuts, structural repairs, welding, grinding, and burning,[20] the obligation to do directional and locating work related to such tasks fell within its scope of work. The subcontract is ambiguous. *See Plunkett*, 624 S.E.2d at 42 ("Contracts are construed as written, without adding terms that were not included by the parties."); *see also Galloway Corp. v. S.B. Ballard Const. Co.*, 464 S.E.2d 349, 355 (Va. 1995) (holding that an ambiguity exists when a phrase, "while appearing perfectly clear at the time the contracts were formed, because of subsequently discovered or developed facts, may reasonably be interpreted in either of two ways.").

Whether a court may consider parol evidence to address an ambiguity depends on the type of ambiguity in question. *Builders Mut. Ins. Co. v. Parallel Design & Dev. LLC*, 785 F. Supp. 2d 535, 548–49 (E.D. Va. 2011). "When evaluating the propriety of considering parol evidence, 'Virginia courts have consistently distinguished between patent ambiguity—ambiguity apparent on the face of the instrument itself—and latent ambiguity—ambiguity that manifests only upon consideration of extrinsic evidence." *Id.* at 549 (quotations and citations omitted). Although the consideration of parol evidence is inappropriate to explain a patent ambiguity, doing so is proper where a latent ambiguity exists. *Zehler v. E.L. Bruce Co.*, 160 S.E.2d 786, 789 n.5 (Va. 1968).

Here, it is apparent that the party responsible for providing labor to perform directional and locating work, an obligation that is entirely absent from the subcontract, constitutes a latent ambiguity. *See Builders Mut. Ins.*, 785 F. Supp. 2d at 549 ("[A] latent ambiguity is one where the 'ambiguity is not self-evident from the writing.'") (internal quotations omitted). While it was clear at the time of contract formation that L3Harris was not responsible for welding, grinding, and burning, it was unclear whether the parties intended that exception to include the attendant task of identifying where such welding, burning, and grinding was to take place. *See Lion Assoc., LLC v.*

---

[20] Hereafter, the Court will refer to these tasks, generally, as "welding, grinding, and burning."

*Swiftships Shipbuilders, LLC*, 475 F. App'x 496, 501 (4th Cir. 2012) ("Latent ambiguity . . . arises where language [although] appearing perfectly clear at the time the contract[] [is] formed, because of subsequently discovered or developed facts, may reasonably be interpreted in either of two ways.") (internal quotations omitted).   Accordingly, the Court looks to extrinsic evidence to determine whether the parties intended L3Harris' scope of work to include directional and locating work. *See S. Ins. Co. of Va. v. Williams*, 561 S.E.2d 730, 733 (Va. 2002) ("resort to parol evidence is proper where a latent ambiguity exists").

"When resolving a dispute between the parties to a contract with a latent ambiguity, the court may first consider, among other things, whether negotiations and prior dealings of the parties manifested their intent with respect to the ambiguous term.  If the parties both manifested the same intent with respect to the ambiguity, that intent will be enforced." *Galloway Corp.*, 464 S.E.2d at 355.  Virginia law permits looking outside the contract to the parties' course of performance, course of dealing, and trade usage, in order to resolve a latent ambiguity. *Medlin & Son Constr. Co. v. Matthews Grp., Inc.*, No. 160050, 2016 WL 7031843, at *8 (Va. Nov. 23, 2016); *Robinson-Huntley v. George Washington Carver Mut. Homes Ass'n, Inc.*, 756 S.E.2d 415, 419 (Va. 2014) ("Further, the acts of the parties in relation to a contract establish a practical construction of it."). *Richlands Flint-Glass Co. v. Hiltebeitel*, 22 S.E. 806, 807 (Va. 1895).

L3Harris makes several arguments in support of its contention that "BAE's contractual obligation to perform welding and other excepted services encompassed a requirement to provide personnel to direct and accompany its personnel in the performance of those tasks." Pl.'s Mem. 21. L3Harris argues that: (1) industry custom and the parties' course of performance indicate that BAE was responsible for supplying personnel to identify where to perform structural work; (2) under the doctrine of *contra proferentum*, ambiguities must be construed against the drafter of the

46

agreement; (3) L3Harris personnel performing this alleged out-of-scope work often had to read and interpret structural drawings within BAE's scope of work and outside of L3Harris' scope of work; (4) L3Harris did not bid these additional structural personnel that it brought on to perform the work of telling BAE's welders where to weld, nor were such tasks included in L3Harris' Quote; (5) L3Harris' Quote states that BAE is responsible to "accomplish" welding, including necessarily the completion of all prerequisites to welding; and (6) nothing in the subcontract detailed how L3Harris was to schedule its personnel to work in tandem with BAE's welders and fitters to advise about the precise location and orientation of structural work, and "one would expect that the Subcontract would provide a mechanism for scheduling this level of coordination to ensure L3Harris could work in tandem with BAE welders." *Id.* at 32–37.

BAE asserts that L3Harris was responsible for providing orientation and directional information to BAE's structural workers, because "[a]s the electrical subcontractor, L3Harris is uniquely equipped to know the location and orientation of electrical components." Def.'s Mem. ¶¶ 319–20. BAE further argues that this information is either shown on electrical drawings that L3Harris was responsible for under the subcontract, or within L3Harris' sole discretion as the electrical subcontractor. *Id.* ¶ 320. Moreover, BAE contends that providing locating and directional services is standard practice for electrical subcontractors and was a critical component of L3Harris' work to avoid the risk of error, and that BAE expected L3Harris to provide these services to BAE's welders. *Id.* ¶¶ 320–22. And, BAE asserts that, because L3Harris possessed all necessary electrical equipment, BAE could not "measure, mark, or mount such electrical equipment" without L3Harris providing access to it. *Id.* ¶ 320.

The Court finds that the evidence shows that the directional and locating work at issue falls into three distinct categories:  (1) identifying where stud runs and cableways should be located,

which included identifying where studs, through which electrical cable would run, needed to be welded; (2) working with BAE welders and fitters to identify where penetrations needed to be located to prepare for the installation of stuffing tubes, multi-cable transits ("MCTs"), and multi-cable penetrations ("MCPs"); and (3) working with BAE welders to specify where electrical equipment, and related foundations and mounts needed to be located to facilitate installation and/or reinstallation of various equipment on the Vicksburg.  The Court will address each category in turn.

### a.   L3Harris was responsible for locating cableways and stud runs.

The first sub-category of directional work at issue requires the Court to determine which party was responsible under the subcontract for identifying where cableways and stud runs needed to be located.  Before looking to extrinsic evidence, the Court first begins with the language of the subcontract.  *See Lion Assoc.*, 475 F. App'x at 501 ("The starting point for ascertaining the parties' intention is the language of the contract.").  L3Harris' performance obligations were delineated in the subcontract's statement of work through lines of the Purchase Order that identified particular spec items, and reference paragraphs within those spec items, that the parties agreed L3Harris would be responsible for.  Pl.'s Ex. 4, at 4–7; Ct.'s Ex. 1, ¶ 24.  "Each Spec Item includes the location of work to be performed, one or more required references to follow in completing the work, [and] a description of the specific work to be performed including required testing, if any."  Ct.'s Ex. 1, ¶ 21.  The Purchase Order contains 17 line items, which each obligate L3Harris to "provide services to accomplish the requirements of" the particular spec item on that line.[21]  Pl.'s Ex. 4, at 4–7.

---

[21] For example, line item 1 provides that L3Harris will "provide services to accomplish the requirements of work item 150-90-001 (accomplish reference 2.9, 2.10, 2.25, 2.26, 2.27, 2.37 & applicable electrical paragraphs)."  Pl.'s Ex. 4, at 4.

Importantly, however, L3Harris also took exception to certain tasks that would be required in order to fulfill the requirements of the line items that L3Harris agreed to accomplish. *Id.* at 1. These exceptions included, in pertinent part, "access cuts, structural repairs and [non-destructive testing], . . . welding . . . , grinding, [and] burning." *Id.* Accordingly, L3Harris' contractual obligations were comprised of all work required to complete the 17 line items on the Purchase Order, other than the work to which L3Harris took exception.[22] Pl.'s Ex. 4; Ct.'s Ex. 1, ¶ 25.

The subcontract does not mention or otherwise reference the task of identifying the location of cableways and stud runs, the first sub-category of the disputed directional work at issue. Thus, the Court looks to extrinsic evidence, which establishes that the parties mutually understood that L3Harris was responsible for identifying the location of cableways and stud runs.

The Court begins by defining the terms at issue. At trial, L3Harris' Stanley Tomlinson testified that "[a] cableway is the transition that the cable is going to navigate . . . from [one] wall all the way to [another] wall." Trial Tr. Day 2, at 330:11–15. Tomlinson clarified that a cableway essentially identified the direction in which a cable is going to travel, and noted that the cable would be traveling either through stuffing tubes, MCTs, or MCPs.[23] *Id.* at 330:16–22. Tomlinson also testified that a stud run referred to studs being put up, and agreed that cable would be transiting between and through those studs. *Id.* at 329:21–25.

Tomlinson testified that L3Harris had an obligation to identify where cableways and stud runs were located. In response to opposing counsel's question, "would you agree that it is common

---

[22] Although the Purchase Order states that "[a] copy of each specification item is enclosed and becomes a part of this order," the Court notes that neither the spec items nor any of the structural and electrical drawings relating thereto, have been made a part of the record in the case. Pl.'s Ex. 4, at 2.

[23] A stuffing tube is a circular electrical tube that allows a single cable to run through it to keep a space watertight, an MCT is a square tube designed for multiple cables to run through, and an MCP is a round tube that serves the same purpose. Trial Tr. Day 1, at 57:15–58:3.

in the industry for an electrician to be involved in advising on the location of a stud run?," Tomlinson testified, "yes, that's going to be a common thing because they would know exactly how we were going to enter that piece of equipment, so we come up with a stud run for that piece of equipment." *Id.* at 329:2–19 (Tomlinson distinguished, however, between where to put equipment, which he contended was not in L3Harris' scope of work, versus the stud runs that ran cable to the equipment, which he agreed was L3Harris' responsibility). Moreover, Tomlinson repeatedly indicated that L3Harris was responsible for directing where stud runs and cableways would be placed. *Id.* at 328:15–329:1 (agreeing that electricians would direct structural workers where to put stud runs and cableways on the ship); Trial Tr. Day 1, at 217:5–7 ("Now I can understand once we put the equipment up you need a cableway or a stud or whatever for your cables, and that's something we would normally do"); *id.* at 218:24–219:2 (stating that L3Harris "would normally do" cableways and stud runs for a piece of equipment, because "we know exactly . . . what cable we want to put to what equipment"); *id.* at 219:3–18 (reiterating that L3Harris would be responsible for "stud runs for the cableways and stuff like that"); *id.* at 243:1–11 (testifying that the absence of hot work provided by BAE affected L3Harris' ability to do its own work, including putting up cableways); Trial Tr. Day 2, at 298:10–21 (explaining that L3Harris' job includes "mount[ing] the equipment," "look[ing] and see[ing] if we need a stud run for the cables that we're going to have running to [the equipment]," "verifying that it's the right cable," and "connect[ing] the equipment or put[ting] the connector on it").

The testimony of Michael Brewer ("Brewer"), a senior project manager at L3Harris, further confirmed that L3Harris was responsible for advising welders where to put studs as it related to cableways and stud runs. Trial Tr. Day 1, at 147:13–16 (testifying that L3Harris would identify where the welder needed to weld for studs, but "not for major structural stuff"); *id.* at 147:20–25

50

(testifying that electricians were involved in directing BAE where they wanted particular studs placed so that they could "run some cable to whatever equipment [they] had to"); *id.* at 185:22–186:3 (explaining that "providing layout is just the direction our cable run [is] going to go and where we need studs every 18 inches . . . and this is where the cable [is] going to run from their piece of equipment that they mounted").[24]

BAE's witnesses agreed. Huss testified that electricians are responsible "for the reinstallation of the equipment, as well as the cable runs." Trial Tr. Day 3, at 237:6–12; *see also* Trial Tr. Day 4, at 107:25–108:3 (testifying that L3Harris was "responsible for the proper orientation of cable runs and stud runs"). Likewise, James Jones, a current project manager at BAE who worked for L3Harris for eight months during performance of the subcontract, testified that electricians "would work hand in hand to lay out a spacing and get all my equipment and studs run and cableways up." Trial Tr. Day 4, at 158:5–15, 167:16–20.

In light of this evidence, the Court finds that the subcontract required L3Harris to identify the location of the stud runs and cableways, and direct BAE's structural personnel where to weld the studs. Although the subcontract was ambiguous as to who bore the obligation to perform this task, industry custom and "the evidence show[] that the parties, by their negotiations and prior dealings, understood and intended" that L3Harris would be responsible for this work. *See Rosenberg v. Turner*, 98 S.E. 763, 775 (Va. 1919) (holding that "even ordinary words or phrases may by usage of trade acquire a restricted or limited meaning, and, when they do, that meaning

---

[24] Although of lesser value, given the nature of his responsibilities on the project, the testimony of L3Harris' Goude, also lends support to the view that L3Harris was responsible for locating stud runs and cableways. Trial Tr. Day 2, at 447:6–14 (testifying that the only portion of structural work that L3Harris anticipated performing was "on the drawings [that] require us to locate the local cable runs going from the main cableway that's depicted on the drawing to the piece of relocated or new equipment").

may be shown by parol evidence . . . [and] the custom is deemed to be a part of the contract."); *see also Galloway Corp.*, 464 S.E.2d at 356–57 ("The testimony of the representatives of these subcontractors shows that, even though the terms of their contracts were legally ambiguous, each had a mutuality of understanding with [the plaintiff] in regard to the ambiguous terms. A plaintiff's case can rise no higher than his own testimony.").

> **b.   Identifying where penetrations needed to be located to prepare for the installation of stuffing tubes, MCTs, and MCPs, as well as identifying the proper location and orientation of the same prior to welding, was within L3Harris' scope of work.**

The second category of directional and locating work at issue requires determining whether: (1) L3Harris was responsible for identifying where penetrations would be located prior to the installation of stuffing tubes, MCTs, and MCPs; and (2) L3Harris had an obligation to assist BAE's welders in identifying the proper orientation and location of the stuffing tubes, MCTs, and MCPs prior to installation. Again, the subcontract is silent on this issue beyond stating that L3Harris is responsible for "provid[ing] services to accomplish the requirements of" the 17 line items listed in the Purchase Order, with the exception of welding, grinding, burning, access cuts and the other tasks to which L3Harris took exception. Pl.'s Ex. 4, at 1, 4–7.

The Court again begins by defining the relevant terms, according to the testimony. Brewer testified that a stuffing tube "is just a circular tube which allows a cable to go through so we can keep the space watertight," and that the penetration through any deck or bulkhead for the tube needed to be as large as three inches in diameter. Trial Tr. Day 1, at 57:13–16, 57:24–58:1; *see* Trial Tr. Day 4, at 93:17–20 (Huss agreeing that a stuffing tube is "a metal tube that has to penetrate the bulkhead and deck to allow the cable to pass through"). Jones clarified that a stuffing tube is for a single cable. Trial Tr. Day 4, at 181:8–11; *see id.* at 94:7–13 (Huss agreeing that stuffing tubes are for a single cable, whereas MCTs and MCPs are for larger groups of cables). Brewer

further testified that MCTs and MCPs are similarly designed to allow cable to go through them to keep a space watertight, but that MCTs and MCPs hold multiple cables, requiring a deck or bulkhead penetration ranging in size from two to three feet. Trial Tr. Day 1, at 57:17–58:3 (Brewer further testified that MCTs are square, whereas MCPs are round). Although a stuffing tube is for a single cable and MCTs and MCPs hold multiple cables, they serve the same function in that they are metal tubes that hold cable and penetrate the bulkhead and/or deck plate so that cable can run to and from equipment on the ship. *See* Trial Tr. Day 4, at 93:17–20.

The parties agree that BAE was responsible for making the actual penetration in the bulkhead or deck plate where the MCT or MCP was going to be placed. *See* Pl.'s Ex. 4, at 1 (L3Harris' exception to performing access cuts, as well as grinding and burning); Trial Tr. Day 3, at 236:22–24 (Huss testifying that a fitter, which he agreed BAE was responsible for providing, would be the person to actually cut into the bulkhead). Moreover, it is undisputed that L3Harris was responsible for pulling and running the cable(s), which traveled through stuffing tubes, MCTs, and MCPs, to equipment. Trial Tr. Day 1, at 147:19–22 (Brewer testifying that L3Harris' job was to run cable to equipment); *id.* at 218:24–219:2 (Tomlinson testifying that L3Harris was responsible for running cable). The dispute between the parties on this issue is limited only to whether the subcontract required L3Harris to identify the precise locations where to penetrate the bulkhead or deck plates, and whether L3Harris was required to assist BAE's welders in identifying the proper orientation and location of the stuffing tubes, MCTs, and MCPs prior to installation. Trial Tr. Day 3, at 236:16–21; Trial Tr. Day 4, at 95:9–96:14.

The Court begins by looking to the relevant exhibits. *See Lear-Sigler Mgmt. Serv. Corp. v. United States*, 867 F.2d 600, 603 (Fed. Cir. 1989) (holding that the parties' contemporaneous interpretation of a contract, before any dispute has arisen, is entitled to great weight). During

performance, the parties disagreed about whether L3Harris had an obligation to perform this directional work.  On January 17, 2019, Tomlinson submitted CFR 096C to BAE stating:

> In a good faith team effort, the contractor has provided to date, eleven man-days of labor walking various BAE personnel through the ship in preparation for the thirty-two MCTs and seventy-two stuffing tubes, required for the shipalt . . . The contractor bid electrical installation hours only; no hours for structural work were included in the estimate.  To date, no penetrations have been installed and the L3 structural supervisor is walking the ship with BAE personnel for the zone 2 installation preparations.
>
> \* \* \*
>
> The contractor requests a[] [Request for Contract Change ("RCC")] be issued and compensation be provided for structural assistance.  The contractor requests thirty workdays (from this date) for L3 to assist BAE personnel with MCTs, [s]tuffing [t]ubes, and [m]iscellaneous foundations throughout the ship.

Pl.'s Ex. 531.  Later, L3Harris sent BAE other CFRs reiterating that providing personnel to assist with penetrations was not within its scope of work.  *See* Pl.'s Ex. 536 (CFR 108C submitted in March 2019 stating that the contractor has continued providing support to BAE structural personnel on a daily basis).

On March 6, 2019, in response to an email from L3Harris notifying BAE about its submission of one such CFR, 108C, Huss, BAE's then project manager, responded:  "BAE is only providing structural support to L3.  Your personnel are still responsible for proper placement of every stuffing tube and MCT/MCP.  That means you will incur structural support costs for personnel that work with BAE Plate & Welding Shop trades.  BAE is only providing hot work support [in accordance with] your list of exceptions on your quote."  Pl.'s Ex. 211, at 2.  Chyance Mattison, a program manager at L3Harris, responded to Huss:

> I will continue to notify you (The Supervisor) of the time expended doing structural work because L3 is not contractually obligated to do so.  Our estimate clearly states 'Electrical Only.'   We went above and beyond that months ago after identifying/marking/laying out all the locations and drawing information for each and every stuffing tube and MCT (several times I might add).  L3 is working with

> your structural depart[ment] at your direction and as a good faith gesture to get the
> job done in a timely manner.

*Id.* at 1.  Moving forward, L3Harris continued to notify BAE that it was providing structural

assistance and that L3Harris had only "planned supporting the structural effort no more than three

months." Pl.'s Ex. 162 (CFR 276C submitted on February 4, 2021).  This culminated in L3Harris

eventually submitting an August 22, 2022 REA for alleged out-of-scope structural support work.

Pl.'s Ex. 22.

The trial testimony further crystallizes the dispute between the parties as to whether

L3Harris was required to assist BAE's structural personnel.  Discussing Huss' March 6, 2019

email, Brewer testified that he disagreed that L3Harris had an obligation to identify the location of

MCTs and MCPs.  Trial Tr. Day 1, at 58:4–10.  Brewer explained that because BAE was

"supplying structural support," they would also "mark [the] MCP MCT in the proper location on

the ship.  I wouldn't expect [any] of my electricians to do that."  *Id.* at 58:7–10.  Brewer later

testified that, although L3Harris was responsible for pulling the cables through MCTs and MCPs,

and was responsible for "providing layout" of where the cable is going to run from the mounted

piece of equipment, BAE had a responsibility to provide "welders, fitters, and firewatches,

everything that's needed to complete the task."  *Id.* at 185:8–15, 185:22–186:3.  Brewer testified

further that electricians do not perform those tasks because they are not trained for it, and they also

do not have the structural drawings to show the exact location where each MCT or MCP or stuffing

tube is supposed to go.  *Id.* at 58:11–14. Discussing the drawings, Brewer stated that, although the

electrical drawings show the MCTs, MCPs, and stuffing tubes, the electrical drawings do not have

dimensions, whereas the structural drawings have dimensions of exactly where the penetration

should be placed.  *Id.* at 80:2–10.  Moreover, he explained that, although the structural drawings

show up on the spec item, they are not in the subcontract, which only contained electrical drawings.

*Id.* at 80:20–81:17. Brewer concluded that L3Harris could not properly place the stuffing tubes, MCTs, and MCPs using just the electrical drawings. *Id.* at 80:11–13.

Tomlinson's testimony on this issue was mostly consistent with Brewer's. Tomlinson testified that BAE could have performed the structural work without L3Harris providing a person to assist. *Id.* at 228:6–8. Moreover, Tomlinson stated that he did not understand it to be common practice for an electrician to direct structural workers where to perform tasks on a ship, with the exception of stud runs and cableways. Trial Tr. Day 2, at 328:19–329:1.

BAE's personnel testified that L3Harris was responsible both for locating where the penetrations were to take place, and for identifying the orientation of the MCT, MCP, or stuffing tube prior to welding. Huss testified that, with respect to MCTs and MCPs, fitters would work with electricians and electrical subcontractors before cutting the hole in the bulkhead. Trial Tr. Day 3, at 236:16–24. Huss continued that following this, the electrical subcontractor would ensure that the component is "properly placed and oriented . . . [and] the location is correct, because there are cables that are going to end up going through that cable transit." *Id.* at 237:1–4. Further, Huss testified that electricians are responsible for the reinstallation of equipment because that information is on electrical drawings, rather than structural drawings, and also because electricians better understand the orientation and location of where the equipment is ultimately going to go. *Id.* at 237:10–18. Referring to MCTs, MCPs, and stuffing tubes collectively as "cableway transits," Huss explained that sometimes these transits need to be installed at various angles, and it would be the electrician's job to determine the optimal angle and convey that information to the welder. Trial Tr. Day 4, at 96:1–14. Huss also testified that he has never seen an electrical subcontractor take exception to this type of locating work. Trial Tr. Day 3, at 237:19–23.

The testimony of James Jones was consistent with that of Huss. Jones testified that each of the paragraphs listed in each line item pertained to an individual drawing, and that these were all electrical drawings because L3Harris was the electrical subcontractor. Trial Tr. Day 4, at 162:3–163:7. Jones testified that the electrical drawings show where the electrical equipment goes in the space, what the electrical cable connects to, and how to connect the cables. *Id.* at 163:16–25. Importantly, Jones clarified that the drawings do not tell the electrician how to route the cable through the ship, and therefore the route is left to the discretion of the electrician pulling the cable. *Id.* at 164:11–19. Even in the case of "certain cables that are mission critical," Jones testified that, although the drawing may tell you to go through a particular bulkhead, it will not specify where to penetrate the bulkhead, and that is left to the discretion of the electrician to take the path of least resistance. *Id.* at 165:1–19. As for structural drawings, Jones testified that, although they would provide more information such as what material a wall is made of, they would not provide any more information about where MCTs or MCPs would be located. *Id.* at 185:14–21.

Additionally, Jones testified that L3Harris was responsible for everything on the drawings relating to electrical work, and that the exception to welding meant only that L3Harris was not going to accomplish the task of fusing metal to metal. *Id.* at 165:20–23, 166:7–10. Jones explained further that the norm in the industry, including when he worked as an electrician, was to "work with the structural department to show them where we want . . . our penetrations . . . and where we want our studs and . . . how we want our spaces laid out." *Id.* at 166:22–167:3. Jones also testified that over the "maybe 30 plus" boats he has worked on in his career, this division of labor where the electrician worked "hand in hand" with the welding shop was always followed. *Id.* at 167:4–24 (stating further that if this practice was not followed, the electrician would be "leaving it up to chance for somebody just to put a stud run or MCT or kick pipe wherever they deem necessary").

57

Having considered the parties' contractual obligations in light of the evidence, the Court finds that L3Harris bore the obligation to identify the location of penetrations, as well as the obligation to properly orient and locate the stuffing tubes, MCTs, and MCPs prior to welding. At the most basic level, the Court's conclusion is based on the following findings. First, L3Harris contracted to perform a subset of the work that BAE was responsible for providing to the U.S. Navy under its prime contract, meaning, for that work, L3Harris assumed the same obligations to BAE that BAE assumed to the U.S. Navy under the prime contract. Pl.'s Ex. 4; Pl.'s Ex. 2, § 212. In taking on this obligation, L3Harris agreed to "provide services to accomplish the requirements of" particular spec items, which were denoted by referenced paragraphs. Pl.'s Ex. 4, at 4–7. The work L3Harris was providing was electrical work, which was reflected in the line items noted in the Purchase Order. *Id.*; *see* Trial Tr. Day 1, at 36:1–7 (Brewer testifying that this clause meant L3Harris was responsible for electrical work). Tomlinson, the project supervisor, understood L3Harris' scope of work under the subcontract to be accomplishing the spec items it contracted to complete, ripping out old cables and equipment, installing new cables, running those cables to the location of new equipment, and then installing cable to the new equipment. Trial Tr. Day 1, at 203:12–206:25, 234:4–7. The cable that L3Harris was installing ran throughout the ship through metal stuffing tubes, MCTs, and MCPs that served as cable transits. *Id.* at 57:15–23; Trial Tr. Day 4, at 96:2–5. These stuffing tubes, MCTs, and MCPs penetrated the bulkhead and/or deck plate of the ship. Trial Tr. Day 4, at 94:7–16, 188:4–11. For the stuffing tubes, MCTs, or MCPs to penetrate the bulkhead, a hole needed to be cut into the bulkhead or deck plate by a fitter, the MCT or MCP needed to be properly placed within the hole, and a welder needed to weld the metal tube in place. *Id.* at 95:4–96:17. L3Harris took exception to providing access cuts, welding, grinding, or burning during the course of its performance. Pl.'s Ex. 4, at 1. Welding is the fusing of two or

more pieces of metal together using heat, grinding is using a mechanical tool to take away metal, and burning is the process of using a torch or plasma cutter to cut a hole in a ship. Trial Tr. Day 3, at 232:11–21; Trial Tr. Day 4, at 89:1–6, 166:3–6. When L3Harris took exception to welding, grinding, and burning, it took exception to the specific tasks of fusing metal together, taking away metal, and cutting holes in the ship, but maintained responsibility for the process of running electrical cable to equipment through stuffing tubes, MCTs, and MCPs. And lastly, to execute this obligation of running cable to equipment, L3Harris was responsible for identifying where penetrations needed to be located within the bulkheads and deck plates of the ship, as well as ensuring the cable transits were properly oriented prior to being welded in place.

In reaching this conclusion, the Court finds certain exhibits and testimony to be particularly persuasive as evidence of course of trade in the ship repair industry. First, the Court finds compelling that L3Harris submitted multiple CFRs to BAE stating that "[t]he contractor planned supporting the structural effort no more than three months." Pl.'s Ex. 162; Ct.'s Ex. 1, ¶ 73. This statement suggests that L3Harris contemplated supporting BAE's structural effort for at least some length of time during its performance of the subcontract, although perhaps not for as long a time period as it did. Second, the Court finds the testimony of James Jones, a former electrician who worked as a project manager for both parties during the course of the subcontract, to be informative. Trial Tr. Day 4, at 157:25–158:15. Jones testified that electricians exercise discretion to determine the precise location where the cable penetrates the bulkhead or deck plate, rather than determining the location based solely on the structural or electrical drawings. *Id.* at 164:11–19, 165:1–19, 185:14–21. Jones also testified this practice was followed throughout the 30-plus ships he had worked on in his career. *Id.* at 167:4–24.

Consistent with this evidence of industry practice, and the subcontract's allocation to L3Harris of the responsibility for running cable, it follows that L3Harris was contractually responsible for identifying where to penetrate the bulkhead and deck plates, and how to orient MCTs, MCPs, and stuffing tubes, to set and optimize the path that the cable would transit. This conclusion is buttressed by L3Harris' contractual responsibility for identifying cableways and stud runs. *See* Trial Tr. Day 1, at 147:13–16, 185:22–186:3; Trial Tr. Day 2, at 329:2–19. As L3Harris was responsible for identifying where the cable needed to run throughout the ship, and worked with welders to ensure studs were properly located, it follows that L3Harris was also responsible for locating where the tubes carrying the cable should penetrate the deck and bulkhead, as well as directing the proper orientation of the tubes in relation to the hole.

Nor is the Court persuaded that a contrary conclusion flows from Brewer's testimony about the parties' course of dealing in subcontracts involving electrical work on the U.S.S. Oscar Austin and U.S.S. Porter. First, the subcontracts for L3Harris' work on these ships are not part of the record. Therefore, the Court cannot compare pertinent contract language relating to the matter at issue. Second, L3Harris' scope of work on both projects appears to have been narrower than on the Vicksburg. For the U.S.S. Oscar Austin, the testimony demonstrated that L3Harris' scope of work was limited to ripping out cables in the aftermath of a fire. Trial Tr. Day 1, at 145:9–21. For the U.S.S. Porter, which was damaged in a collision with another ship, the testimony revealed that L3Harris' scope of work was limited to ripping out cables and then hooking them back up to equipment. *Id.* at 149:18–150:1. As L3Harris' work on both ships did not involve ship alteration and modernization, it is of limited value in determining the parties' intent when contracting for electrical work on the Vicksburg.

Moreover, the Court is not persuaded by L3Harris' argument that "under the doctrine of *contra proferentum*, in the event of an ambiguity in a contract, that ambiguity 'must be construed against the drafter of the agreement.'" Pl.'s Mem. ¶ 160 (citing *Va. is for Movers, LLC v. Apple Fed. Credit Union*, No. 1:23cv576, 2024 WL 1091786, at *4 (E.D. Va. Mar. 13, 2024)). In *Va. is for Movers*, the Court was careful to note that this rule "is a failsafe that 'applies only as a tool of last resort to resolve persistent ambiguities," and that "Virginia law does not envision a shifting burden of proof in claims for breach of contract." *Id.* at *4 (internal citations omitted). Further, the doctrine is designed to place "the risk of ambiguity, lack of clarity and absence of proper warning on the drafting party which could have forestalled the controversy," and save parties from "hidden traps not of their own making." *Folk Constr. Co. v. United States*, 190 Cl. Ct. 681, 688 (1983). No need exists to resort to the doctrine here, as the Court is able to interpret the subcontract to resolve the ambiguity.

Moreover, L3Harris is a sophisticated government contractor. Not only has L3Harris contracted with BAE in the past, but it also played a role in drafting the critical disputed provisions of the subcontract by listing its exceptions to the work within its Quote, which exceptions were incorporated into the Purchase Order. *See* Pl.'s Ex. 21. Accordingly, L3Harris still bears the burden of proving it is entitled to an equitable adjustment. *Va. is for Movers*, 2024 WL 1091786, at *4.

The Court is similarly unpersuaded by L3Harris' contention that because its personnel often had to read and interpret structural drawings within BAE's sphere of responsibility in the subcontract, that is evidence that the direction and locating work at issue fell outside L3Harris' scope of work. Trial testimony about what the electrical and structural drawings showed, who possessed which drawings, as well as which party was best positioned to interpret them, was

inconsistent and conflicting. *See* Trial Tr. Day 1, at 80:2–81:18; *but see* Trial Tr. Day 4, at 164:9–19, 165:1–19, 185:14–21. None of the referenced drawings was offered into evidence. Therefore, to the extent L3Harris relies on drawings not in evidence to argue that BAE required it to perform out-of-scope work, the argument is unavailing.

Moreover, the Ship Repair Addendum contains a clause stating that "if the [Purchase] Order requires shipboard Work, [L3Harris] shall, at no additional cost to BAE [], coordinate its Work with that being performed by BAE." Pl.'s Ex. 2, § 210. In light of this language, the Court rejects L3Harris' argument that the subcontract's lack of detail on how electricians would coordinate with structural workers strengthens L3Harris' interpretation. And, despite the subcontract's lack of detail as to how this coordination would take place, Tomlinson and Brewer testified that this was the standard practice as it relates to stud runs and cableways. Trial Tr. Day 1, at 147:13–16, 185:22–186:3; Trial Tr. Day 2, at 329:2–19. Therefore, the Court is unconvinced by L3Harris' argument that nothing in the subcontract explained how this "combination effort" would work.

Finally, L3Harris' argument that the language of its Quote stating that BAE is to "accomplish" welding and other structural work, also falls short. Although the Quote is one form of extrinsic evidence of the parties' intent, the use of the word "accomplish" does not move the needle to show that the parties agreed that BAE would perform not only welding, grinding, and burning, but also the disputed functions ancillary to those tasks. Pl.'s Mem. ¶ 171. In its Quote, L3Harris could have but failed to take exception to additional tasks, including identifying the location of MCTs, MCPs, and stuffing tubes. Pl.'s Ex. 21. Accordingly, the Court rejects L3Harris' arguments that the subcontract required BAE to identify the location of penetrations, as

well as the proper orientation and location of the stuffing tubes, MCTs, and MCPs prior to installation.

<strong>c. The evidence before the Court is insufficient to determine who was responsible for specifying the location where equipment and the related foundations and mounts needed to be installed.</strong>

The third category of work at issue requires the Court to determine whether L3Harris was responsible under the subcontract for identifying the locations where equipment, and the adjoining foundations and mounts,[25] would be installed or reinstalled.

It is undisputed that L3Harris was contractually responsible for running cable to the location of various pieces of equipment, physically mounting the equipment onto the foundations or mounts that had been welded and structurally installed by BAE, and then connecting the cable to that particular piece of equipment. Trial Tr. Day 1, at 147:19–22, 203:22–204:1, 234:4–7; Trial Tr. Day 2, at 304:24–305:1; Trial Tr. Day 4, at 27:13–21. Therefore, the dispute as to the third category concerns which party was responsible for identifying the precise location where the foundations and mounts for equipment were to be installed. Trial Tr. Day 1, at 147:17–20, 186:4–8.

The trial testimony suggests that the structural and electrical drawings are crucial in addressing this issue. Tomlinson testified that BAE possessed structural drawings providing dimensions specifying exactly where to put a particular piece of equipment. Trial Tr. Day 2, at 329:8–15. Moreover, Tomlinson explained that even though the drawings had layout parameters to tell the structural worker where the equipment needed to go, BAE nevertheless required L3Harris to provide personnel to advise the welder of the specific location where the foundations

---

[25] Tomlinson testified that a foundation is something that sits between a piece of equipment and the bulkhead or deck plate of the ship. Trial Tr. Day 2, at 296:8–16.

and mounts needed to be welded. *Id.* at 365:25–367:2. Similarly, Brewer testified that structural drawings, which he testified L3Harris did not have, specified the dimensions and provided direction to enable BAE to weld foundations and mounts for equipment to be mounted and installed at the proper location. Trial Tr. Day 1, at 43:5–13.

BAE's witnesses testified that the location where equipment needed to be installed was not listed on structural drawings, but on electrical drawings within L3Harris' scope of work. Trial Tr. Day 3, at 237:10–18. Huss explained that interpreting these electrical drawings was within an electrician's scope of work, and did not require any structural expertise, but rather just the ability to read the drawings. Trial Tr. Day 4, at 28:3–12. Moreover, Huss testified that L3Harris was responsible for working with BAE personnel to make sure electrical components were being installed correctly to prevent rework. *Id.* at 102:7–10. Likewise, Jones testified that the electrical drawings identified precisely where equipment went within a space, and that L3Harris' responsibility for everything on the electrical drawings included specifying the location of welding items needed to mount equipment. *Id.* at 163:16–19, 164:1–8, 165:20–23, 178:23–179:12.

To evaluate this testimony and assist in interpreting the subcontract, the Court needs to examine the pertinent structural and electrical drawings and determine who was responsible for any tasks identified thereon. Having considered the relevant evidence, and because none of the electrical or structural drawings were offered at trial, the Court cannot perform these tasks.

On one hand, L3Harris' responsibility for running and attaching cable to particular pieces of electrical equipment suggests that it also was responsible for identifying the location where equipment would go. For instance, there was testimony that oftentimes the cable needed to be "targeted to the equipment in order to get the right amount of cable," and to prevent there from being a shortage or excess of cable. Trial Tr. Day 1, at 257:22–24; *see* Trial Tr. Day 2, at 329:5–

8 (Tomlinson testifying that L3Harris was responsible for stud runs to equipment because it understood exactly how it wanted the cable to enter the equipment). On the other hand, BAE was responsible for welding foundations and mounts needed to attach pieces of equipment to the ship, a job that is not dependent on an electrician's expertise in identifying the best route for a cable to traverse. This suggests that BAE may have been responsible for precisely identifying where such equipment should be located, without any assistance from the electrical subcontractor.

As the drawings are not in evidence, and the testimony on this issue is less than clear, L3Harris has failed to sustain its burden of proof. *See E. Coast Repair*, 199 F. Supp. 3d at 1027 ("It is undisputed, and unremarkable, that Plaintiff has the burden to prove, by a preponderance of the evidence, its affirmative claims seeking an adjustment in the Contract price pursuant to the 'Changes' clause."). Although L3Harris asks the Court to conclude that the structural drawings within BAE's scope of work show the exact dimensions for locating equipment, whereas electrical drawings do not, L3Harris has not offered the pertinent structural or electrical drawings into evidence. *See Delhur Indus.*, 95 Fed. Cl. at 460 (holding that the burden of proof rests with the plaintiff, and that the plaintiff failed to prove that its damages were caused by an action of the defendant that violated the contract). Nor has L3Harris rebutted the testimony of Huss and Jones, BAE's primary witnesses relating to electrical work, who testified that it is not the structural drawings, but the electrical drawings that provide more detailed information about where electrical equipment should be precisely installed. Trial Tr. Day 3, at 237:10–18; *see Renda Marine, Inc., v. United States*, 66 Fed. Cl. 639, 698 (2005) (holding that because plaintiff failed to present any evidence to contradict the defendant's testimony, alongside plaintiff's failure to establish a causal nexus between the defendant's conduct and plaintiff's damages, plaintiff failed to prove its damages by a preponderance of the evidence). Therefore, L3Harris has failed to establish its

entitlement to an equitable adjustment for labor costs associated with specifying the locations of equipment and related foundations and mounts.

Moreover, even had L3Harris met its liability burden, the Court is unable to discern which of its count II damages are attributable to this specific sub-category of alleged out-of-scope work. Goude testified that L3Harris' count II damages are for personnel doing ship fitting and working with BAE to identify where things go on the ship, but he did not indicate any method to further isolate L3Harris' damages relating to this third sub-category of locating work.  Trial Tr. Day 3, at 111:15–114:2.  Without being able to isolate which hours were billed specifically for locating work related to equipment, as opposed to directional work related to the other two sub-categories, the Court could not award damages to L3Harris for such locating work, even if liability had been established.  *Raytheon Co.*, 305 F.3d at 1367.

Therefore, the Court concludes that L3Harris has failed to prove its count II claim for out-of-scope work.

## C.    Count IV – Breach of performance obligations

Count IV of the amended complaint alleges that: (A) BAE failed to provide structural work within a reasonable period of time; and (B) BAE failed to timely deliver GFM.  Am. Compl. ¶¶ 123–32.  The Court addresses these claims separately.

### 1.    Count IV(A) – Breach of contract claim for BAE's failure to provide welding and structural work within a reasonable time period

In count IV(A), L3Harris asserts that "BAE breached the subcontract by failing to provide welding and other structural support services in a reasonable time frame," Pl.'s Mem. 44, resulting in damages of $747,767.44, *id.* at 90–92; *see* Am. Compl. ¶ 62.[26]  L3Harris bears the burden of

---

[26] The amended complaint pleads count IV in the alternative to count III, upon which the Court previously granted summary judgment to BAE.  ECF No. 149, at 44–45 (ruling that "L3Harris

proving this breach of contract claim and establishing the elements required by Virginia law, as discussed above.

L3Harris contends that: (1) BAE was required to provide welding and other structural work[27] within a reasonable time frame; (2) BAE repeatedly failed to do so; and (3) this caused its workers to be idled and delayed its work, resulting in a major expansion of its performance period. Pl.'s Mem. 44–60. BAE argues that: (1) its performance was not subject to any specific schedule; (2) it provided structural work within a reasonable time period under the circumstances; (3) L3Harris' performance was deficient; and (4) while awaiting BAE support, L3Harris could have performed other work. Def.'s Mem. 31–41.

For the reasons discussed below, the Court concludes that the subcontract required BAE to perform structural work within a reasonable time under the circumstances. The circumstances in question, however, are varied and complex. The subcontract work fell within the larger context of an ultimately unsuccessful, multi-year project, spanning three prime contractual phases, to retrofit a decommissioned guided missile cruiser built in the 1980s and return it to naval service. Despite the parties' efforts to blame the other or the Navy or the pandemic or other causes, the evidence is insufficient to fix a reasonable time for BAE's performance of structural work or to find that BAE breached that obligation.

---

[could not] recover under the FAR stop-work order clause for damages resulting solely from an increase in the time or cost of performance" because the Purchase Order precludes any equitable adjustment of the schedule or cost, absent a change in the scope of work). In previously granting BAE's motion to dismiss the original complaint in part, the Court also ruled that the absence of a suspension of work clause in the subcontract precluded L3Harris from pursuing constructive change claims for delay costs, not associated with changes in the scope of work. ECF No. 32, at 12–14. Accordingly, L3Harris pursues an alternate theory of recovery in count IV(A). Pl.'s Mem. 44–56.

[27] Although the amended complaint describes the work at issue in count IV as "structural support work," the Court refers to it as "structural work" to differentiate it from the directional and locating work discussed in count II. *See* Am. Compl. ¶¶ 125–27.

### a.   BAE was required to perform within a reasonable period of time.

The subcontract contains several provisions bearing upon the time for BAE's performance. The Purchase Order lists "availability dates" for performance of April 2 through September 28, 2018, which change orders later extended through December 4, 2019. Def.'s Ex. 1, at 1–2. It also specifies, however, that the "availability or period of performance listed on this order [is] approximate and subject to change based on key events, milestones and ongoing movement of production schedule." *Id.* at 3. The Purchase Order also specifies that "[i]t is the subcontractor[']s responsibility to remain compliant with schedule, any updated schedule, NAVSEA [standard] items, and milestones based on daily production meetings." *Id.* And, under a "Performance and Delivery" section within the Ship Repair Addendum, the subcontract provides:

> It is agreed that time is of the essence in performance of any Order incorporating these terms and conditions. Commencement and completion of Work or delivery of the goods ordered shall be strictly in accordance with the times set forth on the face of the Order, or, if no time is there set forth, in accordance with the requirements of [BAE's] prime contract. If requested by BAE [], [L3Harris] shall submit to BAE [], in the form acceptable to BAE [], a detailed schedule for performance of the Order which schedule will comply with all schedule requirements of [BAE's] prime contract. If the Order requires shipboard Work, [L3Harris] shall, at no additional cost to BAE [], coordinate its Work with that being performed by BAE [], other subcontractors of BAE [], and by [BAE's] customer.

Pl.'s Ex. 2, § 210.

Further, the Purchase Order indicates that, as to the services L3Harris took exception to performing and for which BAE was responsible, L3Harris "required [such services] (all on an as-needed basis unless otherwise noted)." Pl.'s Ex. 4, at 1.

The subcontract does not expressly specify the timeframe for BAE to do the structural work to which L3Harris took exception. The provision that L3Harris "required [welding, grinding, burning, etc.] . . . *on an as-needed basis unless otherwise noted,*" however, indicates that BAE's

service obligations were something other than regular and continuous. *Id.* (emphasis added); *cf.*

*Pearson, Dickerson, Inc. v. United States*, 115 Ct. Cl. 236, 259 (1950) (finding no breach of a

construction contract requiring the United States to "make allocations in sufficient time to enable

plaintiffs to receive the materials *as needed* for the orderly and efficient progress of [] work,"

because the subcontract at issue "was a war contract and plaintiffs . . . must have known that such

material w[as] being or would be allocated for use on various defense projects on the basis of the

greatest need" and that "delay by reason of such controls, priorities and allocations would probably

occur") (emphasis added). Absent any specification by L3Harris of a service timetable other than

"as-needed," the subcontract contains a degree of informality and short-term flexibility indicating

that L3Harris' needs were less than constant and BAE's service obligations were something other

than immediate and continuous. *See* Trial Tr. Day 4, at 282:4–22 (discussing informal process for

requesting welding and structural work from BAE that changed from L3Harris sending a daily

email to later submitting a weekly plan for such work). This is consistent with other subcontract

language for prioritizing between L3Harris' needs and BAE's service obligations. As prime

contractor, BAE bore ultimate responsibility for the Vicksburg project and the subcontract

recognizes this, requiring L3Harris, "at no additional cost to BAE [to] coordinate its [shipboard]

Work with that being performed by BAE," its other subcontractors, and the Navy. Pl.'s Ex. 2,

§ 210.

The subcontract's terms on the period of performance reflect a similar hierarchy and degree

of flexibility. Although the Purchase Order envisioned completion of L3Harris' work in roughly

six months, it also described this schedule as only "approximate" and subject to change based on

"key events, milestones and ongoing movement of the production schedule." Pl.'s Ex. 4, at 1. In

that vein, the subcontract required L3Harris to contact BAE's ship superintendent for the daily

plan of the day, and also put the onus on L3Harris "to remain compliant with schedule, any updated schedule, NAVSEA Std items, and milestones based on daily production meetings." *Id.* Similarly, although the "Performance and Delivery" section of the Ship Repair Addendum indicates that "time is of the essence" in performing the work, it also directs that, if requested by BAE, L3Harris must submit to BAE "a detailed schedule for performance of the Order, which schedule will comply with all schedule requirements of [BAE's] prime contract." Pl.'s Ex. 2, at § 210.

Therefore, the schedule for retrofitting the Vicksburg was fluid, subject to regular change, and driven by work events, which presumably could not always be accounted for in advance. These provisions undermine L3Harris' argument that its estimated schedule for the work, including BAE's structural work, should control over a schedule driven by the actual pace of work on the ship as a whole. *See, e.g.*, Trial Tr. Day 1, at 74–75 (discussing plan to work with BAE for three months and "complete[] the electrical work in the last three months"); Pl.'s Ex. 247; Pl.'s Ex. 449; Trial Tr. Day 2, at 446:22–447:5 (discussing L3Harris' internal projection that structural work preceding most of its tasking would be done by June or July 2018).

Subsequent events confirm the need for the flexibility written into the subcontract. Work on the Vicksburg quickly fell behind schedule, even before L3Harris started working and before the onset of the pandemic. Trial Tr. Day 1, at 204:16–205:21; Trial Tr. Day 2, at 438:13–439:5. Indeed, the subcontract's period of performance changed multiple times from September 2018 to December 4, 2019. Ct.'s Ex. 1, ¶¶ 50–51; Trial Tr. Day 3, at 241:2–10; Def.'s Ex. 1, at 1–2. Likewise, the period of performance for the prime contract (SSRA2) slipped to October 2020. Trial Tr. Day 4, at 146:16–23, 215:3–6.

At some point after the earlier efforts to accelerate L3Harris' work discussed above, BAE's schedule requests to L3Harris became open-ended, because the work on the Vicksburg exceeded

the performance deadlines in both the subcontract and the prime contract. *See, e.g.*, Trial Tr. Day 3, at 241:20–243:12 (noting that, sometime after the performance period lapsed, the Navy directed BAE and its subcontractors simply to complete the assigned work and that BAE did not impose any schedule or deadline for L3Harris to complete its work, but relied upon the NAVSEA standard item 009-60 schedule to guide outstanding work); Trial Tr. Day 4, at 87:2–25 (discussing 009-60 schedule and weekly updates thereto), 267:13–268:22 (same and noting BAE asked L3Harris for performance dates, rather than imposing the same); Trial Tr. Day 2, at 408:6–11 (agreeing that, when L3Harris could not meet an agreed upon schedule, it was moved); Pl.'s Ex. 213; Def.'s Ex. 18; *cf.* Am. Compl. ¶ 125 (noting use of 009-60 to establish the parties' work schedule). As the parties came to operate independent of any fixed completion date set by either the Navy or contract, *see* Trial Tr. Day 4, at 236:20–23; Def.'s Ex. 9 (reflecting L3Harris' reporting of estimated completion dates for its work of March 11 and 25, 2022); Trial Tr. Day 3, at 120:4–18, BAE's requests to L3Harris for new schedules for work completion and its use of the 009-60 to schedule the remaining work comported with the Purchase Order's language and § 210 of the Ship Repair Addendum, as well as the parties' course of dealing.

Relevant caselaw also informs the parties' obligations. Both government contracts and Virginia caselaw recognize that when a contract does not specify a period of performance, "the law imposes an obligation to act within a reasonable period of time." *Specialty Assembling & Packing Co. v. United States*, 355 F.2d 554, 564–65 (Ct. Cl. 1966) (ruling that absent a specification of "the . . . time within which the [prime contractor] was required to act on requests for the approval of nonstandard components," a prerequisite for work by the subcontractor, the prime contractor must act within a reasonable period of time); *B-E-C-K Constr. v. United States*, 571 F.2d 25, 31 (Ct. Cl. 1978) (noting that "[i]t is well settled that where a time is not fixed in a

71

contract for performance of an *obligation*, performance within a reasonable time, dependent on the circumstances applicable, is required.   Where no time limit is given, it is presumed that performance will be concluded within a reasonable time.") (emphasis added); *Duke v. Norfolk & W. Ry. Co.*, 55 S.E. 548, 549 (Va. 1906) (holding that when a Virginia contract did not specify a time of performance, "in such a case it is plain that the contract is to be performed within a reasonable time").

Based on the foregoing, the Court concludes that the subcontract required BAE to perform structural work in a reasonable time.  "What is a reasonable period of time for [one party] to do a particular act under the contract is entirely dependent upon the circumstances of the particular case." *Tri-Cor, Inc. v. United States*, 458 F.2d 112, 131 (Ct. Cl. 1972);[28] *see Duke*, 55 S.E. at 549 (holding that it is for the factfinder to decide, based on all the circumstances, what constitutes a reasonable time).  In weighing the circumstances here, the Court is mindful of, among other things, L3Harris' obligation to coordinate its work with BAE (not the other way around), L3Harris' inability to do some aspects of its work until BAE completed certain structural work, *see, e.g.*, Trial Tr. Day 3, at 230:24–231:6, and the subcontract's linkage of the time to perform to the progress of the work on the Vicksburg.

### b.   L3Harris has failed to prove that BAE did not perform structural work within a reasonable time period.

Multiple factors and parties contributed to extending L3Harris' performance from roughly six months to over five years.  Due to the same and the absence of expert testimony or other

---

[28] For example, where the government's lack of performance halts the contractor from performing most of its work, a reasonable time may be "quite brief," whereas when the contractor is able to mitigate the effects of delay by shifting to other work, "quite lengthy delays have been found to be reasonable." *Tri-Cor*, 458 F.2d at 131.

probative evidence to effectively sort them and assign responsibility, the Court lacks sufficient information to fix a reasonable time for BAE's structural work under the circumstances or to otherwise conclude that BAE failed to do such work within a reasonable time.

For example, the condition of the Vicksburg played a significant role in extending the time for L3Harris' performance. The Vicksburg was a guided missile cruiser originally built in the 1980s and decommissioned in 2013. Trial Tr. Day 1, at 131:7–20, 202:2–12. The vessel was set to undergo a "smart ship" upgrade to bring it back into service, which involved upgrading its navigation, propulsion, and operating systems. *Id.* at 202:17–22. Spanning three prime contract phases,[29] the work to be accomplished included: (1) removing "extensive amounts of deteriorated aluminum superstructure and equipment" from the "topside" of the ship and renewing the same; (2) altering, strengthening, and upgrading the ship; (3) working on various piping and mechanical systems, major engine room equipment, aft tanks, and compensator fuel tanks; (4) making the berthings and living spaces more habitable; and (5) restoring combat system suites. Trial Tr. Day 3, at 228:15–229:18.

Both BAE and L3Harris witnesses agreed that the work on the Vicksburg involved a "very complex," "massive" undertaking. Trial Tr. Day 1, at 131:23–24; Trial Tr. Day 3, at 229:19–21. Once performance began, the project's difficulty grew as workers found that the structural condition of the Vicksburg (and other cruisers being modernized in the same program) was worse than the Navy anticipated, necessitating increased structural work to rehabilitate the vessel. Trial Tr. Day 4, at 275:19–276:1 (discussing "huge structural removing" of "big plates of aluminum on

---

[29] The three prime contracts issued to BAE were identified as SSRA1, SSRA2, and MODPRD. *See, e.g.*, Trial Tr. Day 3, at 226:1–12; Trial Tr. Day 4, at 148:5–10. Although L3Harris later performed some work under MODPRD, the disputes in this case concern its subcontract work under SSRA2. Trial Day 3, at 230:1–12.

the superstructure"); 276:10–22.  This caused work in the first prime contract phase (SSRA1) to bleed into the second phase (SSRA2).  Trial Tr. Day 1, at 204:16–205:21; Trial Tr. Day 4, at 148:11–149:2.  Similarly, work in the third phase (MODPRD) began in early 2020 before the completion of the second phase.  Trial Tr. Day 3, at 227:15–17; Trial Tr. Day 4, at 32:19–33:5 (noting BAE's diminished ability to supply welding and fitting to L3Harris during the "initial ramp-up of work on MODPRD"), 148:11–149:2, 275:19–276:5.  The overlap apparently resulting from the Navy's decision to split the work among three different prime contracts, coupled with the fact that BAE was simultaneously working with roughly 12 to 20 subcontractors on SSRA2 and 20 to 30 on MODPRD, led to problems "orchestrating" the work.  Trial Tr. Day 3, at 229:22–25; Trial Tr. Day 4, at 76:13–16, 149:3–24 (opining that the "process or concept" "was probably not . . . well thought-out" by the Navy); *see* Trial Tr. Day 4, at 249:7–12 (testifying that, at one time, BAE had roughly 60 subcontractors working on SSRA2 and MODPRD).

Due in significant part to these issues, the work on the Vicksburg not only extended into 2023, but the modernization project never came to fruition and the ship never returned to naval service.[30]  Trial Tr. Day 4, at 36:17–37:21.  Efforts to modernize other cruisers in the Vicksburg's class also fared poorly.  Of the three cruisers in the Vicksburg's class, only the U.S.S. Gettysburg was successfully modernized and returned to naval service.[31]  Trial Tr. Day 4, at 241:21–242:11, 243:5–244:6, 276:10–14.

---

[30] The Court takes judicial notice that on June 28, 2024, shortly after the trial ended, the Navy formally decommissioned the Vicksburg.  *See  https://www.surflant.usff.navy.mil/Press-Room/News-Stories/Article/3827085/uss-vicksburg-decommissions/*

[31] There was also testimony that eight ships in total were part of the modernization program and that due to greater than anticipated structural work, modernization efforts consumed much more time than expected.  Trial Tr. Day 4, at 243:17–244:6.

These circumstances weigh heavily in the Court's analysis of the claim in count IV(A). The evidence is insufficient to enable the Court to assign or apportion fault for the lengthy performance delays that appear to have ensued therefrom to BAE, the Navy, L3Harris, or others. No critical path analysis or testimony by a qualified expert was supplied by L3Harris to assist with such a complex task. *See* Trial Tr. Day 3, at 88:3–16, 92:11–18, 102:18–103:14. Moreover, the subcontract links the period for L3Harris' performance (and by extension any necessary preceding structural work by BAE) to the Vicksburg's overall production schedule and key events. As events effectively pushed the production schedule backwards, the time for BAE's performance of structural work necessarily receded as well. It is also significant that the subcontract did not require BAE to conform its work to that being conducted by L3Harris. Instead, it required L3Harris to coordinate its work with BAE's and many other contractors, at no added cost to BAE.

Other circumstances also bear upon any assessment of the time for BAE's performance of structural work required by the subcontract. These include the COVID-19 pandemic. Ct.'s Ex. 1, ¶¶ 92–93. Despite the public health emergency, the Navy directed that work continue on the Vicksburg as an "essential service." *Id.* ¶ 93. As required by law, BAE and L3Harris implemented health and safety measures to reduce the spread of COVID-19. *Id.* ¶ 94. The pandemic and these safety protocols slowed the pace of performance. *See, e.g.*, Trial Tr. Day 2, at 273:2–275:14; Trial Tr. Day 4, at 286:9–288:1; Pl.'s Ex. 590 (reporting "unprecedented absenteeism rate" and "inefficiencies in the planning and execution of the project" due to the pandemic) Am. Compl. ¶¶ 27–29; *see also* Ct's Ex. 1, ¶¶ 100–104 (discussing COVID-19 REAs of L3Harris and BAE). And, as discussed below, on several occasions, access to the ship was temporarily interrupted, including because of an undocking, a power outage, an evacuation due to a toxic fume alarm, and a fire

onboard the vessel. Ct.'s Ex. 1, ¶¶ 74–79. These circumstances, among others,[32] also impacted the production schedule for the Vicksburg and the corresponding time for BAE to perform and complete structural work under the subcontract.

Instead of meaningfully grappling with and disclosing how it accounted for such circumstances, L3Harris primarily relies on evidence showing that, on various days, it requested structural work which BAE failed to adequately provide.[33] Based primarily upon Andrew Goude's conversations with production staff and its initial estimates of the time required for associated work, L3Harris argues that its performance was delayed by BAE's failure to timely perform structural work.[34] See, e.g., Pl.'s Ex. 444, 449 (June 8 and September 13, 2020 CFRs reciting the need to complete outstanding structural work, and requesting a change order for "the additional

---

[32] Other circumstances extending overall performance on the Vicksburg include L3Harris' allegations that, after December 2019, it spent 5,605 man-hours having to re-do work it previously completed as this work was later damaged by others working on the Vicksburg. Am. Compl. ¶¶ 46–53. The Court previously granted summary judgment to BAE on this part of count II. ECF No. 149, at 38–42.

[33] This evidence includes the following. See, e.g., Pl.'s Ex. 8 (February 4, 2020 CFR notifying BAE that L3Harris had 2–3 people standing for two hours each day that week due to a lack of structural work); Pl.'s Ex. 9 (June 28, 2020 CFR indicating that L3Harris had people standing around because BAE did not provide all the requested welders and fitters); Pl.'s Ex. 10–19 (March 3, 2020 CFRs and attached matrices notifying BAE that L3Harris continued to require the completion of structural work necessary for L3Harris to perform); Pl.'s Ex. 68 (L3Harris' plan of the day noting "[p]ossible [p]roblems/[d]elays" and noting "no hot work" on June 5, 2021); Pl.'s Ex. 69 (same for June 6, 2021); Pl.'s Ex. 444 (June 8, 2020 CFR reporting that L3Harris had people standing by that week due to BAE not providing the full contingent of requested welders and fitters); Trial Tr. Day 2, at 338:23–339:2.

[34] L3Harris also points to vague testimony, about the fact that some structural work was never completed, to suggest that BAE failed to timely perform. See Trial Tr. Day 1, at 156:15–23; see also Trial Tr. Day 2, at 460:4–5. And, in the context of COVID-19, L3Harris contends that had it not hired additional personnel, its performance would have been pushed out at least eight months further. Trial Tr. Day 2, at 499:20–23. The Court is unable to conclude that BAE was solely at fault for any incomplete work based upon such testimony. See, e.g., Trial Tr. Day 4, at 37:6–13 (BAE representative testifying that any structural work left incomplete was due to L3Harris' failure to complete its own work).

structural support provided, delays, disruptions, extensions and inefficiencies incurred"); Trial Tr. Day 3, at 109:4–110:22, 113:10–114:2, 164:20–24, 167:4–7 (acknowledging the lack of "significant documentation"). L3Harris' arguments, including its reliance upon internal plans to complete structural work in several months, Trial Tr. Day 2, at 446:22–447:5, mostly fail to account for the circumstances described above.[35] *Cf. E. Coast Repair*, 199 F. Supp. 3d at 1030 (holding that a contractor bearing the burden of showing that an event caused a delay to the overall completion of the contract must show that the delay affected activities on the critical path of work).[36]

Although it did not always receive requested structural workers at the times and in the numbers sought, witnesses who worked for L3Harris at the time acknowledged that BAE did, in fact, perform structural work.[37] Further, although L3Harris occasionally had workers idled due to the absence of BAE structural workers, to some extent it remained able to pursue other tasks elsewhere and in some respects delayed doing so.[38]

---

[35] Trial Tr. Day 3, at 113:4–16 (Goude testifying that hours tracked in tab 2 of plaintiff's exhibit 132 captured the impact of L3Harris waiting for BAE to finish the welding, and acknowledging the absence of an opinion about who bore responsibility for such delays).

[36] Nor does the admission of plaintiff's exhibit 216, which indicates that one of the items L3Harris was working on fell on the critical path of BAE's prime contract, change this analysis.

[37] Such testimony was offered by Michael Brewer, Stanley Tomlinson, and James Jones, a former employee of L3Harris now working for BAE. Trial Tr. Day 1, at 45:5–7 (Brewer testifying that BAE provided welders); *id.* at 242:11–23 (Tomlinson testifying that while there were delays in getting hot work, L3Harris did get hot work "in a general manner"); Trial Tr. Day 2, at 340:15–19 (Tomlinson testifying that while L3Harris was delayed at times by a lack of structural work, there were also times when L3Harris received such support); Trial Tr. Day 4, at 176:23–177:3 (Jones testifying that "the vast majority of the time . . . we got the [structural] support we needed).

[38] Supporting evidence includes the following. *See, e.g.*, Pl.'s Ex. 60 (indicating that while there was no steel welder on April 29, 2021, L3Harris was still able to get other work done); Pl.'s Ex. 61 (same on May 4, 2021); Pl.'s Ex. 68–70 (same on June 5–7, 2021); *see* Trial Tr. Day 2, at 342:2–8 (Tomlinson testifying that he sometimes would re-prioritize people based on a lack of

On many of the days that L3Harris reported to BAE about lacking structural support, the same reports show that BAE provided at least some of the requested structural workers.[39][40]  The Court also finds credible the testimony of James Jones, who previously worked as a project manager on the Vicksburg for L3Harris from roughly February through September 2021.  Trial Tr. Day 4, at 158:7–15, 160:4–19.  In discussing L3Harris' regular requests to BAE for multiple welders and fitters, Jones testified that an L3Harris supervisor effectively instructed him to pad any future requests for BAE welders because L3Harris "had an REA claim" and asking for four rather than one welder "would help [its] claim."  *Id.* at 175:2–176:7; *see* Pl.'s Ex. 440, at 1–2 (responding to Jones' email to BAE requesting one welder, fitter, and firewatch, and advising that "[w]e having been requesting 4 welders every day.  I would like for us to get together on Monday to make sure we are all on the same page with these reports.").  This testimony went unchallenged on cross-examination.  Further, BAE's Huss testified that L3Harris' requests for five welders were unrealistic because L3Harris could not make effective use of them and because "there was never

---

structural work); Trial Tr. Day 4, at 177:4–9 (noting that L3Harris' tasks included "the cable installation, the cable ring-out, the cable hookups . . . all that stuff isn't dependent on structural [work]"); *id.* at 255:13–257:8 (noting that, as of May 2021, L3Harris had to yet "connectoriz[e]" equipment that had already been mounted, test cables that had been installed, and prepare required reports for the Navy showing that the cables "tested fine").

[39] Supporting evidence includes the following. *See, e.g.,* Pl.'s Ex. 9 (noting that L3Harris received structural workers from BAE on two of the days requested); Pl.'s Ex. 244 (stating that L3Harris received at least one welder or fitter on each day requested during the week of January 25–30, 2021); Pl.'s Ex. 382 (indicating that L3Harris was assigned two welders and at least one fitter every day from December 12–18, 2020); Pl.'s Ex. 406 (noting that BAE provided welders and fitters on five of six days from January 9 to 15, 2021, with the one exception for a day with tasks having a higher priority); Pl.'s Ex. 444 (indicating that on four of the five days that L3Harris requested structural workers, it received at least one welder).

[40] Similarly, certain spreadsheets that Tomlinson attached to CFRs, listing electrical components yet to be installed, also document the completed installation and welding of many other pieces of equipment. *See* Pl.'s Ex. 56–57, 145, 162, 193, 247; Trial Tr. Day 2, at 336:15–22 (Tomlinson testifying that welding had been accomplished for a fair number of items).

enough welders from a program's point of view," suggesting that BAE had to prioritize their tasking.[41]  Trial Tr. Day 4, 34:16–35:12, 116:9–22, 117:21–118:11, 145:23–146:8; *see also* Trial Tr. Day 3, at 244:5–24 (discussing process for assessing and providing structural work to L3Harris).  Jones also opined that L3Harris was not delayed by any lack of structural work from BAE, Trial Tr. Day 4, at 177:10–13.

Multiple factors and parties played a role in extending the period of subcontract performance.  L3Harris' contention that BAE deserves some of the blame appears to be partly correct.  Various exhibits reflect that, on some days, BAE did not supply the full complement of structural workers requested by L3Harris.  *See, e.g.*, Pl.'s Ex. 9, 244, 382, 406, 444.  L3Harris' witnesses testified this delayed L3Harris' work.[42]  *See, e.g.*, Trial Tr. Day 1, at 78:7–12, 242:3–16.  And, even Huss testified that BAE may have slightly delayed L3Harris.  Trial Tr. Day 4, at 38:1–9 (Huss testifying that BAE may have slightly delayed L3Harris under certain circumstances where other work took priority).  The extent of BAE's responsibility for the extension of performance of work on the Vicksburg generally, however, is distinct from the issue of whether it performed structural work related to L3Harris' subcontract in a reasonable time under the

---

[41] BAE's Smith testified that, at the time of work under SSRA2 and MODPRD, BAE had about 100 welders to serve 8 different projects.  Trial Tr. Day 4, at 249:20–250:5; *but see* Rule 30(b)(6) Depo. of BAE Systems Designated Corp. Rep. at 139:8–10 (Smith testifying he did not know how many welders BAE employed); Trial Tr. Day 4, at 155:1–19 (Huss testifying that BAE had 10–15 aluminum welders and a similar amount of steel welders during SSRA2).  Although BAE tracked the hours billed by welders to the Vicksburg project, which presumably would have facilitated evaluation of the testimony about welders, no such records were offered into evidence.  *See* Trial Tr. Day 4, at 279:9–19.

[42] Brewer testified that a possible reason for the delay was the fact that BAE reportedly sent all of its welders to Hawaii for another job at the start of the Vicksburg availability.  Trial Tr. Day 1, at 77:16–23.  If this occurred, its significance is hard to gauge in light of Brewer's other testimony that L3Harris did not need welders during the first two months of the availability because it was performing "ripout."  Trial Tr. Day 1, at 163:5–21.

circumstances.[43]  The latter assessment and any related performance delays must be viewed in light of all the circumstances and the subcontract's schedule and its requirements to provide structural work "as needed" and for L3Harris to coordinate its work with BAE and its subcontractors.  From that vantage point, the present record is insufficient to conclude that BAE violated its obligations under the fixed price subcontract.

The evidence shows that L3Harris also bears some responsibility for delay in the completion of such structural work.[44]  Indeed, L3Harris' own personnel admitted that it was at least partially responsible for some of the delay.  Trial Tr. Day 3, at 179:25–180:5 (Goude testifying that "L3[Harris] may have had some impact on th[e] delay"); *see* Trial Tr. Day 3, at 151:18–153:25 (testifying that L3Harris accounted for and removed such hours from its calculation).

For all these reasons, the Court lacks the information needed to fix a reasonable time for BAE's structural work under the circumstances or to otherwise conclude that BAE failed to do

---

[43] Notably, the parties disagree about when BAE completed most, if not all, of the structural work. *Compare* Trial Tr. Day 4, at 255:7–18 (May 2021); Def.'s Ex. 19 (noting drop off in requests for structural support in June 2021) *with* Trial Tr. Day 2, at 460:2–5 ("most" structural work finished in 2022); Trial Tr. Day 2, at 202:16–203:1 (structural work ongoing when Jones left in Fall 2021).

[44] Evidence supporting this conclusion includes the following. *See* Pl.'s Ex. 519 (email from Anthony Hicks stating that L3Harris inefficiently planned out where it needed structural support, resulting in the inefficient use of BAE's structural personnel); Def.'s Ex. 17; *see also* Trial Tr. Day 4, at 38:24–41:10 (Huss testifying that L3Harris requested "exorbitant amount[s] of support that [it] could not efficiently use" and that its inaccurate and non-current spreadsheets of outstanding welding work contributed to the disconnect in the process of L3Harris requesting BAE structural workers); 46:8–18 (noting repeat occurrences in which L3Harris' scheduler not working on ship demanded structural work support at odds with L3Harris personnel working on ship); 47:7–48:2 (discussing alleged lack of quality leadership, and resulting inefficiencies, at L3Harris after Brewer and another employee left the project); 252:14–254:2 (Smith testifying that he and the Navy discovered that L3Harris' reports tracking its progress in installing cable were inaccurate).

such work, either individually or collectively, within a reasonable time.  L3Harris has not met its

burden of proving the claim in count IV(A) by a preponderance of the evidence.

### 2.    Count IV(B) – Breach of contract claim for failure to provide GFM in a timely manner

In count IV(B), L3Harris contends that "BAE breached the subcontract by failing to

provide adequate GFM in a reasonable time[]frame." Pl.'s Mem. 60.  As a result, L3Harris asks

the Court to award damages of $216,474.16.  *Id.* at 92–93; *see* Am. Compl. ¶ 70.  As in count

IV(A), L3Harris must prove the elements of breach of contract as recognized by Virginia law, as

previously discussed.

L3Harris contends that:  (1) BAE was responsible for providing GFM in a reasonable and

timely manner; (2) BAE breached that duty; and (3) L3Harris was damaged as a result by being

unreasonably delayed and having to spend more time tracking and notifying BAE about missing

GFM needed to accomplish its work.  Pl.'s Mem. 60–73, 92–93.  BAE argues that:  (1) it was only

required to "deliver" GFM to L3Harris; (2) it delivered GFM within a reasonable time; and (3)

L3Harris could continue working while awaiting delivery of GFM.  Def.'s Mem. 41–44.

### a.    BAE was required to timely deliver GFM to L3Harris.

Whether a party has a contractual obligation depends on the language of their agreement.

*Sunrise Continuing Care*, 671 S.E.2d at 135.  The Purchase Order, with respect to each line item,

specifies that "BAE[] takes exception to all materials for this requirement." Pl.'s Ex. 4, at 5–8.  In

addition, FAR § 52.245-1, the government property clause incorporated into the subcontract,

provides, in pertinent part, that:

(d) Government-furnished property

(1) [BAE] shall deliver to [L3Harris] the Government-furnished property described
in this contract.  [BAE] shall furnish related data and information needed for the
intended use of the property.  The warranties of suitability of use and timely

delivery of Government-furnished property do not apply to property acquired or fabricated by [L3Harris] as contractor-acquired property and subsequently transferred to another contract with [L3Harris].

(2) The delivery and/or performance dates specified in this contract are based upon the expectation that the [Government/BAE]-furnished property will be suitable for contract performance and will be delivered to [L3Harris] by the dates stated in the contract.

(i) If the property is not delivered to [L3Harris] by the dates stated in the contract, [BAE] shall, upon [L3Harris'] timely written request, consider an equitable adjustment to the contract.

48 C.F.R. § 52.245-1(d)(1)–(2); *see* Pl.'s Ex. 3, at 2 (providing that the phrase "Contracting Officer" means BAE in the paragraphs above and the word "Government" is unchanged in the phrases "Government property" and "Government furnished property" except in paragraph (d)(1) where it means BAE and in paragraph (d)(2) and (g) where the term includes BAE).

In light of the contractual provisions above, BAE had a duty to deliver GFM to L3Harris.[45] Although BAE "took exception to all materials" for the line items that L3Harris contracted to complete, this exception referred to contractor-furnished material ("CFM"), as opposed to GFM. Trial Tr. Day 1, at 35:7–22 (Brewer testifying that the exception meant that BAE was not responsible for CFM, rather than GFM); Trial Tr. Day 3, at 240:1–9 (Huss testifying to the difference between CFM and GFM). Moreover, BAE had a contractual obligation, via the FAR government-furnished property clause, to receive GFM from the government, and then subsequently turn that GFM over to the appropriate subcontractor upon request. Trial Tr. Day 4, at 5:12–6:7 (Huss testifying that BAE would receive and take inventory of the GFM at its warehouse, and then deliver that GFM to the receiving contractor when requested). Further, the

---

[45] The subcontract also contains a "furnished property" clause within the General Terms and Conditions. *See* Pl.'s Ex. 1, § 33. Because it has no bearing on resolving this claim, and the parties do not argue otherwise, the Court need not review it here.

language of the government-furnished property clause indicates that if GFM was not delivered on time, L3Harris' remedy was to seek an equitable adjustment from BAE.   48 C.F.R. § 52.245-1(d)(2).

Absent a specific date noted in the subcontract, the Court finds that BAE was obligated to deliver GFM to L3Harris in a timely manner.[46]  *See Peter Kiewit Sons' Co. v. United States*, 151 F. Supp. 726, 731 (Ct. Cl. 1957) ("When the contract does not specify particular dates upon which delivery of the material is to be made . . . [there] is an obligation not to willfully or negligently fail to furnish the materials in time to be installed in the ordinary and economical course of the performance of the contract."); *see also Franklin Pavkov Constr. Co. v. Roche*, 279 F.3d 989, 997 (Fed. Cir. 2002) ("The time, place and manner of delivery, if not specified in the contract or by subsequent agreement of the parties, should be a reasonable time, place and manner that enables the contractor to perform under the contract."); *Duke*, 55 S.E. at 549 (when "the contract . . . fixe[d] no time for the delivery of the cross-ties, and in such a case it is plain that the contract is to be performed within a reasonable time . . . it is for the jury to say what is a reasonable time, under all the circumstances of the case.").

---

[46] The subcontract is unclear as to the timeline in which BAE was required to deliver GFM.  Under the FAR government property clause, L3Harris' "delivery and/or performance dates . . . [were] based upon the expectation that the [GFM] [would] be suitable for contract performance and [would] be delivered . . . by the dates stated in the contract."  48 C.F.R. § 52.245-1(d)(2). Moreover, if the property was not delivered by the dates stated, or was not in a condition suitable for its intended use, BAE was required to consider an equitable adjustment upon L3Harris' timely written request.  *Id.*  While there was some suggestion that BAE's prime contract required it to make GFM available within 30 days of the start of the contract, *see* Trial Tr. Day 4, at 127:22–24, the parties have not pointed the Court to any language within the subcontract that requires delivery within such a timeline, and the prime contract is not in evidence.

**b.      BAE failed to timely deliver GFM to L3Harris on some occasions.**

L3Harris contends that because it needed GFM in order to perform, BAE breached its duty by often not making the GFM available to L3Harris upon request. Pl.'s Mem. 61–62. In support, L3Harris points to testimony and exhibits evidencing the fact it was often delayed in its receipt of GFM.

L3Harris encountered issues getting GFM from the beginning of its performance. Trial Tr. Day 1, at 115:1–9 (Brewer testifying that L3Harris first encountered issues getting GFM at the beginning of the availability, which persisted throughout); Trial Tr. Day 2, at 460:21–461:23 (Tomlinson testifying that very few items were made available when performance began, and this persisted over the years).

L3Harris notified BAE through CFRs that not having the necessary GFM was delaying its work. For instance, on January 9, 2020, L3Harris notified BAE that it still needed over 5,000 feet of a hydra cable, and that L3Harris "require[d] approximately 4 weeks to complete the necessary electrical connections, final grooming, and testing [a]fter all cables are installed." Pl.'s Ex. 38. Similarly, on February 4, 2021, L3Harris submitted a CFR stating: "The contractor continues having delays on receiving GFM [] from the Supervisor. As of 2/4/2021 the attached list of GFM has yet to be provided, which in turn is causing delays in the completion of Item 438-90-001." Pl.'s Ex. 199. The attached list included items such as cables, shock isolators, transformers, maintenance switches, electrical panels, monitors, cable video kits, computer equipment racks, media converters, battery cabinets, amplifiers, adapters, and electrical connectors. *Id.* (attached spreadsheet). The list also apprised BAE of the drawing it was referencing for each item, the part number, a description of the item, and the quantity needed. *Id.*

L3Harris also demonstrated that because it was waiting on GFM, its performance was delayed.[47] Trial Tr. Day 1, at 192:1–5, 253:6–9 (Brewer and Tomlinson testifying that the delay in receiving GFM slowed L3Harris' performance); Trial Tr. Day 2, at 462:4 (Goude testifying that L3Harris "couldn't install the cable without it being there"). Accordingly, the Court finds that BAE failed to timely deliver GFM on the occasions proven at trial.[48]

      c.      **L3Harris has failed to prove with reasonable certainty the damages attributable to BAE's breach of this performance obligation.**

L3Harris asserts that it tracked damages associated with late or missing GFM by way of Andrew Goude's conversations with L3Harris leadership at weekly production meetings and his allocation of a certain portion of its total weekly hours to GFM delays. Trial Tr. Day 3, at 71:17–72:14, 180:14–181:6. Goude testified somewhat vaguely that "delays for late or missing GFM were specifically attributed to our logistics persons and the persons on the boat that were tracking the specific material besides myself and ensuring that we had what we needed when we need it

---

[47] L3Harris also alleges that BAE breached its duty by delivering incorrect cables that did not have pre-fabricated connectors on one end, as required for performance. Trial Tr. Day 1, at 246:4–13; Pl.'s Ex. 163. However, due to conflicting evidence regarding cable delivery, how many cables did not have connectors, and the extent to which this actually affected L3Harris' work, the Court does not deem this contention supportive of a finding that BAE breached its duty to timely deliver GFM. *See* Trial Tr. Day 4, at 14:15–15:19 (Huss testifying that he understood the U.S. Navy's response to L3Harris to be that 41 of the 43 cables were delivered as required, and only two of the cables did not have the appropriate pre-fabricated connector); Def.'s Ex. 26.

[48] Having found that BAE was obligated to deliver GFM to L3Harris in a timely manner, the Court need not address BAE's brief argument that § 222 of the Ship Repair Addendum bars L3Harris' recovery for its GFM-related claims for several reasons. *See* Pl.'s Ex. 2, § 222; Def.'s Mem., ECF No. 177, at 83. First, because the government-furnished property clause required BAE to deliver GFM to L3Harris, the contract direction/changes clause within the Ship Repair Addendum does not bar L3Harris' recovery on account of U.S. Navy action. 48 C.F.R. § 52.245-1(d); *see* Pl.'s Ex. 3, at 2. Second, even if § 222 applied and the conduct at issue constituted a contractual change supporting an equitable adjustment, BAE has not sufficiently proven exactly GFM it did and did not receive from the U.S. Navy and when this happened, to excuse BAE's obligation to timely deliver GFM to L3Harris. *See, e.g.*, Trial Tr. Day 1, at 244:23–250:17. Finally, no need exists to discuss the applicability of § 222 in light of the Court's analysis below regarding L3Harris' claimed damages.

and the extra labor required to keep informing BAE of these materials that we needed to perform our work." *Id.* at 181:25–182:5.  Based on the foregoing, L3Harris contends that Goude allocated hours to each GFM CFR listed in the amended complaint and calculated a total of ▮ hours related to GFM delays after December 2019.  *See* Pl.'s Ex. 23, at 5; Pl.'s Mem. 92–93.

L3Harris' reliance upon this bottom line calculation as the measure of its GFM damages, however, falters without supporting evidence detailing the bases for the hours claimed.  The November 2022 REA states that "[a]n exact accounting of these [▮ hours, on a CFR-to-CFR basis, from December 2019 to the present date is provided on Tab (1) of Enclosure (1), along with comments to assist in further understanding the precise impacts of the additional labor hours incurred."  Pl.'s Ex. 23, at 5.  That accounting for the total hours, however, was not offered into evidence at trial.  Absent that or other like evidence, the Court is unable to attribute the portions of the total hours claimed to specific CFRs and lacks any basis for reasonably evaluating the derivation of these ▮ hours, the specific tasks and impacts to which they relate, and who performed such tasks (and when).[49]  *See Saks Fifth Ave. v. James, Ltd.,* 630 S.E.2d 304, 311 (Va. 2006) ("A plaintiff thus must prove two primary factors relating to damages.  First, a plaintiff must show a causal connection between the defendant's wrongful conduct and the damages asserted.  Second, a plaintiff must prove the amount of those damages by using a proper method and factual foundation for calculating damages.").  For example, with respect to delayed GFM that L3Harris

---

[49] This is notable because, among other reasons, both the amended complaint and the November 2022 REA indicate that the claimed ▮ hours also include hours for BAE's untimely completion of area closeouts and other, unspecified production delays.  *See* Am. Compl. ¶¶ 67–68; Pl.'s Ex. 23, at 5.  Inasmuch as Goude testified that the hours "for late or missing GFM were specifically attributed to our logistics persons and the persons on the boat that were tracking the specific material besides myself and ensuring that we had what we needed when we need it and the extra labor required to keep informing BAE of these materials that we needed to perform our work," Trial Tr. Day 3, at 181:25–182:5, the ▮ hours claimed may include hours for extraneous items unrelated to GFM.

needed to perform work item 438-90-001, the Court has neither a mechanism for determining which of the total ███ hours are attributable to that work item, nor a method for assessing the actual tasks performed and persons involved for which compensation is sought. *See Shepherd v. Davis*, 574 S.E.2d 514, 524 (Va. 2003) ("[Plaintiffs] had the burden of proving with reasonable certainty the amount of damages and the cause from which they resulted; speculation and conjecture cannot form the basis of recovery.") (internal citations omitted).

Nor does the Court's review of the CFRs listed in L3Harris' November 2022 REA help its cause. *See* Pl.'s Mem. ¶ 382 ("to get to the ███ hours, L3Harris simply added up all the hours spent on each GFM CFR that was submitted after December 2019"). To begin, relatively few of the approximately 50 CFRs listed in L3Harris' November 2022 REA and allegedly relating to GFM were received into evidence. *See, e.g.*, Pl.'s Ex. 38, 41, 44–45, 160, 162–163, 192, 199; *see* Ct.'s Ex. 1, ¶ 88 (noting also that 15 of these CFRs "were submitted prior to August 30, 2019"). In this subset of admitted CFRs, only three deal with GFM. *See* Pl.'s Ex. 38, 163, and 199. Although each of these three CFRs contains a space for quoting L3Harris' pricing for labor hours and other costs, none contains any hourly or other cost breakdown. *See id.* Finally, two of the other admitted CFRs seek compensation for a total of ████████ labor hours due to a "hot work stoppage" and heavy weather closure. Pl.'s Ex. 41, 160. Yet, neither Mr. Goude nor L3Harris has addressed why these ██ hours were apparently included in the ███ hours that Mr. Goude attributed to logistics and other L3Harris personnel involved in requesting and tracking GFM. Trial Tr. Day 3, at 181:25–182:5; *see* Pl.'s Mem. 60–66, 92–93 (arguing breach of contract and seeking recovery solely for failure to supply GFM).

L3Harris' failure to prove its damages with respect to this count is also evidenced by comparison to count I. In count I, the Court verified Goude's testimony regarding hours

attributable to the COVID-19 pandemic because there was a specific charge node to which employees billed their time.  Trial Tr. Day 3, at 32:6–9, 100:17–101:2; Trial Tr. Day 2, at 484:2–485:16 (Goude testifying that employees electronically billed hours to a particular charge node based on the specific task they were working on, and that Goude would run a weekly report showing how many hours were charged to a particular node in that time period).  As no such charge node existed for hours relating to GFM, however, Goude tracked these hours by having daily or weekly conversations with managers or supervisors regarding hours expended on the subcontract. *See generally* Trial Tr. Day 3, at 86:2–87:8, 166:3–167:7, 181:18–182:14; *cf.* Pl.'s Ex. 23, at 5 (grouping GFM-related CFRs and other CFRs); *see* Pl.'s Mem. 92–93.  Goude further noted that he did not track each individual employee, but instead was "more focused on tracking different activities that were occurring."  Trial Tr. Day 3, at 87:9–18.  Thus, unlike for count I, where the Court could independently review and assess the hours, that is not possible regarding the claimed ███ GFM-related hours based on Goude's conversations with management personnel.

Additionally, Goude did not begin working on the subcontract until May 12, 2020.  Trial Tr. Day 3, at 31:1–3.  Because of this, he testified to copying over records that a previous employee uploaded to the spreadsheet, from the start of the subcontract, in April 2018, through June 2020.  Trial Tr. Day 3, at 31:1–3, 71:4–16; *see* Trial Tr. Day 3, at 168:17–169:16.  This additional layer of uncertainty adds credence to the conclusion that the ███ hours lack substantiation.

Accordingly, having failed to provide sufficient evidence to explain how the total hours claimed are specifically tied to BAE's failure to deliver GFM, L3Harris has not met its burden of proof.[50]  *See Saks Fifth Ave.,* 630 S.E.2d at 311 (holding that the plaintiff failed to carry its burden

---

[50] Nor is resort to either the "jury verdict" or "total cost" method for calculating damages appropriate.  This is so because a reliable method of calculating L3Harris' damages with reasonable certainty apparently exists, but L3Harris has failed to supply it.

of proving that the wrongful conduct of the defendants proximately caused its damages); *see also Delhur Indus.*, 95 Fed. Cl. at 460 (holding that the plaintiff in a government contracts case did not satisfy its burden of proof to show that its damages were a result of the defendant's action).[51]

## D. Count V – Breach of implied duties

In count V,[52] L3Harris seeks damages because "BAE breached its implied duties to avoid hindrance, provide access to the worksite, act in good faith, and exercise its discretion reasonably."[53] Pl.'s Mem. 73. L3Harris argues that: (1) BAE breached its duty to provide timely access by unreasonably blocking worksite access for "numerous evacuations, shipyard closures, and a major weather event" that occurred during L3Harris' performance; and (2) BAE breached the implied covenant of good faith and fair dealing, as well as the implied duty to avoid a controlled hindrance of L3Harris' performance, by failing to timely perform its obligations under the subcontract and requiring L3Harris to walk the ship to close out work authorization forms ("WAFs"). *Id.* at 75–83.

BAE argues that: (1) it did not violate any implied duty to make the worksite available because the few instances of worksite inaccessibility were due to events outside BAE's control

---

[51] At trial, L3Harris argued that the change order 36 settlement should be limited in scope to only include claims that L3Harris raised "directly" against BAE, and should not encompass claims that L3Harris made against the U.S. Navy, through sponsorship of BAE. Trial Tr. Day 1, at 196:19–197:19. In its proposed findings of fact and conclusions of law, however, L3Harris seems to have effectively abandoned this argument, stating that it "is only seeking damages for the GFM CFRs submitted after December 4, 2019 and the ███ hours already exclude hours for CFRs submitted before September 30, 2019." Pl.'s Mem. ¶ 383. Thus, the Court concludes that L3Harris has waived this argument. *See Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) ("A party waives an argument by failing to present it in its opening brief or by failing to 'develop its argument—even if its brief takes a passing shot at the issue.'") (alterations and citation omitted).

[52] L3Harris alleges count V in the alternative to count IV. Am. Compl. ¶ 134.

[53] The Court granted summary judgment in favor of BAE as to six of the ten implied duties alleged by L3Harris in count V of its amended complaint, leaving only the four implied duties mentioned above. ECF No. 149, at 62.

which were otherwise excusable; and (2) it did not breach the implied covenant of good faith and fair dealing, or the implied duties to reasonably exercise discretion and not intentionally hinder L3Harris' performance, because BAE reasonably performed its contractual duties and L3Harris has not shown that BAE acted "dishonestly, arbitrarily, unreasonably, or in bad faith with respect to contractual rights." Def.'s Mem. 44–49, 83–85.

**1.     BAE did not breach the implied duty to provide timely access to the worksite.**

Virginia law imposes an implied duty that the worksite be made available. *R. G. Pope Constr. Co. v. Guard Rail of Roanoke, Inc.*, 244 S.E.2d 774, 778 (Va. 1978) (holding that performance was subject to certain conditions, "the most important of which was the implied condition that a site would be available"). However, if BAE's duty to make the site available was excused under the circumstances, then it would not be in breach. *See id.*; *cf. Housing Auth. of Bristol v. E. Tenn. Light & Power Co.*, 31 S.E.2d 273, 276 (Va. 1944) (holding that where impossibility is due to domestic law, or due to the nonoccurrence of "a certain state of affairs or means of performance, the [] existence of which was contemplated by both parties," the promisor will be excused unless he assumed the risk, or the impossibility was due to his fault).

L3Harris alleges that it was unable to access the job site on six[54] occasions throughout performance.   L3Harris requests compensation for:   (1) two workdays when 20 L3Harris employees were unable to access the worksite due to Hurricane Isaias, Pl.'s Ex. 41; Trial Tr. Day

---

[54] L3Harris also alleges a seventh occasion in its proposed findings of fact, where it claims it could not access the job site due to delay associated with "[data acquisition unit] 8A staging" not being completed, which blocked two L3Harris employees from gaining access to their work area for a full eight-hour workday. Pl.'s Ex. 22, at 11; Ct.'s Ex. 1, ¶ 80. However, L3Harris neither elicited testimony explaining how BAE breached its duty in regard to this occasion, nor did it seek to move the underlying CFR into evidence. Accordingly, although L3Harris mentions this argument in its proposed findings of fact, the trial evidence does not support such a claim.

1, at 92:3–20; (2) "lost man-hours" when power was lost on the job site, preventing 23 L3Harris

personnel from accessing the site, Pl.'s Ex. 180; (3) idle time when its personnel were unable to

access the worksite for over an hour due to a toxic fume alarm requiring a temporary evacuation

of the Vicksburg, *see* Pl.'s Ex. 22, at 10; (4) lost time when a fire onboard the vessel required the

temporary evacuation of on-site personnel, *see id.* at 11; (5) a locked cabinet preventing L3Harris

personnel from making a required cable connection, Pl.'s Ex. 152; Trial Tr. Day 2, at 308:19–

309:14, 357:3–358:9; and (6) BAE failing to provide structural support to L3Harris for a two-week

period during the ship's undocking.[55] Pl.'s Ex. 179; Trial Tr. Day 2, at 311:14–314:3, 355:7–

356:3.  The Court finds that L3Harris' temporary lack of access to the jobsite on each of these

instances was excusable under the circumstances, and therefore BAE did not breach any implied

duty to make the worksite available. *See R. G. Pope Constr.*, 244 S.E.2d at 779 (holding that there

is no breach of the implied duty to make the worksite available if the circumstances excused

making the site available).

In each of the first four situations, the Court finds that BAE was excused under the

circumstances from providing worksite access.  Each instance in question involved times when

BAE did not make the site available due to safety concerns:  a hurricane, a power outage due to a

thunderstorm, a temporary evacuation due to a toxic fume alarm, and a temporary evacuation due

to a fire.  Trial Tr. Day 4, at 51:8–22 (Huss testifying that the power outage was due to a

"thunderstorm or some type of storm that caused an outage for Dominion Power that affected

---

[55] L3Harris also argues that BAE delayed the process for approving WAFs, a required step to
beginning certain stages of work in each area, which interfered with L3Harris' ability to access the
worksite.  Pl.'s Mem. ¶ 302.  Because L3Harris' complaints with respect to WAFs are not based
on a lack of site access, however, but rather on a delay in the issuance of WAFs and added work
to close them out, the Court will address those in relation to the implied covenant of good faith
and fair dealing and the implied duty to avoid a controlled hindrance of L3Harris' performance.
Trial Tr. Day 1, at 98:25–99:12, 102:3–11.

[BAE's] [ship]yard"); Pl.'s Ex. 41, 143, 180–81.  It can be fairly stated that the parties each contemplated, as a condition of performance, that the worksite would be safe for work.  *See Va. Iron, Coal & Coke Co. v. Graham*, 98 S.E. 659, 663 (Va. 1919).  Because BAE only made the worksite unavailable due to safety concerns, the Court concludes that BAE's duty to provide worksite access was excused under the circumstances.  *See* Trial Tr. Day 4 at 52:2–10 (Huss testifying that L3Harris would not have been allowed on the ship due to "MARMC safety, U.S. Navy, BAE safety" directives).

Moreover, L3Harris had a contractual obligation to comply with health and safety laws and regulations, including BAE's policies and procedures.  *See* Pl.'s Ex. 2, § 216 ("[L3Harris] shall comply with all applicable federal, state, and local health, safety and fire protection laws and regulations.  [L3Harris] shall also comply with BAE['s] safety policies and procedures.").  Inasmuch as BAE made the site temporarily unavailable on account of safety, L3Harris had a contractual duty to comply with such instruction.  *See id.*  This obligation is corroborated by testimony that, on the occasions of the toxic fume alarm and power outage due to the thunderstorm, BAE withheld site access at the U.S. Navy's direction, as failing to comply with government safety procedures could lead to expulsion from the shipyard.  Trial Tr. Day 4, at 50:25–54:13, 57:19–23 (Huss testifying that remaining on the ship during a government evacuation would be grounds for "expulsion from the shipyard or at least not [being] able to access that vessel").  Accordingly, L3Harris' duty to abide by applicable federal health and safety regulations was also implicated. Further, in each instance, L3Harris has provided no evidence that BAE's actions in limiting access were not excusable, instead relying only on the fact that BAE had previously paid L3Harris for similar occurrences.  *See* Trial Tr. Day 1, at 92:3–20 (Brewer testifying that BAE paid L3Harris

for an identical CFR it submitted for lack of access to the U.S.S. Oscar Austin as a result of Hurricane Isaias).

For the remaining two instances, the Court similarly finds that L3Harris has failed to carry its burden of proof. Regarding L3Harris' allegation that inability to unlock a cabinet caused delay, Tomlinson testified that the lack of a key delayed L3Harris' completion of a cable hook-up. Trial Tr. Day 2, at 308:2–309:14; *see* Pl.'s Ex. 152. The record, however, supports excusing BAE from responsibility for the relatively brief delay at issue, *see* Pl.'s Ex. 22, at 11 (listing 24 hours). *See Housing Auth. of Bristol,* 31 S.E.2d at 276. Testimony from L3Harris and BAE witnesses establishes that the U.S. Navy's actions caused L3Harris to be unable to access the locked cabinet and that L3Harris was able to do other work pending resolution of this issue. Trial Tr. Day 2, at 357:3–20 (Tomlinson testifying that the U.S. Navy had the key to the locked cabinet); Trial Tr. Day 4, at 55:4–56:24 (noting that the U.S. Navy asked that all keys be turned over to Ship's Force[56] for safekeeping and that L3Harris could perform other work in the interim). As L3Harris could continue with other work, the Court also finds that lack of cabinet access did not unreasonably delay its performance. *Cf. Redland Co.,* 97 Fed. Cl. at 754 (noting that, if the claimed breach is for delay, "liability attaches only when the actions causing the delay are unreasonable").

The trial testimony also undercuts L3Harris' assertion that BAE withheld site access for a two-week period during a ship undocking. *See* Pl.'s Ex. 179. Undocking is the process by which a ship in dry dock is placed back into the water by filling up the dry dock with water and floating the vessel out to the pier. Trial Tr. Day 2, at 311:23–312:1, 312:13–15, 356:4–7. Tomlinson testified that during the undocking, which normally takes a couple of hours or a full day depending

---

[56] The Ship's Force is comprised of service personnel that work for the United States government and are authorized to hang and clear danger tags, which note when equipment needs secure power, from pieces of equipment. Trial Tr. Day 1, at 102:7–103:12.

on problems encountered, neither BAE nor L3Harris personnel were permitted to be onboard the ship, which was manned solely by Ship's Force personnel and the pilot.  *Id.* at 312:8–11. Tomlinson explained that issues arose while undocking the Vicksburg, which increased the time that non-essential personnel were kept off the vessel.  *Id.* at 313:18–23, 356:11–25.  Although less than certain, Tomlinson said that BAE and L3Harris personnel were denied access for about "one or two days."  *Id.* at 309:24–310:3, 313:6–17, 356:23–357:2.  Tomlinson also explained that "a lot of the welding support was taken off the ship prior to undocking . . . [s]o whatever time it took [BAE] to put that back on board probably affected the welding support."  *Id.* at 355:17–25. Further, Tomlinson stated that L3Harris remained able to do work not involving welding  on the ship during that time, aside from the two days in question.  Trial Tr. Day 2, at 355:17–356:3; *see* Trial Tr. Day 4, at 50:13–24 (Huss testifying to the same).  Accordingly, the time during which L3Harris was actually unable to access the ship was not two weeks, but two days.

Relative to the two days, BAE's Huss also explained that shipboard services were not available for two days during the actual undocking, as "there are requirements to pull back services to make the ship watertight, free up watertight doors so they can be closed in case of an emergency, watertight hatches, scuttles, . . . pass-throughs on board the ship."  Trial Tr. Day 4, at 49:6–50:6. These activities are done, pursuant to both BAE and U.S. Navy safety protocols to ready the vessel for undocking.  *Id.* at 50:7–12.  In fact, as acknowledged by Tomlinson, issues arose when filling the Vicksburg's dry dock, as water started "coming in somewhere in the boat" and extended the time for moving the vessel.  Trial Tr. Day 2, at 356:4–25; *see id.* at 313:18–314:25 (noting need "to take care of those situations first in order not to flood the ship or cause any damage").  For the reasons described above, such safety concerns and L3Harris' contractual safety obligations excuse BAE's obligation to otherwise make the site available during this limited time period.

Finally, the conclusion that each of the six instances of temporary interruptions to L3Harris' worksite access does not constitute a breach, also finds support in the subcontract's provision noting that the "availability or period of performance listed on this order are approximate and subject to change based on key events, milestones and ongoing movement of the production schedule." Pl.'s Ex. 4, at 1.

**2.     BAE did not breach the implied covenant of good faith and fair dealing or the implied duty to avoid any controlled hindrance of L3Harris' performance.[57]**

"[A]lthough the duty of good faith does not prevent a party from exercising its explicit contractual *rights*, a party may not exercise contractual *discretion* in bad faith, even when such discretion is vested solely in that party." *Va. Vermiculite Ltd. v. W.R. Grace & Co.*, 156 F.3d 535, 542 (4th Cir. 1998). "[T]he elements of a claim for breach of an implied covenant of good faith and fair dealing are (1) a contractual relationship between the parties, and (2) a breach of the implied covenant." *Stoney Glen, LLC v. Southern Bank and Trust Co.*, 944 F. Supp. 2d 460, 466 (E.D. Va. 2013). The two ways in which the duty of good faith and fair dealing may be breached are: "(1) where a party has a clear contract right, even if its exercise would arguably be arbitrary, that party is only forbidden from acting dishonestly; [and] (2) where a party has discretion in performance, that party cannot act arbitrarily or unfairly." *Id.*; *see also Mawyer v. Atlantic Union Bank*, No. 3:21cv726, 2022 WL 1049311, at *5–7 (E.D. Va. Apr. 7, 2022).

Regarding the implied duty to avoid a controlled hindrance of subcontractor performance, this implied duty is sometimes referred to as the prevention doctrine, "a generally recognized

---

[57] Virginia caselaw treats the implied duty to reasonably exercise one's discretion as part and parcel of the implied covenant of good faith and fair dealing. *See Morrison v. Wells Fargo Bank, N.A.*, 30 F. Supp. 3d 449, 455 (E.D. Va. 2014) ("The implied covenant of good faith and fair dealing prohibits a party with valid contractual rights from exercising such rights in bad faith."). Thus, the Court will address these duties together.

principle of contract law according to which if a promisor prevents or hinders fulfillment of a condition to his performance, the condition may be waived or excused." *Moore Bros. Co. v. Brown & Root, Inc.*, 207 F.3d 717, 725 (4th Cir. 2000); *see Parrish v. Wightman*, 34 S.E.2d 229, 232 (Va. 1945) (recognizing the prevention doctrine under Virginia law). The doctrine is most commonly used as a defense, "preclud[ing] the 'preventing party' from recovering 'damages for the resulting nonperformance' by the party prevented or from 'otherwise benefit[ing] from its own wrongful acts.'" *Rastek Constr. & Dev. Corp. v. Gen. Land Comm. Real Estate*, 806 S.E.2d 740, 745–46 (Va. 2017); *see Boggs v. Duncan*, 121 S.E.2d 359, 362–63 (Va. 1961) (holding that where the plaintiffs prevented the defendant from performing, "it necessarily follows that they are not entitled to recover damages [from] the defendant for nonperformance").

The prevention doctrine may also be used affirmatively if there is a showing by the plaintiff of some wrongful act by the defendant that prevented the plaintiff's performance. *Rastek Constr.*, 806 S.E.2d at 749 (holding that to use the doctrine affirmatively, the circumstances must show "a purposeful act or omission that 'wrongfully prevented'" the condition from being satisfied) (internal quotations omitted).

L3Harris contends that BAE breached these implied obligations by failing to timely perform, both in its provision of structural work and delivery of GFM, and by requiring L3Harris to walk the ship to close out WAFs. Pl.'s Mem. 75–83. The Court has already ruled that L3Harris has neither established that BAE did not perform structural work within a reasonable time, nor proven its damages related to any breach by BAE to deliver GFM within a timely manner.[58]

---

[58] At the summary judgment stage, the Court ruled in favor of BAE on L3Harris' claims that BAE breached implied duties to "complete preceding work so that [L3Harris] could proceed timely to complete its work," and "timely deliver BAE-furnished and GFM and equipment." ECF No. 149, at 55–56; Am. Compl. ¶ 136. The Court found that because both claims were expressly covered by the subcontract, "no implied duty ar[ose] with respect to activity governed by express

Therefore, no need exists to revisit these issues. Nor is there evidence to support a finding that BAE committed a purposeful act or omission that wrongfully prevented L3Harris from performing.

This leaves L3Harris' contention that BAE "unreasonably delayed the process for approving [WAFS]," and also "closed out WAFs in an untimely and unreasonable manner, forcing L3Harris to continuously walk the ship and provide the same information numerous times." Trial Tr. Day 1, at 103:16–104:16; Pl.'s Mem. ¶¶ 302, 329. Brewer testified that L3Harris would submit a WAF prior to commencing work to notify BAE and the U.S. Navy about its upcoming work. Trial Tr. Day 1, at 98:17–21. Although asserting that BAE had modified the WAF form to be used on the Vicksburg project, he acknowledged that the WAF was a government form, which L3Harris submitted to BAE, which, in turn, submitted the WAF to the U.S. Navy. *Id.* at 173:20–174:20. As to the delay in approving WAFs at the onset of work, Brewer testified that L3Harris submitted WAFs from the onset of the availability, but it took "upward[s] of a week to two weeks, maybe in some cases a month for them to get approved," which he described as highly unusual because the norm was roughly two to three days. *Id.* at 98:25–99:7, 173:11–14 (confirming that WAFs were

---

contractual terms." *Skillstorm, Inc. v. Electronic Data Systems, LLC*, 666 F. Supp. 2d 610, 620 (E.D. Va. 2009); *see* ECF No. 149, at 55–56; *see also* Pl.'s Ex. 2, § 210 (requiring L3Harris to perform its work in coordination with BAE, other subcontractors, and the U.S. Navy); Pl.'s Ex. 4, at 1 (requiring BAE to provide structural work to L3Harris on an "as-needed basis"). L3Harris' attempt to revive these claims through the remaining implied duties fails, and the Court finds, as it did on summary judgment, that no implied duty exists as to GFM or timely performance of structural work, because these claims are governed by express contractual language. *See Ward's Equip., Inc. v. New Holland N. Am., Inc.*, 493 S.E.2d 516, 520 (Va. 1997) ("[W]hen parties to a contract create valid and binding rights, an implied covenant of good faith and fair dealing is inapplicable to those rights."). Although the subcontract's language did not specify the exact time within which structural work needed to be performed, or GFM delivered, the Court has nonetheless found that BAE had an obligation to complete these tasks within a reasonable and timely manner. Thus, these matters are governed by the express terms of the contract, and no implied duty arises. *See Skillstorm*, 666 F. Supp. 2d at 620.

used on the "front end" to gain access to the vessel and to start work). Brewer explained that this delayed L3Harris and idled its personnel, who could only start work after receiving an approved WAF back from BAE.[59] *Id.* at 99:10–22.

As for WAF closeouts, Brewer testified that L3Harris was "required to walk the ship with a handful of WAFs with a BAE employee, a Ship's Force employee[,] and a United States government employee, which would be a civilian, and walk each item that we submitted the WAF order closed and show them that we did the work." *Id.* at 103:16–20. Brewer explained that L3Harris submitted a CFR for time spent performing this work, because it "was added work" and "[n]ormally when you submit a WAF . . . you don't have to walk every single WAF, prove it to them, that the work was completed." *Id.* at 103:21–104:5; *see id.* at 102:5–11, 175:12–20 (describing L3Harris' obligation as limited to submitting WAFs to BAE for approval); *see* Pl.'s Ex. 81 (May 2023 CFR requesting $194,005.13 for labor costs from November 2022 to April 2023 in walking the ship to close out WAFs). Once again, L3Harris, through Brewer, asserted that BAE possessed the final authority to approve and close out a WAF. Trial Tr. Day 1, at 173:9–20 (testifying that "the final signature on the WAF is [BAE's] WAF coordinator's"). Relative to L3Harris' claim for the costs of walking the Vicksburg to review the status of the work, BAE's Smith indirectly contested Brewer's assertion, testifying that "[i]t was a government decision to

---

[59] The record is murky about who possessed final approval for WAFs submitted as predicates to start work and no WAFs have been received into evidence. Implicit in L3Harris' claim and related CFRs regarding front-end WAFs is that BAE possessed that authority. When this issue arose, however, during events leading up to Change Order 36, the parties agreed that L3Harris would carve out, among other things, front-end WAF approval claims and submit them to the U.S. Navy, implicitly (if not directly) indicating that the U.S. Navy bore responsibility for signing off on the front-end WAFs before L3Harris could start working. Ct.'s Ex. 1, ¶¶ 57–59 (referencing "costs and associated CFRs that were government-caused"), 61. As discussed further below, despite this agreement and Change Order 36's settlement of "any and all claims by L3 directly against BAE through contract completion date of [August 30, 2019]," Pl.'s Ex. 129, L3Harris now asserts that BAE bore responsibility for delays in front-end WAF approvals.

capture what work was complete and not complete, was to walk the WAFs and close the WAFs.").
Trial Tr. Day 4, at 271:3–11; *see id.* at 271:12–14 (noting "the MARMC project team, the
government" requested that L3Harris walk the boat).

The presence of U.S. Navy representatives when walking the Vicksburg leaves the Court
with no doubt that the government initiated the request for L3Harris' to attend. Aside from
verifying completion of the work described on the WAFs, after lengthy delays in refurbishing the
Vicksburg, the U.S. Navy's motives for doing so are unknown. Smith testified, however, that
L3Harris inaccurately reported on the status of its cable installation work and that he "got caught
a couple of times" unknowingly forwarding the same to the U.S. Navy. Trial Tr. Day 4, at 252:14–
254:2.

L3Harris has proven neither that BAE breached the implied covenant of good faith and fair
dealing nor that it intentionally hindered L3Harris' performance. With respect to front-end WAF
submissions through August 30, 2019, L3Harris' claim against BAE with respect to the same are
barred by its settlement of such claims against BAE in Change Order 36. In Change Order 36,
L3Harris and BAE agreed to settle "any and all claims by L3[Harris] against BAE through . . .
[August 30, 2019]." Pl.'s Ex. 129, at 3; Ct.'s Ex. 1, ¶ 67; *see* Trial Tr. Day 1, at 195:17–199:25.
In conjunction with that settlement, L3Harris asserted that the front-end WAF delays were caused
by the government and agreed to submit such claims to the government, with BAE's support. Ct.'s
Ex. 1, ¶¶ 59, 63 (describing them as "Government driven delays and disruption"), 65–66; Pl.'s Ex.
20, at 3. At the same time, L3Harris settled all existing claims against BAE arising through August
30, 2019, including its current claim that BAE bore responsibility for the same front-end WAF
delays it previously attributed to the government. Pl.'s Ex. 129, at 3. Accordingly, its effort to
breathe new life into this claim fails. Similarly, although Brewer testified that the problem of

front-end WAF delays remained "an issue through the whole availability," Trial Tr. Day 1, at 104:9–16, presumably continuing after August 30, 2019, no other reliable evidence exists to substantiate this testimony and it is insufficient to prove L3Harris' claim. Finally, the evidence is also insufficient to establish that BAE, in handling any front-end WAFs, acted arbitrarily, unfairly, or purposely acted or failed to act so as to wrongfully prevent L3Harris from performing. *See Stoney Glen*, 944 F. Supp. at 466; *see also Rastek Constr.*, 806 S.E.2d at 749. Indeed, L3Harris' prior contention that the government bore responsibility for the front-end WAF delays arising before August 30, 2019, buttresses this conclusion.

With respect to the back-end WAFs or WAF close outs, L3Harris' claim also fails in several respects. To start, the subcontract vested both BAE and the U.S. Navy with the authority and discretion to inspect L3Harris' work. In provides:

> BAE . . . and [the U.S. Navy] may inspect all Work at reasonable times and places, including, when practicable, during manufacture and before shipment. BAE . . . shall perform such inspections in a manner that will not unduly delay the Work. [L3Harris] shall provide all information, facilities, and assistance necessary for safe and convenient inspection without additional charge.

Pl.'s Ex. 1, § 25(a). Further, the subcontract also specified that "work items will not be considered completed until all documentation records have been submitted and accepted." Pl.'s Ex. 4, at 2. This comports with Smith's testimony that the purpose of walking the ship was to ensure "that the work that was authorized is completed or noted in a block on that WAF." Trial Tr. Day 4, at 271:6–8.

Accordingly, the subcontract expressly permitted the inspections about which L3Harris complains, and further required L3Harris to provide information, facilities, and assistance needed to enable them to proceed. Contrary to Brewer and Goude's suggestion that L3Harris' work was effectively done upon *submission* of a WAF and pending a signature from BAE, Trial Tr. Day 1,

at 104:1–5; Trial Tr. Day 2, at 248:6–14, the subcontract tied work item completion to both the

submission and acceptance of a WAF. Inasmuch as the U.S. Navy requested L3Harris (and BAE)

to walk the ship to review the work relating to back-end WAFs, BAE reasonably acceded to the

same before finalizing and accepting those WAFs and deeming work items to be completed. BAE

also properly exercised its discretion to conduct such inspections in a reasonable way that did not

"unduly delay" L3Harris' work. The evidence, therefore, fails to support the conclusion that BAE,

in the course of dealing with back-end WAFs, acted arbitrarily, unfairly, or on purpose so as to

prevent L3Harris from completing its work.[60] *See Va. Vermiculite,* 156 F.3d at 542; *see also Stoney*

*Glen,* 944 F. Supp. 2d at 466.

Finally, had L3Harris established BAE's liability with respect to such back-end WAFs, its

claim for $194,005.13 in damages would fail. This is so because L3Harris did not introduce

---

[60] At trial, the Court reserved on BAE's assertion about whether CFR 417C, Pl.'s Ex. 81, was
sufficiently pled within count V to give BAE notice of the claim and damages sought. Trial Tr.
Day 3, at 15:19–23. As L3Harris has failed to prove count V, whether CFR 417C was sufficiently
pled does not bear on the outcome of the case. However, the Court finds that the claim, as pled in
the amended complaint, was sufficient to meet a notice pleading standard. *See United States ex
rel. Elms v. Accenture LLP*, 341 F. App'x 869, 873–74 (4th Cir. 2009) (holding in a case involving
a cost-plus government contract that the plaintiff only needed to satisfy Rule 8's notice pleading
requirements of asserting allegations sufficient to put defendant on notice of the nature of the
claim). The amended complaint specifies that L3Harris submitted CFR 417C, and that "[l]ike
category No. 7," the "CFR resulted from L3Harris requiring additional close out efforts above and
beyond the [c]ontract requirements." Am. Compl. ¶¶ 87–88. Category 7 was pled in count V, and
CFR 417C concerns close out work that is similar to the claims underlying the CFRs that were
pled in count V, and unlike the claim pled in count II. Moreover, CFR 015C, like CFR 417C,
discusses claims regarding WAFs. *See* Pl.'s Ex. 182. As CFR 015C was pled as a part of category
6 within count V, BAE had additional notice of the nature of L3Harris' claim. And finally, the
total damages L3Harris sought in count V, $3,252,999.53, is a sum of each of the damage
categories pled as a part of the count, in addition to the $194,005.13 L3Harris alleged as additional
costs discussed in CFR 417C. Am. Compl. ¶¶ 87–89, 144.

evidence to explain the basis for Goude's calculation for the $194,005.13. *See* Trial Tr. Day 3, at

3:11–23:13. Accordingly, L3Harris has not carried its burden as to count V.[61]

## IV.   CONCLUSION

As set forth above, the Court makes the following findings:

- **Count I** – The Court finds that L3Harris has proven its constructive acceleration claim in count I and awards partial damages of **$5,757.06**.

- **Count II** – The Court finds that L3Harris has failed to prove its constructive change claim for alleged out-of-scope structural support work.

- **Count IV** – The Court finds that L3Harris has failed to prove that BAE breached its performance obligation providing structural work. The Court finds that BAE breached its obligation to timely deliver GFM on some occasions, but that L3Harris has failed to prove its damages.

- **Count V** – The Court finds that L3Harris has failed to prove breach of contract predicated on certain implied duties.

Therefore, BAE is **ORDERED** to pay damages to L3Harris of **$5,757.06**.

---

[61] In count V, L3Harris also seeks damages for added management and administration costs due to the subcontract's extension from seven months to over five years. Am. Compl. ¶¶ 74–79; *see* Pl.'s Ex. 23, at 6–7 (November 2022 REA alleging that L3Harris spent ███ additional hours related to administration and management on the subcontract, and seeking compensation of $1,564,491.60). These damages were initially pled as part of count III, and in count V in the alternative. Am. Compl. 18–20. Summary judgment was granted in favor of BAE as to count III, and therefore these administrative and management costs only survived to trial through count V. Because L3Harris has failed to prove that BAE was liable for breach of any implied duties, the Court finds that L3Harris is not entitled to any compensation for this category of damages. Moreover, as stated above, the subcontract's absence of a suspension of work clause prohibits L3Harris from asserting its increased administrative and management costs as a delay claim. ECF No. 32, at 12.

The Clerk is **DIRECTED** to forward a copy of this opinion and order to all counsel of record.

      **IT IS SO ORDERED.**

_____

Robert J. Krask
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
October 21, 2024